# 23-1005

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

BLOOMBERG L.P. AND DOW JONES & COMPANY, INC.
*Plaintiffs-Appellants,*

v.

UNITED STATES POSTAL SERVICE
*Defendant-Appellee.*

*On appeal from the United States District Court
for the Southern District of New York*

## BRIEF OF PLAINTIFFS-APPELLANTS BLOOMBERG L.P.
## AND DOW JONES & COMPANY, INC.

Katie Townsend
   *Counsel of Record*
Adam A. Marshall
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Ste. 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
ktownsend@rcfp.org
amarshall@rcfp.org

## CORPORATE DISCLOSURE STATEMENTS

Bloomberg L.P., the publisher of Bloomberg News, is a limited partnership. Its general partner is Bloomberg Inc., which is privately held. No publicly held corporation owns 10% or more of Bloomberg L.P.'s limited partnership interests.

Dow Jones & Company, Inc. ("Dow Jones") is an indirect subsidiary of News Corporation, a publicly held company. Ruby Newco, LLC, an indirect subsidiary of News Corporation and a non-publicly held company, is the direct parent of Dow Jones. News Preferred Holdings, Inc., a subsidiary of News Corporation, is the direct parent of Ruby Newco, LLC. No publicly traded corporation currently owns 10% or more of the stock of Dow Jones.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS........................................ii

TABLE OF AUTHORITIES ....................................................v

JURISDICTIONAL STATEMENT ........................................... 1

ISSUE PRESENTED ...................................................... 1

STATEMENT OF THE CASE ............................................. 1

SUMMARY OF THE ARGUMENT ........................................ 7

STANDARD OF REVIEW ................................................13

ARGUMENT ...............................................................13

    I.  USPS is unlawfully withholding the COA data sought by
        Requesters; 39 U.S.C. § 410(c)(2) does not apply. ......................13

        A.  The requested COA data is not "of a commercial
            nature[.]".............................................................15

            i.  Records must be inherently commercial to fall within
                 the scope of 39 U.S.C. § 410(c)(2)........................................15

            ii.  The COA data sought by Requesters is not "of a
                 commercial nature[.]"............................................21

            iii. USPS's planned or actual sale of some COA data does
                 not render it "of a commercial nature[.]" ...........................22

        B.  USPS did not—and cannot—demonstrate that COA data
            would not be publicly disclosed "under good business
            practice[.]".............................................................24

            i.  USPS submitted no evidence to show that businesses
                 normally would not publicly disclose migration data
                 like the requested COA data.............................................25

ii.  The record contains ample evidence that private
     businesses publicly disclose migration data. ......................26

II. USPS's position, if accepted, would make key government
    data inaccessible to the public and unusable by members of
    the press. ..................................................................................38

    A.  USPS unilaterally cut off access to COA data for two
        years; it now seeks to permanently block access to certain
        data previously available to the public under FOIA. ...............39

    B.  USPS's pricing and "licensing" restrictions for COA data
        are inconsistent with FOIA and jeopardize public interest
        reporting. ....................................................................................42

    C.  USPS's theory, if accepted, would allow the agency to
        stymie access to important records under FOIA. ....................45

CONCLUSION ...........................................................................................48

CERTIFICATE OF COMPLIANCE ........................................................50

# TABLE OF AUTHORITIES

## Cases

*A. Michael's Piano, Inc. v. FTC*,
  18 F.3d 138 (2d Cir. 1994) ...................................................... 13, 14, 26

*Airline Pilots Ass'n, Int'l v. U.S. Postal Serv.*,
  No. 03-CV-2384, 2004 WL 5050900 (D.D.C. June 24, 2004) ......... 21, 22

*Am. Airlines, Inc. v. Nat'l Mediation Bd.*,
  588 F.2d 863 (2d Cir. 1978) ................................................................ 16

*Am. Oversight v. U.S. Postal Serv.*,
  No. 20-CV-2580, 2021 WL 4355401 (D.D.C. Sept. 23, 2021) ......... 38, 47

*Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*,
  742 F. Supp. 2d 76 (D.D.C. 2010) ................................................. 20, 22

*Assocs. Against Outlier Fraud v. Huron Consulting Grp., Inc.*,
  817 F.3d 433 (2d Cir. 2016) ................................................................ 23

*Bloomberg L.P. v. U.S. Postal Serv.*,
  No. 22CV6112 (DLC), 2023 WL 3976010
  (S.D.N.Y. June 13, 2023) ....................................................................... 7

*Carlson v. U.S. Postal Serv.*,
  504 F.3d 1123 (9th Cir. 2007) ...................................................... *passim*

*CIA v. Sims*,
  471 U.S. 159 (1985) ............................................................................. 14

*Citizens for Resp. & Ethics in Wash. v. U.S. Postal Serv.*,
  557 F. Supp. 3d 145 (D.D.C. 2021) ...................................................... 47

*Dep't of Air Force v. Rose*,
  425 U.S. 352 (1976) ............................................................................. 13

*Dorsey & Whitney LLP v. U.S. Postal Serv.*,
  402 F. Supp. 3d 598 (D. Minn. 2019) ...................................... 11, 25, 35

*Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*,
  443 U.S. 340 (1979) ............................................................................40

*Florez v. CIA*,
  829 F.3d 178 (2d Cir. 2016) ...............................................................13

*Goland v. CIA*,
  607 F.2d 339 (D.C. Cir. 1978) ............................................................47

*N.Y. Times Co. v. Dep't of Justice*,
  756 F.3d 100 (2d Cir. 2014) ...............................................................46

*N.Y. Times Co. v. Dep't of Health & Hum. Servs.*,
  15 F.4th 216 (2d Cir. 2021) ................................................................13

*Nat'l Archives & Recs. Admin. v. Favish*,
  541 U.S. 157 (2004) .......................................................................42, 43

*Nat'l W. Life Ins. Co. v. United States*,
  512 F. Supp. 454 (N.D. Tex. 1980) .........................................19, 20, 22

*New York v. Dep't of Justice*,
  951 F.3d 84 (2d Cir. 2020) .................................................................15

*NLRB v. Robbins Tire & Rubber Co.*,
  437 U.S. 214 (1978) ............................................................................13

*Reid v. U.S. Postal Serv.*,
  No. 05-CV-294, 2006 WL 1876682 (S.D. Ill. July 5, 2006) ...........20, 22

*United States v. Dauray*,
  215 F.3d 257 (2d Cir. 2000) ...............................................................46

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
  127 F. Supp. 3d 156 (S.D.N.Y. 2015) ..................................................29

*Wickwire Gavin, P.C. v. U.S. Postal Serv.*,
  356 F.3d 588 (4th Cir. 2004) .......................................................*passim*

*Wilner v. Nat'l Sec. Agency*,
  592 F.3d 60 (2d Cir. 2009) .................................................................26

*Yanofsky v. Dep't of Commerce*,
  306 F. Supp. 3d 292 (D.D.C. 2018) ......................................................43

**Statutes**

28 U.S.C. § 1291................................................................................ 1

28 U.S.C. § 1331................................................................................ 1

39 U.S.C. § 101(a) ............................................................................ 9

39 U.S.C. § 410(c)(2) ...........................................................*passim*

5 U.S.C. § 552...............................................................................1, 7

5 U.S.C. § 552(a)(4) ...............................................................1, 25, 42

5 U.S.C. § 552(a)(6) ...............................................................40, 42

5 U.S.C. § 552(b)(3) ...........................................................*passim*

5 U.S.C. § 552(b)(4) ...........................................................16

**Other Authorities**

*2020 Allied Van Lines State Magnet Report*, Allied,
  https://perma.cc/82HT-VDAB (last accessed Jan. 4, 2023) .................30

*2021 Allied x Zillow Magnet States Report*, Allied,
  https://www.allied.com/migration-map,
  https://perma.cc/3KW5-PUVV (last accessed Dec. 14, 2022).........29, 30

Barry Sullivan, *FOIA and the First Amendment: Representative
  Democracy and the People's Elusive "Right to Know"*,
  72 Md. L. Rev. 1 (2012) ......................................................48

*Commercial*, Black's Law Dictionary (11th ed. 2019) ...................15, 22

*Commercial*, Merriam Webster,
  https://www.merriam-webster.com/dictionary/commercial
  (last updated Oct. 8, 2023)................................................15

Dana Anderson, *Homebuyers Are Looking to Relocate to Affordable Areas–Especially in Florida–Amid High Rates, Prices*, Redfin (Nov. 29, 2022), https://perma.cc/9FQW-QE6W ....................................................32, 33

Data for Good, Meta, https://dataforgood.facebook.com/dfg/tools (last accessed Oct. 16, 2023) ................................................................34

Freedom of Information Act Source Book: Legislative Materials, Cases, Articles, Subcomm. on Administrative Practice and Procedure of the Committee on the Judiciary (1974), https://perma.cc/TFV9-JYNC........................................................47, 48

Giovanni Bonaccorsi et al., *Socioeconomic differences and persistent segregation of Italian territories during COVID-19 pandemic*, Scientific Reports (Oct. 27, 2021), https://www.nature.com/articles/s41598-021-99548-7 ........................34

Jeff Tucker, *U.S. Movers Continued to Seek Affordability in 2021, but in Different Areas*, Zillow (Dec. 20, 2021), https://perma.cc/ZH23-9RX8........................................................31, 32

Marie Patino et al., *More Americans Are Leaving Cities, But Don't Call It an Urban Exodus*, Bloomberg (Apr. 26, 2021), https://bloom.bg/3M7fu05 ...........................................................2, 9, 43

Memorandum from Merrick Garland to Heads of Executive Departments and Agencies (Mar. 15, 2022), https://www.justice.gov/media/1212566/dl?inline ...............................41

Memorandum from Peter Orszag to Heads of Executive Departments and Agencies (Dec. 8, 2009), https://perma.cc/8PBU-GMVP..........................................................41

*Nature*, Merriam Webster, https://www.merriam-webster.com/dictionary/nature (last updated Oct. 6, 2023)....................................................................16

*Nature*, Am. Heritage Dictionary (5th ed. 2022), https://www.ahdictionary.com/word/search.html?q=nature ...............16

U.S. Postal Service Freedom of Information Act (FOIA) Report for
  Fiscal Year 2021, U.S. Postal Serv.,
  https://perma.cc/EP8N-H2BW (last accessed Sept. 20, 2023) .............46

*Use location targeting*, Meta,
  https://www.facebook.com/business/help/365561350785642?id=1
  76276233019487 (last accessed Oct. 16, 2023) ...................................34

*Workforce Report December 2022, New York City*,
  LinkedIn (Dec. 1, 2022),
  https://perma.cc/N32L-877T .................................................27, 28, 29

Yan Wu & Luis Melgar, *Americans Up and Moved During the
  Pandemic. Here's Where They Went.*,
  Wall St. J. (May 11, 2021),
  https://on.wsj.com/3NgWCx2 .......................................................3, 9, 43

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this matter pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331. On June 13, 2023, the district court issued an opinion and order granting summary judgment for Defendant-Appellee United States Postal Service ("USPS") and denying summary judgment for Plaintiffs-Appellants Bloomberg L.P. ("Bloomberg") and Dow Jones & Company, Inc. ("Dow Jones") (collectively, the "Requesters"). JA181. Final judgment was entered for USPS on June 14, 2023. JA196. Requesters timely appealed on July 7, 2023. JA197. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUE PRESENTED

Whether change-of-address ("COA") data requested by Bloomberg and Dow Jones pursuant to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA" or the "Act"), was lawfully withheld by USPS under FOIA Exemption 3 and 39 U.S.C. § 410(c)(2).

## STATEMENT OF THE CASE

When individuals, families, and businesses move, they notify USPS of a temporary or permanent change to their mailing address by filing an online change-of-address request or by filling out a physical mail

1

forwarding order. JA029 ¶ 8. Until recently, USPS provided aggregate "to" and "from" change-of-address ("COA") data in response to FOIA requests submitted by Requesters and others—data that made possible invaluable reporting.

COA data previously released by USPS pursuant to FOIA fueled, for example, groundbreaking reporting by Bloomberg CityLab that shed light on the movement of Americans during the COVID-19 pandemic. *See* Marie Patino et al., *More Americans Are Leaving Cities, But Don't Call It an Urban Exodus*, Bloomberg (Apr. 26, 2021), https://bloom.bg/3M7fu05. Bloomberg reporters examined how "[d]ense core counties of major U.S. metro areas saw a net decrease in flow into the city, while other suburbs and some smaller cities saw net gains." *Id.* (reporting, *inter alia*, that "[t]he regions around San Francisco and San Jose, two of the country's most expensive housing markets, saw the rates of permanent moves increase the most, by more than 23% and 17% respectively, compared to 3% nationally"). Similarly, *The Wall Street Journal* (the "*Journal*"), published by Dow Jones, used COA data provided in response to FOIA requests to report on the more than seven million households that moved to a different county between the start of the pandemic and May 2021.

2

*See* Yan Wu & Luis Melgar, *Americans Up and Moved During the Pandemic. Here's Where They Went.*, Wall St. J. (May 11, 2021), https://on.wsj.com/3NgWCx2. Access to that COA data enabled *Journal* reporters to delve into residents' flight from New York County, which includes Manhattan, to neighboring New Jersey, and from California cities like Los Angeles and San Francisco to mountain states and the Southwest. *See id.*

To continue informing the public about how the pandemic and other factors have affected migration patterns across the United States, in 2021, Bloomberg and Dow Jones submitted FOIA requests (the "Requests") to USPS—as they had previously—for certain COA data. JA114 ¶ 2; JA127 ¶ 2. Specifically, their Requests sought aggregate change-of-address data reflecting net-flows of businesses and residents to and from jurisdictions across the United States for December 2020, and for January 2021 through June 2021. JA030 ¶ 12; JA033 ¶ 20. The Requests did not seek any personal information or individualized data; rather, they sought aggregate numbers of moves to and from specific counties or ZIP codes—the same type of data that USPS had previously provided in response to FOIA requests. JA125; JA136.

This time, however, USPS denied the Requests citing FOIA Exemption 3, 5 U.S.C. § 552(b)(3), in conjunction with 39 U.S.C. § 410(c)(2) ("Section 410(c)(2)"). JA031–32 ¶ 17; JA033 ¶ 22. It asserted that the COA data requested by Bloomberg and Dow Jones was "under development for a commercial product." JA045 (denial of Dow Jones request); *see also* JA059 (denial of Bloomberg request).

In denying the Requests, USPS noted that some COA data is published on its website. JA044; JA059. That data, however, differs in key ways from the data sought by the Requests (and from the COA data USPS previously released to Requesters). The COA data sought by the Requests includes both permanent and temporary moves, and breaks those moves down as between specific ZIP codes or counties. By way of example, the following are two rows of county-level COA data that Dow Jones previously received from USPS in response to a FOIA request:

| YYYYMM | Old County | Old State | New County | New State | Total Perm | Total Temp |
|---|---|---|---|---|---|---|
| 202005 | DISTRICT OF COLUMBIA | DC | PHILADELPHIA | PA | 36 | 0 |
| 202005 | PHILADELPHIA | PA | DISTRICT OF COLUMBIA | DC | 48 | 0 |

JA137. This data shows that in May 2020, 36 residential COA forms were submitted for moves from the District of Columbia to Philadelphia County, Pennsylvania, and 48 residential forms were submitted for

moves from Philadelphia to Washington, D.C. during that same time period.

The COA data USPS posts on its website, on the other hand, shows only the number of change-of-address forms filed for a particular ZIP code; it does not (1) distinguish between temporary and permanent moves, and (2) does not provide the ZIP codes or counties that residents moved to or from. JA029–30 ¶¶ 9–10.

Requesters administratively appealed the denials of their Requests; those administrative appeals were denied. JA046–55; JA061–73. Requesters initiated this lawsuit on July 18, 2022. JA005. Thereafter, the parties cross-moved for summary judgment on the issue of whether Exemption 3 and 39 U.S.C. § 410(c)(2) apply to the COA data sought by the Requests. JA182.

On May 12, 2023—while this lawsuit was pending and more than two years after Bloomberg's FOIA request was denied—USPS launched its "Population Mobility Trends product" (hereinafter the "PMT"). JA141. The PMT allows a licensed user to purchase some—but not all—COA data, which is combined with demographic data, such as median age, income, and household size. JA148. Only forms of the top three

to/from ZIP codes are included in the data available for purchase through the PMT. JA149. For example, for COA moves out of ZIP code 90210 in California, the PMT would only provide the "top three" ZIP codes for destinations (a) within the county, (b) within California but outside the county, and (c) outside the state (for a maximum total of nine ZIP codes). *See id.* However, the PMT does not provide any ZIP codes with fewer than 11 COA requests. *Id.*

PMT data is licensed for a particular time period at rates that are set by USPS. According to the PMT's "Order Form," a license for 12 months of data at the "Limited" level costs $120,000. JA161. A license for 48 months-worth of data at the "Enterprise" level costs $277,000. *Id.*

A PMT licensee must agree to conditions and restrictions imposed by USPS before they can access the product. PMT's sample "Data License Agreement" contains numerous restrictions. *See* JA163–80. For example, most of the licensing "tiers" do not allow for publication of PMT data. JA177. The two "tiers" that do allow for public disclosure restrict publications to showing "highlights," prohibiting, among other things, "[i]nteractive applications or visualizations that expose underlying data[.]" JA178–79. A licensee of PMT must also agree that USPS has

6

the right "to examine such books and records in [the l]icensee's possession or under its control with respect to the subject matter and terms of th[e license a]greement[.]"  JA171.

On June 13, 2023, the district court issued an opinion and order granting USPS's motion for summary judgment and denying Requesters' motion for summary judgment.  JA195; *see also Bloomberg L.P. v. U.S. Postal Serv.*, No. 22CV6112 (DLC), 2023 WL 3976010 (S.D.N.Y. June 13, 2023).  The district court held that in light of USPS's launch of the PMT, the COA data requested by Bloomberg and Dow Jones pursuant to FOIA was "of a commercial nature" within the meaning of 39 U.S.C. § 410(c)(2), JA190–92, and that it would not be publicly disclosed under good business practice, JA193–94.  Requesters timely appealed.  JA197.

## SUMMARY OF THE ARGUMENT

This case turns on a question of first impression in this Circuit with significant ramifications for the public's right to access government data under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA" or the "Act"):  Does 39 U.S.C. § 410(c)(2) authorize USPS to deny FOIA requests for government data—data it previously made available to the press and public—merely because the agency has plans to make some (but not all)

7

of the requested data available (with restrictions on its use) pursuant to "licenses" that are prohibitively expensive to obtain?  The district court, below, answered that question in the affirmative.  This Court should reverse.  USPS's denial of the FOIA requests submitted by Plaintiffs-Appellants Bloomberg and Dow Jones is incompatible with the plain text of Section 410(c)(2) and persuasive caselaw from the only federal court of appeals to interpret that provision.  If affirmed, it would place large swaths of important government data beyond the public's reach, effectively allowing USPS to withhold any records it wants under FOIA.

Pursuant to FOIA, Bloomberg and Dow Jones requested certain change-of-address data; namely, the aggregate number of individuals, families, and businesses that submitted a form to USPS to change their mailing address to or from ZIP codes and counties across the country.  Put another way, the COA data sought by Requesters would show, for example, the total number of change-of-address forms submitted during a certain time period that reflected a move from ZIP code A to ZIP code B.  Such data is collected by USPS so that it can perform its statutory mission, which is to provide "postal services" to the American people.  39 U.S.C. § 101(a).

8

In the past, USPS released COA data in response to FOIA requests. Indeed, Bloomberg's *CityLab* and *The Wall Street Journal*, published by Dow Jones, used COA data from USPS to inform the public about new migration patterns within the United States spurred by the COVID-19 pandemic. *See* Marie Patino et al., *More Americans Are Leaving Cities, But Don't Call It an Urban Exodus*, *supra*; Yan Wu & Luis Melgar, *Americans Up and Moved During the Pandemic. Here's Where They Went.*, *supra*. But the agency abruptly changed its position some time in 2021, when it denied the FOIA requests at issue in this case on the ground that it had plans to develop a "product" that would make (some) COA data available for sale. According to USPS, because it had decided to attempt, at some point in the future, to make certain COA data available pursuant to a license agreement for a fee, it was now empowered to withhold any and all COA data requested under FOIA pursuant to 39 U.S.C. § 410(c)(2). That statute provides that while USPS is subject to FOIA, the agency need not release under the Act "information of a commercial nature" that "under good business practice would not be publicly disclosed[.]" 39 U.S.C. § 410(c)(2).

9

USPS's argument is wrong. As an initial matter, neither prong of Section 410(c)(2) is satisfied with respect to the COA data sought by Requesters. First, the plain text of that statutory provision makes clear that in order for it to apply the information in question must be "of a commercial nature"—*i.e.*, inherently commercial. *See id.* The COA data sought by Requesters—aggregate numbers of households and businesses that moved to and from counties and ZIP codes—is not in and of itself "commercial" in "nature." *Id.* And USPS cannot transform that data into "commercial" information within the meaning of Section 410(c)(2) simply by deciding to try and sell it. As the Ninth Circuit has concluded, interpreting "of a commercial nature" to encompass anything that may have commercial "value" is simply "too broad a definition[.]" *Carlson v. U.S. Postal Serv.*, 504 F.3d 1123, 1129 (9th Cir. 2007). Information must be "of 'a commercial nature' *in the first instance*." *Id.* (emphasis added). For that reason, alone, Section 410(c)(2) is inapplicable.

The second requirement of Section 410(c)(2)—that the information at issue would not be publicly disclosed "under good business practice"—is also not met. That inquiry looks to what other businesses, in fact, do. *See, e.g.*, *Wickwire Gavin, P.C. v. U.S. Postal Serv.*, 356 F.3d 588, 594 (4th

10

Cir. 2004); *Dorsey & Whitney LLP v. U.S. Postal Serv.*, 402 F. Supp. 3d 598, 603 (D. Minn. 2019). But here, USPS, which bears the burden of proving that Section 410(c)(2) applies, failed to introduce any evidence to show that the type of data at issue here is not publicly disclosed "under good business practice." Conversely, Requesters provided evidence of numerous private companies that, like USPS, collect migration data in connection with their business activities and disclose aggregated data to the public for free. Accordingly, the second prong of Section 410(c)(2) is also not satisfied. For that independent reason, too, Section 410(c)(2) is inapplicable here.

USPS's reliance on Section 410(c)(2) to withhold the COA data sought by Requesters also should be rejected because, if it is accepted, the practical consequences for the ability of the press and public to access government data would be grave. USPS's theory would bestow the agency with unilateral power to deny access to any record under FOIA simply by claiming it will "license" access to it at some unspecified point in the future. Indeed, USPS denied access to the COA data sought here even though its PMT "product" would not launch for more than two years. At the time, the agency could not even say when the PMT would launch,

11

simply denying access on the basis that it was forthcoming at some time.

Even though the PMT has now launched, it *does not* include all of the data that Requesters seek; rather, it only provides access to a sliver of the requested COA data—various formulations of "top three" ZIP codes. Thus, even setting aside the fact that providing government data only to those who can afford "licenses" that cost hundreds of thousands of dollars will make that data effectively inaccessible, USPS maintains that the public has no right, whatsoever, to access a huge swath of government data that is not even part of its "product." Moreover, the little data that can be licensed (again, for hundreds of thousands of dollars) contains use restrictions imposed by USPS which will inhibit, if not outright prevent, reporting in the public interest. Simply put, the position taken by USPS in this litigation is contrary to the very purpose of FOIA, which is to ensure that government records are available to the public, and to limit an agency's ability to decide what government information the public is allowed to have.

For the reasons set forth herein, this Court should reverse the decision of the district court below and remand this matter with instructions to enter an order granting Requesters' cross-motion for

summary judgment.

## STANDARD OF REVIEW

This Court reviews orders granting summary judgment in FOIA cases *de novo*. *N.Y. Times Co. v. Dep't of Health & Hum. Servs.*, 15 F.4th 216, 219 (2d Cir. 2021); *Florez v. CIA*, 829 F.3d 178, 182 (2d Cir. 2016). "The burden of proof, upon such review, rests with the agency asserting the exemption, with doubts resolved in favor of disclosure." *A. Michael's Piano, Inc. v. FTC*, 18 F.3d 138, 143 (2d Cir. 1994).

## ARGUMENT

### I. USPS is unlawfully withholding the COA data sought by Requesters; 39 U.S.C. § 410(c)(2) does not apply.

FOIA was enacted to create an enforceable, statutory right of "access to official information long shielded unnecessarily from public view[.]" *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (citation omitted). Passed with the purpose of ensuring "an informed citizenry," *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978), the Act starts with "a general philosophy of full agency disclosure[,]" *Rose*, 425 U.S. at 360 (citation omitted). Accordingly, "any member of the public is entitled to have access to any record maintained by a federal agency, unless that record is exempt from disclosure under one of the Act's nine

exemptions." *A. Michael's Piano*, 18 F.3d at 143.

FOIA Exemption 3 applies to agency records that are "specifically exempted from disclosure by statute" if two criteria are satisfied. 5 U.S.C. § 552(b)(3). First, the statute invoked must qualify as an Exemption 3 statute. *A. Michael's Piano*, 18 F.3d at 143 (citing *CIA v. Sims*, 471 U.S. 159, 167 (1985)). Second, the information in question must fall within the scope of that statute. *Id.*

In denying the FOIA requests at issue in this case, USPS invoked Exemption 3 and a provision of the Postal Reorganization Act of 1970: 39 U.S.C. § 410(c)(2).[1] Section 410(c)(2) states that while USPS is subject to the requirements of FOIA, USPS is not required to disclose:

> information of a commercial nature, including trade secrets, whether or not obtained from a person outside the Postal Service, which under good business practice would not be publicly disclosed[.]

*Id.* There are thus two independent requirements that must both be satisfied for USPS to withhold information pursuant to Section 410(c)(2): the information (A) must be "of a commercial nature," which (B) would

---

[1]    Requesters do not contest that Section 410(c)(2) qualifies as an Exemption 3 statute when it is properly invoked. As detailed herein, however, Section 410(c)(2) is inapplicable to the COA data at issue.

14

not be publicly disclosed "under good business practice[.]" *Id.* Neither requirement is satisfied here.

### A. The requested COA data is not "of a commercial nature[.]"

> i. *Records must be inherently commercial to fall within the scope of 39 U.S.C. § 410(c)(2).*

This Court has not had occasion to interpret 39 U.S.C. § 410(c)(2), and the terms therein are not defined elsewhere in FOIA or the Postal Reorganization Act of 1970. That said, proper interpretation of the provision's first requirement—that information be "of a commercial nature"—is informed by the plain meaning of those terms, as reflected in dictionary definitions. *Cf. New York v. Dep't of Justice*, 951 F.3d 84, 106 (2d Cir. 2020) (a word that is not statutorily defined is "properly construed according to its contemporary dictionary definition").

"Commercial" means "[o]f, relating to, or involving the buying and selling of goods[,] *Commercial*, Black's Law Dictionary (11th ed. 2019), or "occupied with or engaged in commerce or work intended for commerce," *Commercial*, Merriam Webster, https://www.merriam-webster.com/dictionary/commercial (last updated Oct. 8, 2023). This Court has similarly interpreted "commercial" in the context of FOIA Exemption 4 to mean "pertaining or relating to or dealing with

15

commerce." *Am. Airlines, Inc. v. Nat'l Mediation Bd.*, 588 F.2d 863, 870 (2d Cir. 1978).[2] "Nature," in turn, means "the inherent character or basic constitution . . . of a person or thing[,]" *Nature*, Merriam Webster, https://www.merriam-webster.com/dictionary/nature (last updated Oct. 6, 2023), or the "set of inherent characteristics or properties that distinguish something[,]" *Nature*, Am. Heritage Dictionary (5th ed. 2022), https://www.ahdictionary.com/word/search.html?q=nature. Thus, with these definitions taken together, for information to be "of a commercial nature," it must inherently relate to the buying or selling of goods.[3]

The only federal court of appeals to have considered what is meant by the phrase "of a commercial nature" in Section 410(c)(2) is the Ninth

---

[2]     The text of Section 410(c)(2) differs meaningfully from the text of Exemption 4, which applies to "trade secrets and commercial or financial information obtained from a person and privileged or confidential[.]" 5 U.S.C. § 552(b)(4).

[3]     Although this Court's review is *de novo*, it bears noting that the district court erred when it stated that Requesters were attempting to graft a non-textual "inherent" requirement onto Section 410(c)(2). *See* JA192 (stating Requesters seek "to add a limitation to the statutory language that does not appear in the statute"). The district court's conclusion ignores the word "nature" in the statute. *Compare id.*, *with* 39 U.S.C. § 410(c)(2).

Circuit in *Carlson v. U.S. Postal Service*, 504 F.3d 1123 (9th Cir. 2007).[4]

*Carlson* involved USPS's invocation of Exemption 3 and 39 U.S.C. §

410(c)(2) to withhold the names, addresses, phone numbers, business

hours, and final collection times for outgoing mail for every post office in

the United States. *Id.* at 1125. That information was made available to

the public by USPS via a page on its website—Find My Post Office™—

but the requester sought an electronic copy of the underlying data. *See*

*id.* USPS argued that it was not required to disclose that data in

response to a FOIA request, because Find My Post Office™ was

> one of the most popular pages on the [USPS's] web site,
> attracting approximately 750,000 hits monthly. In internet
> commerce, the ability to draw hits is a measure of the success
> of the web site. Thousands of users are drawn to [USPS's] web
> site by the Post Office Locator web page, and the [USPS]
> would prefer to retain customers at its web site.

---

[4]     The only other federal court of appeals' decision to consider Section
410(c)(2) at all is *Wickwire Gavin, P.C. v. U.S. Postal Service*, 356 F.3d
588 (4th Cir. 2004). At issue in that case were spreadsheets detailing
quantity and pricing information in a contract between USPS and a
successful bidder for a mailing supplies contract that outlined a Postal
Service program to sell packaging materials. *Id.* at 598–90. The plaintiff
in that case conceded that the information sought was "of a commercial
nature." *See id.* at 594 (arguing only that "a finding of competitive harm
is necessary for USPS to invoke Exemption 3"). Accordingly, the Fourth
Circuit did not address the issue.

*Id.* USPS advanced other arguments, as well, including that "release of the requested information could cause 'mirror' websites, which could [] reduce USPS product sales[.]" *Id.*

The Ninth Circuit rejected USPS's arguments. Surveying ordinary dictionary definitions, the court concluded that while "[m]ail service may be essential to commerce and trade," "information concerning the names, addresses, telephone numbers, and regular business hours of post offices, is not commercial information." *Id.* at 1129. While USPS had argued that "the requested information concerning post offices is commercial because it has value," the court determined that was "too broad a definition of commercial," because Section 410(c)(2) requires "that the information be of 'a commercial nature' *in the first instance*." *Id.* (emphasis added).

The decision in *Carlson* provides three useful guideposts. First, it endorses a common-sense, dictionary definition-supported interpretation of the phrase "of a commercial nature," requiring data to be inherently commercial to satisfy the first prong of Section 410(c)(2). *See id.* Second, it recognizes that even though the "[m]ail service" provided by USPS is an important part of "commerce and trade," *id.*, that does not make all

18

data about (or connected in any way to) USPS operations inherently commercial. *See id.* Third, the decision confirms that potential downstream uses of USPS information or data—including arguments that it has "value"—cannot bring such information within the scope of the statute. *See id.* These limitations on the scope of Section 410(c)(2) are crucial: without them, the statute would potentially swallow *all* USPS records and information. That would be inconsistent with Exemption 3's standards, which require that a proper withholding statute establish "*particular criteria* for withholding or refers to *particular types* of matters to be withheld[.]" 5 U.S.C. § 552(b)(3) (emphasis added).

Similarly, the U.S. District Court for the Northern District of Texas, in a decision that predates *Carlson*, found that a "list of names and duty stations" of USPS employees did not constitute information "of a commercial nature" under Section 410(c)(2). *See Nat'l W. Life Ins. Co. v. United States*, 512 F. Supp. 454, 462 (N.D. Tex. 1980). The district court held that such information "is not in itself *intrinsically* economic or financial information," *id.* at 459 (emphasis added), and it rejected USPS's argument that the "nature of commercial information must be

determined by the purpose to which the information may be put by the requesting party[,]" *id.* at 459–60. Thus, like the Ninth Circuit in *Carlson*, the district court looked to the nature of the information requested, not its potential downstream use, to determine whether it qualified.

Courts have, conversely, upheld USPS's withholding of records under Section 410(c)(2) where the information at issue was clearly "of a commercial nature" because it went to the heart of USPS's business operations. For example, records concerning "lump-sum bonus and salary increases" for USPS employees "based on individual, unit and corporate performance indicators devised by the Postal Service[,]" were found to be "of a commercial nature" and exempt from disclosure. *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 742 F. Supp. 2d 76, 81 (D.D.C. 2010). Other types of inherently commercial information held to satisfy the first requirement of Section 410(c)(2) include financial reports and the details of contracts between USPS and third parties. *See, e.g.*, *Reid v. U.S. Postal Serv.*, No. 05-CV-294, 2006 WL 1876682 (S.D. Ill. July 5, 2006) (vacated in part on other grounds) (allowing USPS to withhold the postage rate it charges mailers and certain financial

reports); *Airline Pilots Ass'n, Int'l v. U.S. Postal Serv.*, No. 03-CV-2384, 2004 WL 5050900 (D.D.C. June 24, 2004) (permitting USPS to withhold key terms of a contract between it and Federal Express including rate and pricing information).

   ii.  *The COA data sought by Requesters is not "of a commercial nature[.]"*

Bloomberg and Dow Jones requested county- and ZIP-code-level aggregate COA data showing where households and businesses in the United States moved to and from (both permanently and temporarily). JA116, JA125; JA129, JA136. The example above, *supra* p. 4, shows county-level data; the following example is taken from ZIP code-level data that Bloomberg previously obtained from USPS under FOIA:

| YYYYMM | Old Zip | New Zip | Perm Total | Temp Total |
|---|---|---|---|---|
| 201901 | 00602 | 00602 | 18 | 0 |
| 201901 | 00612 | 00612 | 17 | 1 |
| 201901 | 00617 | 00617 | 13 | 0 |

JA126.

Whether county-level or ZIP code-level, such data is not "of a commercial nature" within the meaning of 39 U.S.C. § 410(c)(2). There is nothing about this data that "involv[es] the buying and selling of goods[.]" *Commercial*, Black's Law Dictionary (11th ed. 2019). It is not

information about internal USPS business operations, *cf. Am. Postal Workers Union*, 742 F. Supp. 2d at 81 (documents concerning bonus and salary increases based on internal performance indicators), nor does it reflect the details or terms of any commercial relationship between USPS and a third party, *cf. Wickwire Gavin*, 356 F.3d 588 (spreadsheets detailing quantity and pricing information); *Reid*, 2006 WL 1876682 (postage rates); *Airline Pilots Ass'n, Int'l*, 2004 WL 5050900 (contract terms with Federal Express). The requested COA data simply shows, in an aggregated way, requests made by households and businesses to change their mailing address. There is nothing "*intrinsically* economic or financial" about such information. *See Nat'l W. Life Ins. Co.*, 512 F. Supp. at 459 (emphasis added). Because the requested COA data is not "of a commercial nature," it cannot be withheld under Section 410(c)(2).

> iii.  *USPS's planned or actual sale of some COA data does not render it "of a commercial nature[.]"*

USPS argued below that the requested COA data is "of a commercial nature" for one reason alone: the agency decided it would license access to some of that data for a fee. JA031–32 ¶17; JA033 ¶ 22; JA036–37 ¶¶ 29–32. But that argument, which was erroneously accepted by the district court, is contrary to the plain text of the statute and would

give USPS license to withhold *anything* under FOIA, including the same data it tried (unsuccessfully) to withhold in *Carlson*, just by claiming it has plans to sell it in the future.

The plain language of Section 410(c)(2) does not support the argument that because something is sold (or might be sold) it falls within its scope. In interpreting a statute, courts "must attempt to give effect to the plain meaning of *each word* in the statute." *Assocs. Against Outlier Fraud v. Huron Consulting Grp., Inc.*, 817 F.3d 433, 437 (2d Cir. 2016) (emphasis added) (citation omitted). For the purposes of Section 410(c)(2), that means "nature" must be given as much effect as "commercial." And thus, as discussed above, there must be something *inherently* commercial about the information at issue for it to fall within the exemption's scope. Merely being sold cannot transform data into something that is inherently commercial; it must be commercial "in the first instance." *Carlson*, 504 F.3d at 1129.

Take, for example, Monet's *Bridge over a Pond of Water Lilies*, a painting that has been bought and sold multiple times. A sales contract for that artwork with terms, including the price, a method of delivery, etc., would be "of a commercial nature" because that contract is, in the

first instance, about the buying and selling of a good.  But the painting itself is not "of a commercial nature" simply because it has been sold (and may be sold again in the future); it is, *inherently*, art.  So too here:  COA data is not transformed into inherently commercial data because USPS intends to license it for a fee.  The downstream use or sale of information cannot, *ex post facto*, change its nature.

Because the requested COA data is not "of a commercial nature" within the meaning of 39 U.S.C. § 410(c)(2), it cannot be withheld under that provision.

B.    USPS did not—and cannot—demonstrate that COA data would not be publicly disclosed "under good business practice[.]"

Even assuming, *arguendo*, that the requested COA data is "of a "commercial nature" and thus satisfies the first requirement of Section 410(c)(2), that provision would still be inapplicable because USPS has not met—and cannot meet—its burden to show that  "under good business practice[, the requested COA data] would not be publicly disclosed[.]"  39 U.S.C. § 410(c)(2).  That independent requirement also must be satisfied for USPS to prevail.  *Id.*  And, as detailed below, USPS cannot do so because migration data—like the aggregate COA data at issue—is

24

routinely made available to the public for free by private businesses that, like USPS, collect such data in connection with their businesses.

> i.    *USPS submitted no evidence to show that businesses normally would not publicly disclose migration data like the requested COA data.*

Other courts have concluded that "the statutory term 'good business practice'" in Section 410(c)(2) should be interpreted "with reference to what businesses normally do." *Wickwire Gavin*, 356 F.3d at 594; *accord Dorsey*, 402 F. Supp. 3d at 603 ("[T]he activities of private businesses are instructive in this analysis."). The entirety of USPS's evidence on this point, however, consisted of a handful of paragraphs in the declaration of a USPS employee. JA037–38. While the declaration references three companies—Here Technologies, Inc., SafeGraph, Inc., and Unacast, Inc., *id.* ¶ 34—their relevance (if any) is impossible to discern. There is nothing in the record to show that any of these companies possess but do not disclose data analogous to the requested COA data for individuals, families, and/or businesses. *See id.*

It is black-letter law that the agency bears the burden of showing a claimed exemption applies under FOIA. 5 U.S.C. § 552(a)(4)(B); *accord, e.g.*, *A. Michael's Piano*, 18 F.3d at 143; *Wilner v. Nat'l Sec. Agency*, 592

F.3d 60, 69 (2d Cir. 2009) ("The agency asserting the exemption bears the burden of proof, and all doubts as to the applicability of the exemption must be resolved in favor of disclosure."). Merely name-dropping companies without elaboration does not satisfy USPS's burden to show "what businesses normally do." *Wickwire Gavin*, 356 F.3d at 594. Here, because USPS was either unable or unwilling to introduce any evidence concerning the practices of other businesses that would support its decision to withhold the COA data requested by Bloomberg and Dow Jones, USPS failed to carry its burden with respect to the second prong of Section 410(c)(2).

> ii.    *The record contains ample evidence that private businesses publicly disclose migration data.*

Requesters provided the district court, below, with ample evidence that private companies that obtain migration data in connection with their operations do, in fact, publicly disclose aggregated data of the kind USPS has withheld here.

Take, for example, LinkedIn, which publishes monthly "Workforce Report[s]" that rely on data from the company's more than "191 million LinkedIn members in the United States" to provide "unique insight into the real-time dynamics of Americans starting new jobs and moving to

26

new cities." JA078.[5] LinkedIn's Workforce Report contains detailed charts for specific cities demonstrating net migration per 10,000 LinkedIn members. Los Angeles's chart, for example, shows the most people moved there in December 2022 from Dallas-Fort Worth, Portland, Washington, D.C., and Columbus:



*Workforce Report*, *supra.* Similar charts are available for Atlanta, Austin, Boston, Chicago, Cleveland-Akron, Dallas-Fort Worth, Denver,

---

[5]     Also available at *Workforce Report December 2022, New York City*, LinkedIn (Dec. 1, 2022), https://perma.cc/N32L-877T.

Detroit, Houston, Los Angeles, Miami-Fort Lauderdale, Minneapolis-St. Paul, Nashville, New York City, Philadelphia, Phoenix, San Francisco Bay Area, Seattle, St. Louis, and Washington, D.C. *See id.*

LinkedIn also provides corresponding charts showing population loss; one for New York shows the volume of people that moved from the city in December 2022 to Miami-Fort Lauderdale, Austin, Tampa Bay, and other cities:



*See id.* In other words, LinkedIn makes available, for free, aggregate data collected from its users showing where people are moving to and moving from—aggregate data similar to what USPS is withholding.

Another example is Allied, a moving company, that works with Zillow, a real estate company, to provide detailed reports about migration across the United States. Allied's Magnet States Report contains an interactive map of the United States; any user can click on a state and see the number of inbound and outbound moves for that jurisdiction in a given year. *See* JA081.[6] This tool also provides data more granular than state-level data, permitting a user to, for instance, learn that with respect to Des Moines, Iowa, most individuals who moved there in 2021 came from Chicago, Phoenix-Mesa, Minneapolis-St. Paul, etc., and most who moved away left for Minneapolis-St. Paul, Kansas City, Phoenix-Mesa, etc.:

---

[6]     Also available at *2021 Allied x Zillow Magnet States Report*, Allied, https://www.allied.com/migration-map, https://perma.cc/3KW5-PUVV (last accessed Dec. 14, 2022). Requesters attached printouts of some of these websites to the Declaration of Katie Townsend, but as many of the sites' full functionality can only be explored interactively, Requesters respectfully request that the Court take judicial notice of the content of the websites cited herein; such notice is proper pursuant to Fed. R. Evid. 201(b). *See, e.g.*, *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015).



*See id.* The data underlying this tool comes from Allied, which collects it in connection with its business operations. The 2020 State Magnet Report notes that "[t]o determine moving trends, Allied Van Lines reviewed its own proprietary, aggregated customer move data, which includes consumer and corporate moves from 2020 from January 1 through December 5, 2020[.]" *2020 Allied Van Lines State Magnet Report*, Allied, https://perma.cc/82HT-VDAB (last accessed Jan. 4, 2023). Allied provides this data to the public for free, not only for the most recent year but also going back to 2017.

For its part, Zillow provides its own detailed migration analysis to the public for free, cross-referencing its own data with Allied's: According to Zillow's 2021 report, "[t]he Dallas-Fort Worth metro area topped the rankings for the most net inbound moves in 2021, pulling in movers . . . from . . . Los Angeles[,] . . . Chicago, as well as . . . Phoenix." Jeff Tucker, *U.S. Movers Continued to Seek Affordability in 2021, but in Different Areas*, Zillow (Dec. 20, 2021), https://perma.cc/ZH23-9RX8; JA085. Zillow offers charts illustrating, for instance, the popularity of moves from New York to Miami; San Diego to Dallas; Detroit to Los Angeles, along with detailed analyses. *See id.* For example: "In 2020, Phoenix had the most net inbound moves among all metro areas analyzed, while Austin had the fourth-most. But in 2021, Phoenix and Austin slid to the eight and ten spots on the list of highest net destinations, respectively." *Id.* One of Zillow's charts is reproduced below:

**Destinations for people leaving the top origin metro areas:**

| Origin Metro | 1 | 2 | 3 |
|---|---|---|---|
| Chicago, IL | Phoenix, AZ | Dallas-Fort Worth, TX | Los Angeles, CA |
| Los Angeles, CA | Dallas-Fort Worth, TX | Phoenix, AZ | Seattle, WA |
| New York, NY | Miami, FL | Los Angeles, CA | Tampa, FL |
| San Diego, CA | Dallas-Fort Worth, TX | Phoenix, AZ | Houston, TX |
| Detroit, MI | Los Angeles, CA | Tampa, FL | Chicago, IL |

31

*Id.*[7]

Migration data made publicly available by businesses is not limited to where people are moving to, but also where they are considering moving to. A recent report by Redfin, another real estate company, for example, included a detailed analysis of potential migration trends in the United States—for free. *See* Dana Anderson, *Homebuyers Are Looking to Relocate to Affordable Areas–Especially in Florida–Amid High Rates, Prices*, Redfin (Nov. 29, 2022), https://perma.cc/9FQW-QE6W; JA094. The Redfin report highlights charts and graphs to illustrate "net inflow[s]"—homeowners looking to move into a metropolitan area, subtracted by homeowners looking to leave said area—for dozens of U.S. metro areas:

---

[7] North American Moving Services ("NAMS") is another moving company that makes migration data publicly available; it publishes a yearly report online that users can download for free that details which states had the most inbound and outbound migrations. JA090. U-Haul, which rents moving trucks, similarly publishes a "Growth Index" based on "more than 2 million one-way U-Haul truck transactions that occur annually across the U.S. and Canada." *U-Haul Ranks Florida the No. 2 Growth State of 2022*, U-Haul (Jan. 3, 2023), https://myuhaulstory.com/2023/01/03/uhaul-ranks-florida-2-growth-state-of-2022/.

**Top 10 Metros Homebuyers Are Moving Into, by Net Inflow**

Net inflow = Number of Redfin.com home searchers looking to move into a metro area, minus the number of searchers looking to leave

| Rank | Metro* | Net Inflow | Top Origin | Top Out-of-State Origin |
|---|---|---|---|---|
| 1 | Sacramento, CA | 7,800 | San Francisco, CA | Chicago, IL |
| 2 | Las Vegas, NV | 7,100 | Los Angeles, CA | Los Angeles, CA |
| 3 | Miami, FL | 6,700 | New York, NY | New York, NY |
| 4 | San Diego, CA | 6,500 | Los Angeles, CA | Chicago, IL |
| 5 | Tampa, FL | 5,600 | New York, NY | New York, NY |
| 6 | Phoenix, AZ | 4,700 | Los Angeles, CA | Los Angeles, CA |
| 7 | Cape Coral, FL | 4,600 | Chicago, IL | Chicago, IL |
| 8 | North Port-Sarasota, FL | 4,300 | Chicago, IL | Chicago, IL |
| 9 | Dallas, TX | 3,800 | Los Angeles, CA | Los Angeles, CA |
| 10 | Orlando, FL | 3,700 | New York, NY | New York, NY |

*Combined statistical areas with at least 500 users searching to and from the region in August-October 2022

*Id.* The Redfin analysis is based on its own data, from "about two million Redfin.com users who viewed for-sale homes online across more than 100 metro areas from August 2022 to October 2022." *Id.*

Finally, there are also several commercial entities participating in a "Data for Good" initiative whereby they provide their own location data to individuals and organizations who research and publish analyses of mobility data, such as how COVID-19 affected travel. One such company is Meta. It sells advertisements based on location data, but also provides access to its location data (gathered from users), which has been used in

33

a wide variety of publications.[8]  One paper based on Meta's location data

shows how Italians' mobility was affected during different windows of

time before, during, and after a COVID-19 lockdown.    JA099

(reproduction of Giovanni Bonaccorsi et al., *Socioeconomic differences*

*and persistent segregation of Italian territories during COVID-19*

*pandemic*,      Scientific      Reports      (Oct.      27,      2021),

https://www.nature.com/articles/s41598-021-99548-7).       Such      data

enabled the publication of detailed mobility maps:



JA102.  In short, even companies that use migration data for commercial

purposes  also  disclose  it  to  persons  and  organizations  who—like

---

[8]      Data for Good, Meta, https://dataforgood.facebook.com/dfg/tools
(last accessed Oct. 16, 2023).   Meta also sells advertisements based on
location      data.      *See      Use      location      targeting*,      Meta,
https://www.facebook.com/business/help/365561350785642?id=1762762
33019487 (last accessed Oct. 16, 2023).

Requesters—seek to inform the public about how populations are moving.

The district court gave short shrift to this mountain of evidence presented by Requesters, dismissing its relevance (and ignoring the lack of any contrary evidence proffered by USPS). JA193–94. According to the district court, the companies that Requesters identified "were not freely disclosing the information which they were also attempting to sell." *Id.*[9] But the fact that those businesses do not attempt to sell that information is precisely the point; the relevant question is what companies that collect migration data in connection with their operations (for USPS, so that it can deliver the mail) normally do with such data. *See Wickwire Gavin*, 356 F.3d at 594; *Dorsey*, 402 F. Supp. 3d at 603. And, as Requesters demonstrated, those companies make aggregate migration data publicly available.[10]

---

[9]    As Requesters noted, Meta both sells location-based advertising and provides location-based data for free through its "Data for Good" program. *See supra* pp. 33–34 & note 8.

[10]    The district court also dismissed the evidence submitted by Requesters on the ground that these companies' "free disclosure of the location data sought to promote their revenue generating lines of business and to burnish their public images." JA194. This speculation— unsupported by any evidence in the record—even if accurate is

To be clear, the data USPS (now) "licenses" through its PMT also differs in key ways from the COA data that was requested by Bloomberg and Dow Jones, further undercutting any argument that the latter would not be disclosed under "good business practice." The district court mistakenly suggested that this data is the same. *See* JA194 ("[I]t is good business practice not to provide for free the data which it is licensing to generate income."). But the very real differences between them make PMT data both useful to marketers and less valuable to Requesters.

The PMT *combines* COA data with demographic data for each ZIP code, including median age, median income, and average household size, as well as the percentage of multi-family or multi-tenant addresses in each ZIP code. JA148–49. The addition of that demographic data—not sought by Requesters—fundamentally changes the usefulness of the PMT to potential licensees, such as marketers. Knowing the age, income, and family size of families moving to a particular ZIP code allows for

---

irrelevant. A business's reason for making information publicly available is not part of the analysis under Section 410(c)(2). What matters is what businesses *do*, not why they do it. *See Wickwire Gavin*, 356 F.3d at 594 (the statute should be interpreted "with reference to what businesses normally do").

targeted marketing in a way that knowing the aggregate number of moves alone does not.

Moreover, the PMT only offers a limited number of "Top 3" to/from ZIP codes in its data. *See* JA148. But Requesters did not limit their FOIA requests to the "top three" jurisdictions—they have requested all "to" and "from" data for specific time periods. *See* JA041, JA057. Accordingly, USPS's claim that its PMT would be undercut if the COA data Requesters seek is released under FOIA makes no sense. *Cf.* JA039 ¶ 38 (arguing if USPS discloses the requested COA data it would "negatively impact USPS's data licensing offerings"). And there is no evidence in the record that any potential PMT customer would be dissuaded from licensing the PMT data by the release of the COA data sought by Requesters.

In sum, because many companies publish aggregate migration data—similar to the COA data at issue—that is collected in connection with their business operations, USPS cannot show that the requested COA data would not be publicly disclosed under "good business practice." 39 U.S.C. § 410(c)(2). Moreover, because the data "licensed" through the PMT differs in key ways from the data sought by Requesters, its release

under FOIA would not run afoul of "good business practice." Accordingly, the second requirement of Section 410(c)(2) cannot be satisfied.

## II. USPS's position, if accepted, would make key government data inaccessible to the public and unusable by members of the press.

While the Postal Reorganization Act of 1970 afforded USPS the ability to withhold some information under FOIA, it did not remove the agency from the ambit of FOIA nor insulate it entirely from public transparency. Though Congress wanted USPS to operate more like a business, "unlike private enterprises, Congress determined that USPS would still be subject to FOIA—no doubt an obligation imposed in light of the USPS's public sector work funded by the public's tax dollars." *Am. Oversight v. U.S. Postal Serv.*, No. 20-CV-2580, 2021 WL 4355401, at *5 (D.D.C. Sept. 23, 2021).

Yet the reading of Section 410(c)(2) advanced by USPS—and accepted by the district court below—would allow USPS to eliminate access to any of its records under FOIA by simply claiming it will "license" access to them in the future—requiring payment of whatever sum the agency comes up with, and accompanied by restrictions on what can be done with those government records. That scheme is not only contrary

38

to the purposes of FOIA, but also would inhibit crucial reporting.

A. <u>USPS unilaterally cut off access to COA data for two years; it now seeks to permanently block access to certain data previously available to the public under FOIA.</u>

Because of the expansive nature of USPS's Section 410(c)(2) theory, *no* to/from COA data was available for more than two years while its PMT "product" was under development. The PMT did not exist at the time the Requests were denied, *see* JA045, JA059, and it was not launched until more than two years after Bloomberg's request was denied, JA141—after cross-motions for summary judgment were fully briefed in the district court below. Indeed, in its summary judgment briefing, USPS could not tell the district court precisely when the PMT would launch. *See* JA036 ¶ 30 (USPS declarant stating that "[a]t this time, USPS *anticipates* that the Population Mobility Trends product will be released in the spring of 2023" (emphasis added)). USPS's theory of Section 410(c)(2) was, accordingly, that it could deny access to agency records because it planned at some undetermined future time to license those records.

Under that theory, which has no limiting principle, USPS could make the same argument to withhold records because it has vague plans to launch a "product" in 2, 5, or even 20 years. But the public's right to

39

access agency records cannot turn on whether an agency claims that it has a plan, at some point in the future, to sell or license those records. *Cf.* 5 U.S.C. § 552(a)(6)(A) (requiring agencies, in most cases, to provide a determination within 20 business days); *Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 354 (1979) (noting that FOIA establishes a "requirement of *prompt* disclosure" (emphasis added)).

In any event, now, after launch of the PMT, there is still *no way* for members of the press and public to access any data on COA flows outside the PMT's "Top 3" ZIP code offerings. USPS has *completely eliminated* public access to a crucial subset of its data that it is not even using. Neither "licensed" under the PMT nor made available through FOIA, this data—collected by a government agency—will never be publicly available. While this 'lesser' migratory data may not be seen as worthy of 'licensing' by USPS, it is important for Requesters. Small migratory movements may herald a future deluge, and it is important for the news media to be able to identify when a pattern begins to emerge. For example, the migratory effects of a government program may be slow at first, but going back in time through historical data to see when migration to or from a particular jurisdiction began could prove

40

invaluable. Moreover, for large cities like New York, the "Top 3" ZIP codes are unlikely to scratch the surface of the multitude of origins and destinations for people moving in and out of the city. Access to 'lesser' migratory data could unlock a multitude of insights by the news media, policy researchers, and academics.

For a government agency to permanently cut off access to such important data is—in addition to being unlawful—contrary to longstanding government policy. For well over a decade, it has been the policy of the United States to promote "Open Government" through, among other things, the proactive publication of "high-value data sets" from "each agency" in open-source formats. *See* Memorandum from Peter Orszag to Heads of Executive Departments and Agencies at 2 (Dec. 8, 2009), https://perma.cc/8PBU-GMVP. As the Attorney General recently reiterated, "[p]roactive disclosures enable information about federal government operations to be more readily available to all[,]" and thus agencies should "maximize their efforts to post more records online quickly and systematically in advance of any public request." Memorandum from Merrick Garland to Heads of Executive Departments and Agencies at 2 (Mar. 15, 2022),

41

https://www.justice.gov/media/1212566/dl?inline. Under these principles, USPS should be *proactively posting* the COA data that was requested by Bloomberg and Dow Jones. Instead, not only has USPS denied Requesters access to the COA data they requested under FOIA, but also it has determined that for large swaths of COA data, no one will be able to access it under FOIA or otherwise.

B. <u>USPS's pricing and "licensing" restrictions for COA data are inconsistent with FOIA and jeopardize public interest reporting.</u>

In creating an enforceable right "for citizens to know what their Government is up to[,]" FOIA "defines a structural necessity in a real democracy." *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 171–72 (2004) (cleaned up, citation omitted). Members of the news media use FOIA to inform the public, an important role that Congress has specifically recognized as valuable. *See, e.g.*, 5 U.S.C. § 552(a)(4)(A)(ii)(II) (limiting fees for representatives of the news media); *id.* § 552(a)(6)(E)(ii) (providing for expedited processing of requests made by persons primarily engaged in disseminating information).

As noted above, Requesters' reporting on mobility trends spurred by the COVID-19 pandemic has proved invaluable in showing the

relationship between migration patterns and factors like rent prices, availability of affordable housing, the strength of various tax bases throughout the nation, and fiscal policy. Patino, *supra*; Yan Wu & Luis Melgar, *supra*. USPS's withholding of COA data is not only contrary to law, *see supra*, but would interfere with journalists' ability to engage in that type of reporting in the future.

Take the cost of "licensing" the sliver of COA data that USPS now makes available through the PMT: four years of "Enterprise" data costs *$277,000*. JA161. That extraordinary sum places it well out of reach of journalists and almost all news organizations. A "license" fee for COA data that is beyond what members of the press and public can afford effectively eliminates the public good that could come from use of this government data—reserving it solely for marketing firms with multi-million dollar budgets. Such an outcome is contrary to the principle that government "information belongs to citizens to do with as they choose. . . . As a general rule, if the information is subject to disclosure, it belongs to all." *Favish*, 541 U.S. at 172; *see also Yanofsky v. Dep't of Commerce*, 306 F. Supp. 3d 292, 293 (D.D.C. 2018) (Jackson, J.) ("[I]nformation and records that an agency possesses rightfully belong to the public[.]").

43

Even if a member of the news media were to somehow come up with hundreds of thousands of dollars to "license" part of the agency's COA data, the conditions in USPS's license agreement would make that data essentially unusable for journalistic purposes. JA163–80. According to the sample license agreement, licensees must agree to restrictions on their ability to "use, copy, modify, and distribute" the data; further, licensees "shall not disclose, release, [or] distribute . . . any portion of the [d]ata . . . to any third party without [USPS's] prior written consent"; and, shall not "publish . . . or otherwise make available the [d]ata . . . or display any compilation or directory of the [d]ata[.]" JA164–65. Most of the "tiers" of licensing offered by USPS do not allow for *any external publication* of PMT data. JA177. The two "tiers" that do allow for any publication of PMT data restrict it to "highlights," and still prohibit a number of uses, including publishing "[a]ny representation of the underlying data," and "[i]nteractive applications or visualizations that expose underlying data." JA178–79.

Other aspects of USPS's license agreement are also particularly troubling for journalists and news organizations. It requires, for example, all licensees using PMT data to "assign[] all right, title, and

44

interest, including all copyrights, that it might have, if any" in "derivative compilations" of the data to USPS. JA165. Moreover, the agreement states that licensees must agree that USPS has the right "to examine such books and records in [the l]icensee's possession or under its control with respect to the subject matter and terms of th[e license a]greement[.]" JA171. A license term that would seemingly permit the government to audit journalists' work is an affront to—and incompatible with—press freedom and, again, could not be agreed to by any journalist or news organization.

As unacceptable as these terms are for journalists, even more extreme "license" fees and restrictions are possible—there is no limit on the conditions USPS could impose on access or use of the PMT's data. *See* JA166 (USPS reserving the "right to change the terms, conditions, and notices under which" COA data is provided). The agency could decide to double the cost to license the data, or it could prohibit any external publication of any of that data. Such a result is anathema to FOIA and should not be accepted by this Court.

C.  <u>USPS's theory, if accepted, would allow the agency to stymie access to important records under FOIA.</u>

USPS's arguments concerning the scope of 39 U.S.C. § 410(c)(2)—if

45

accepted by this Court—would fundamentally undermine the public's right to know. *Cf. United States v. Dauray*, 215 F.3d 257, 264 (2d Cir. 2000) ("A statute should be interpreted in a way that avoids absurd results."). At base, USPS's position is that it can, unilaterally, at any time, pluck any of its data or records (including those previously released to the public), and remove them from FOIA in favor of a monetized, licensed, access regime that it has total control over.

There are good reasons to be concerned about the effect of such an expansive reading of Section 410(c)(2), which could turn that narrow exception to access under FOIA into an all-purpose denial statute. That exemption is already being frequently invoked by the agency: In fiscal year 2021, USPS denied 1,546 requests in part or in full, and it invoked Section 410(c)(2) 462 times—in 30% of its denials.[11] And USPS has previously attempted to assert Section 410(c)(2) to withhold all manner

---

[11] U.S. Postal Service Freedom of Information Act (FOIA) Report for Fiscal Year 2021, U.S. Postal Serv., https://perma.cc/EP8N-H2BW (last accessed Sept. 20, 2023). Requesters respectfully ask that the Court take judicial notice of this government publication pursuant to Federal Rule of Evidence 201. *See, e.g.*, *N.Y. Times Co. v. Dep't of Justice*, 756 F.3d 100, 110 n.8 (2d Cir. 2014) (judicially noticing government document). USPS fully granted an additional 734 FOIA requests in 2021, meaning that of the total number of requests in which the agency located records, it cited Section 410(c)(2) to deny 20% of them in part or in full.

46

of agency records. For example, the agency attempted to withhold the Postmaster General's "financial disclosures, recusal and divestiture obligations, and related communications with [the Office of Government Ethics]" under Section 410(c)(2), claiming that disclosing it "would provide another company with a competitive advantage over the Postal Service." *Citizens for Resp. & Ethics in Wash. v. U.S. Postal Serv.*, 557 F. Supp. 3d 145, 153 (D.D.C. 2021) (rejecting invocation of Section 410(c)(2)). USPS also has argued that it could withhold the entries in the Postmaster General's calendar pursuant to Section 410(c)(2) on the theory, "in essence, that the entirety of [his] calendar is commercial information simply because the agency is responsible for a myriad of commercial activities." *Am. Oversight*, 2021 WL 4355401, at *5 (denying USPS's motion for partial summary judgment).

The entire purpose of FOIA is to "eliminate [] discretionary standards" previously relied upon by agencies to deny public access to government records. *Goland v. CIA*, 607 F.2d 339, 360 n.12 (D.C. Cir. 1978) (Bazelon, J., dissenting). Under the Administrative Procedure Act, agencies could deny access to Executive branch records "for good cause" or if secrecy was, in the agency's view, in the "public interest." Freedom

47

of Information Act Source Book: Legislative Materials, Cases, Articles, Subcomm. on Administrative Practice and Procedure of the Committee on the Judiciary, at 29–30 (1974).[12]  In practice, this meant that agencies could almost always refuse to grant requests for information.  *Id.* at 27–28.  Congress changed that by passing FOIA: a "remedial statute" that created a "presumption in favor of disclosure."  Barry Sullivan, *FOIA and the First Amendment: Representative Democracy and the People's Elusive "Right to Know"*, 72 Md. L. Rev. 1, 21 (2012). But if USPS can treat records as exempt from FOIA merely because it may sell or license some of those records in the future, it would vest USPS with virtually unlimited discretion to deny FOIA requests seeking all manner of agency records.

## CONCLUSION

For the reasons set forth herein, Requesters respectfully ask this Court to reverse the decision of the district court below and remand this matter with instructions to enter an order granting Requesters' cross-motion for summary judgment.

---

[12]     *Available at* https://perma.cc/TFV9-JYNC.

Dated: October 17, 2023          Respectfully submitted,

*/s/ Katie Townsend*
Katie Townsend
    *Counsel of Record*
Adam A. Marshall
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Phone: 202.795.9300
Facsimile: 202.795.9310
Email: ktownsend@rcfp.org
Email: amarshall@rcfp.org

*Counsel for Plaintiffs-Appellants*

49

## CERTIFICATE OF COMPLIANCE

I, Katie Townsend, hereby certify that the foregoing Brief: (1) complies with the type-volume limit of Local Rule 32.1(a)(4) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f), it contains 9,269 words; and (2) complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Century Schoolbook.

Dated: October 17, 2023                    */s/ Katie Townsend*
                                           Katie Townsend
                                           *Counsel for Plaintiffs-Appellants*

50