# 23-1005

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

BLOOMBERG L.P. AND DOW JONES & COMPANY, INC.
*Plaintiffs-Appellants,*

v.

UNITED STATES POSTAL SERVICE
*Defendant-Appellee.*

*On appeal from the United States District Court
for the Southern District of New York*

### JOINT APPENDIX

Katie Townsend
    *Counsel of Record*
Adam A. Marshall
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Ste. 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
ktownsend@rcfp.org
amarshall@rcfp.org
*Counsel for Plaintiffs-Appellants*

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-2721
*Counsel for Defendant-Appellee*

# TABLE OF CONTENTS

**Page**

Docket Sheet in *Bloomberg L.P. v. United States Postal Service*, No. 1:22-cv-06112-DLC (S.D.N.Y.) ..................................... JA001

Complaint, dated July 18, 2022 (ECF 1) ........................................ JA005

Answer, dated Aug. 26, 2022 (ECF 9) ........................................... JA015

Declaration of Jeffrey Tackes, dated Dec. 9, 2022 (ECF 18) ........... JA027

    Ex. A:    Dow Jones FOIA Request to USPS (ECF 18-1)............. JA040

    Ex. B:    USPS Denial Letter, dated Sept. 17, 2021 (ECF 18-2)................................................................... JA043

    Ex. C:    Dow Jones Administrative Appeal, dated Nov. 24, 2021 (ECF 18-3) ............................................................ JA046

    Ex. D:    USPS Opinion & Order Denying Dow Jones Administrative Appeal, dated Dec. 9, 2021 (ECF 18-4)................................................................... JA052

    Ex. E:    Bloomberg FOIA Request to USPS (ECF 18-5)............. JA056

    Ex. F:    USPS Denial Letter, dated Apr. 19, 2021 (ECF 18-6)................................................................... JA058

    Ex. G:    Bloomberg Administrative Appeal, dated June 29, 2021 (ECF 18-7) ...................................................... JA061

    Ex. H:    USPS Opinion & Order Denying Bloomberg Administrative Appeal, dated July 29, 2021 (ECF 18-8)................................................................... JA068

Declaration of Katie Townsend, dated Jan. 20, 2023 (ECF 25) ...... JA074

Ex. A:   *Workforce Report December 2022, New York City*,
LinkedIn (Dec. 1, 2022),
https://www.linkedin.com/jobs/blog/linkedin-workforce-report-december-2022-new-york-ny?src=or-search&veh=www.google.com%7Cor-search
(ECF 25-1) .................................................................... JA077

Ex. B:   *2021 Allied x Zillow Magnet States Report*, Allied,
https://perma.cc/3KW5-PUVV (ECF 25-2).................... JA080

Ex. C:   Jeff Tucker, *U.S. Movers Continued to seek Affordability in 2021, but in Different Areas*,
Zillow (Dec. 20, 2021),
https://www.zillow.com/research/moving-toaffordability-2021-30470/ (ECF 25-3) ......................... JA084

Ex. D:   *Where did Americans Move in 2022?*,
NorthAmerican Moving Services,
https://www.northamerican.com/migration-map
(ECF 25-4) .................................................................... JA089

Ex. E:   Dana Anderson, *Homebuyers Are Looking to Relocate to Affordable Areas–Especially in Florida–Amid High Rates, Prices*, Redfin (Nov. 29, 2022), https://www.redfin.com/news/housing-migration-trends-october-2022/ (ECF 25-5)................... JA093

Ex. F:   Giovanni Bonaccorsi et al., *Socioeconomic differences and persistent segregation of Italian territories during COVID-19 pandemic*, Scientific Reports (Oct. 27, 2021),
https://www.nature.com/articles/s41598-021-99548-7 (ECF 25-6) ...................................................... JA098

Declaration of Marie Patino, dated Jan. 20, 2023 (ECF 26) ........... JA114

    Ex. 1:    Bloomberg FOIA Request to USPS, dated Mar. 30, 2021 (ECF 26-1) ............................................................. JA116

    Ex. 2:    USPS Denial Letter, dated Apr. 19, 2021 (ECF 26-2)....................................................................JA122

    Ex. 3:    Records received from USPS in response to Dec. 30, 2020 FOIA request for change-of-address data (ECF 26-3)....................................................................JA125

Declaration of Paul Overberg, dated Jan. 18, 2023 (ECF 27) ......... JA127

    Ex. 1:    Dow Jones FOIA Request to USPS, dated Sept. 15, 2021 (ECF 27-1) ........................................... JA129

    Ex. 2:    USPS Denial Letter, dated Sept. 17, 2021 (ECF 27-2)....................................................................JA133

    Ex. 3:    Excerpts of records received from USPS in response to Feb. 8, 2021 FOIA request for change-of-address data (ECF 27-3) ............................................ JA136

Suppl. Declaration of Jeffrey Tackes, dated Feb. 17, 2023 (ECF 30) ......................................................................................... JA138

Defendant's Letter re: Launch of "Population Mobility Trends" product, dated May 16, 2023 (ECF 33) ............................. JA141

Plaintiffs' Letter re: Launch of "Population Mobility Trends" product, dated May 22, 2023 (ECF 34)........................................... JA143

    Ex. A:    USPS Office of Addressing Technology, *Population Mobility Trends: Technical Guide* (May 2023) (ECF 34-1) .................................................................JA145

Ex. B:   USPS Population Mobility Trends Order Form
(Apr. 2023) (ECF 34-2) .................................................. JA160

Ex. C:   USPS Population Mobility Trends Data License
Agreement (version 5/12/2023) (ECF 34-3) .................. JA162

Opinion & Order, dated June 13, 2023 (ECF 35) ........................... JA181

Judgment, dated June 14, 2023 (ECF 36) ..................................... JA196

Plaintiffs' Notice of Appeal, dated July 7, 2023 (ECF 38) .............. JA197

CLOSED,APPEAL,ECF

## U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:22–cv–06112–DLC

Bloomberg L.P. et al v. United States Postal Service
Assigned to: Judge Denise L. Cote
Cause: 05:552 Freedom of Information Act

Date Filed: 07/18/2022
Date Terminated: 06/14/2023
Jury Demand: None
Nature of Suit: 895 Freedom of
Information Act
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Bloomberg L.P.**                     represented by **Katielynn Boyd Townsend**
Reporters Committee For Freedom of The
Press
1156 15th Street NW Suite 1020
Washington, DC 20005
202–795–9300
Fax: 202–795–9310
Email: ktownsend@rcfp.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dow Jones & Company, Inc.**          represented by **Katielynn Boyd Townsend**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**United States Postal Service**       represented by **Tomoko Onozawa**
U.S. Attorney's Office, SDNY (Chambers
Street)
86 Chambers Street
New York, NY 10007
(212) 637–2721
Fax: (212) 637– 2686
Email: tomoko.onozawa@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/18/2022 | 1 | COMPLAINT against United States Postal Service. (Filing Fee $ 402.00, Receipt Number ANYSDC–26429788)Document filed by Bloomberg L.P., Dow Jones & Company, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H).(Townsend, Katielynn) (Entered: 07/18/2022) |
| 07/18/2022 | 2 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Other Affiliate Bloomberg Inc. for Bloomberg L.P.; Corporate Parent Ruby Newco, LLC, Corporate Parent News Corporation for Dow Jones & Company, Inc.. Document filed by Bloomberg L.P., Dow Jones & Company, Inc...(Townsend, Katielynn) (Entered: 07/18/2022) |
| 07/18/2022 | 3 | CIVIL COVER SHEET filed..(Townsend, Katielynn) (Entered: 07/18/2022) |
| 07/18/2022 | 4 | REQUEST FOR ISSUANCE OF SUMMONS as to United States Postal Service, re: 1 Complaint,. Document filed by Bloomberg L.P., Dow Jones & Company, Inc...(Townsend, Katielynn) (Entered: 07/18/2022) |

| 07/19/2022 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above–entitled action is assigned to Judge Denise L. Cote. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district–judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf–related–instructions..(gp) (Entered: 07/19/2022) |
| --- | --- | --- |
| 07/19/2022 | | Magistrate Judge Jennifer Willis is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018–06/AO–3.pdf. (gp) (Entered: 07/19/2022) |
| 07/19/2022 | | Case Designated ECF. (gp) (Entered: 07/19/2022) |
| 07/19/2022 | 5 | ELECTRONIC SUMMONS ISSUED as to United States Postal Service..(gp) (Entered: 07/19/2022) |
| 07/27/2022 | 6 | NOTICE OF INITIAL PRETRIAL CONFERENCE: Initial Conference set for 9/30/2022 at 2:30 PM in Courtroom 18B, 500 Pearl Street, New York, NY 10007 before Judge Denise L. Cote. (Signed by Judge Denise L. Cote on 7/27/2022) (vfr) (Entered: 07/27/2022) |
| 08/02/2022 | 7 | AFFIDAVIT OF SERVICE of Complaint served on United States Postal Service on 7/27/22. Service was made by Mail. Document filed by Bloomberg L.P., Dow Jones & Company, Inc...(Townsend, Katielynn) (Entered: 08/02/2022) |
| 08/05/2022 | 8 | AFFIDAVIT OF SERVICE of Notice of Pretrial Conference served on United States Postal Service; U.S. Attorney's Office on Aug. 2, 2022; Aug. 4, 2022. Service was made by Mail. Document filed by Bloomberg L.P., Dow Jones & Company, Inc...(Townsend, Katielynn) (Entered: 08/05/2022) |
| 08/26/2022 | 9 | ANSWER to 1 Complaint,. Document filed by United States Postal Service..(Onozawa, Tomoko) (Entered: 08/26/2022) |
| 08/31/2022 | 10 | CONSENT LETTER MOTION to Adjourn Conference addressed to Judge Denise L. Cote from Katie Townsend, Counsel for Plaintiffs dated Aug. 31, 2022. Document filed by Bloomberg L.P., Dow Jones & Company, Inc...(Townsend, Katielynn) (Entered: 08/31/2022) |
| 08/31/2022 | 11 | ORDER granting 10 Letter Motion to Adjourn Conference. Having received on August 31, 2022 the parties' consent letter motion requesting an adjournment, it is hereby ORDERED that the initial pretrial conference is adjourned until October 21, 2022 at 9:30 A.M. Initial Conference set for 10/21/2022 at 09:30 AM before Judge Denise L. Cote.. (Signed by Judge Denise L. Cote on 8/31/2022) (tg) (Entered: 08/31/2022) |
| 10/06/2022 | 12 | STATUS REPORT. Document filed by Bloomberg L.P., Dow Jones & Company, Inc...(Townsend, Katielynn) (Entered: 10/06/2022) |
| 10/18/2022 | 13 | MEMO ENDORSEMENT on re: 12 Status Report filed by Dow Jones & Company, Inc., Bloomberg L.P. ENDORSEMENT: The October 21 conference is cancelled. The parties' proposed schedule is adopted. ( Cross Motions due by 12/23/2022., Motions due by 11/18/2022., Responses due by 1/13/2023, Replies due by 2/3/2023.) (Signed by Judge Denise L. Cote on 10/18/2022) (vfr) (Entered: 10/18/2022) |
| 11/16/2022 | 14 | LETTER MOTION for Extension of Time to File *Motion for Summary Judgment* addressed to Judge Denise L. Cote from AUSA Tomoko Onozawa dated Nov. 16, 2022. Document filed by United States Postal Service..(Onozawa, Tomoko) (Entered: 11/16/2022) |
| 11/16/2022 | 15 | ORDER: granting 14 Letter Motion for Extension of Time to File. Granted. (Signed by Judge Denise L. Cote on 11/16/2022) (ama) (Entered: 11/16/2022) |
| 11/16/2022 | | Set/Reset Deadlines: Cross Motions due by 1/20/2023. Motions due by 12/9/2022. Responses due by 2/17/2023 Replies due by 3/10/2023. (ama) (Entered: 11/16/2022) |

| | | |
|---|---|---|
| 12/09/2022 | 16 | MOTION for Summary Judgment . Document filed by United States Postal Service..(Onozawa, Tomoko) (Entered: 12/09/2022) |
| 12/09/2022 | 17 | MEMORANDUM OF LAW in Support re: 16 MOTION for Summary Judgment . . Document filed by United States Postal Service..(Onozawa, Tomoko) (Entered: 12/09/2022) |
| 12/09/2022 | 18 | DECLARATION of Jeffrey Tackes in Support re: 16 MOTION for Summary Judgment .. Document filed by United States Postal Service. (Attachments: # 1 Exhibit A (Dow Jones FOIA Request), # 2 Exhibit B (September 2021 USPS Decision), # 3 Exhibit C (November 2021 Dow Jones Appeal), # 4 Exhibit D (December 2021 USPS Decision & Order), # 5 Exhibit E (Bloomberg FOIA Request), # 6 Exhibit F (April 2021 USPS Decision), # 7 Exhibit G (June 2021 Bloomberg Appeal), # 8 Exhibit H (July 2021 USPS Opinion & Order)).(Onozawa, Tomoko) (Entered: 12/09/2022) |
| 01/20/2023 | 19 | CROSS MOTION for Summary Judgment . Document filed by Bloomberg L.P., Dow Jones & Company, Inc.. (Attachments: # 1 Text of Proposed Order Proposed Order in Supp. of Plaintiffs' Mot. for Summary Judgment).(Townsend, Katielynn) (Entered: 01/20/2023) |
| 01/20/2023 | 20 | MEMORANDUM OF LAW in Support re: 19 CROSS MOTION for Summary Judgment . . Document filed by Bloomberg L.P., Dow Jones & Company, Inc...(Townsend, Katielynn) (Entered: 01/20/2023) |
| 01/20/2023 | 21 | DECLARATION of Katie Townsend in Support re: 19 CROSS MOTION for Summary Judgment .. Document filed by Bloomberg L.P., Dow Jones & Company, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F).(Townsend, Katielynn) (Entered: 01/20/2023) |
| 01/20/2023 | 22 | DECLARATION of Marie Patino in Support re: 19 CROSS MOTION for Summary Judgment .. Document filed by Bloomberg L.P., Dow Jones & Company, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3).(Townsend, Katielynn) (Entered: 01/20/2023) |
| 01/20/2023 | 23 | DECLARATION of Paul Overberg in Support re: 19 CROSS MOTION for Summary Judgment .. Document filed by Bloomberg L.P., Dow Jones & Company, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3).(Townsend, Katielynn) (Entered: 01/20/2023) |
| 01/20/2023 | 24 | MEMORANDUM OF LAW in Opposition re: 16 MOTION for Summary Judgment . . Document filed by Bloomberg L.P., Dow Jones & Company, Inc...(Townsend, Katielynn) (Entered: 01/20/2023) |
| 01/20/2023 | 25 | DECLARATION of Katie Townsend in Opposition re: 16 MOTION for Summary Judgment .. Document filed by Bloomberg L.P., Dow Jones & Company, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F).(Townsend, Katielynn) (Entered: 01/20/2023) |
| 01/20/2023 | 26 | DECLARATION of Marie Patino in Opposition re: 16 MOTION for Summary Judgment .. Document filed by Bloomberg L.P., Dow Jones & Company, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3).(Townsend, Katielynn) (Entered: 01/20/2023) |
| 01/20/2023 | 27 | DECLARATION of Paul Overberg in Opposition re: 16 MOTION for Summary Judgment .. Document filed by Bloomberg L.P., Dow Jones & Company, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3).(Townsend, Katielynn) (Entered: 01/20/2023) |
| 02/17/2023 | 28 | REPLY MEMORANDUM OF LAW in Support re: 16 MOTION for Summary Judgment . . Document filed by United States Postal Service..(Onozawa, Tomoko) (Entered: 02/17/2023) |
| 02/17/2023 | 29 | MEMORANDUM OF LAW in Opposition re: 19 CROSS MOTION for Summary Judgment . . Document filed by United States Postal Service..(Onozawa, Tomoko) (Entered: 02/17/2023) |
| 02/17/2023 | 30 | DECLARATION of Jeffrey Tackes (Supplemental Declaration) in Support re: 16 MOTION for Summary Judgment .. Document filed by United States Postal Service..(Onozawa, Tomoko) (Entered: 02/17/2023) |

| | | |
|---|---|---|
| 03/10/2023 | 31 | REPLY MEMORANDUM OF LAW in Support re: 19 CROSS MOTION for Summary Judgment . . Document filed by Bloomberg L.P., Dow Jones & Company, Inc...(Townsend, Katielynn) (Entered: 03/10/2023) |
| 03/14/2023 | 32 | LETTER MOTION for Oral Argument addressed to Judge Denise L. Cote from Plaintiffs Bloomberg L.P. and Dow Jones & Company, Inc. dated March 14, 2023. Document filed by Bloomberg L.P., Dow Jones & Company, Inc...(Townsend, Katielynn) (Entered: 03/14/2023) |
| 05/16/2023 | 33 | LETTER addressed to Judge Denise L. Cote from AUSA Tomoko Onozawa dated May 16, 2023 re: Launch of USPS Population Mobility Trends product. Document filed by United States Postal Service..(Onozawa, Tomoko) (Entered: 05/16/2023) |
| 05/22/2023 | 34 | LETTER addressed to Judge Denise L. Cote from Plaintiffs Bloomberg L.P. and Dow Jones & Company, Inc. dated 5/22/23 re: Response to Defendant's launch of Population Mobility Trends. Document filed by Bloomberg L.P., Dow Jones & Company, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C).(Townsend, Katielynn) (Entered: 05/22/2023) |
| 06/13/2023 | 35 | OPINION AND ORDER re: 16 MOTION for Summary Judgment . filed by United States Postal Service, 19 CROSS MOTION for Summary Judgment . filed by Dow Jones & Company, Inc., Bloomberg L.P.. The Defendant's December 9, 2022 motion for summary judgment is granted. The Plaintiffs' January 20, 2023 motion for summary judgment is denied. The Clerk of Court shall enter judgment for the Defendant and close the case. (Signed by Judge Denise L. Cote on 6/13/2023) (tg) Transmission to Orders and Judgments Clerk for processing. (Entered: 06/13/2023) |
| 06/14/2023 | 36 | CLERK'S JUDGMENT re: 35 Memorandum & Opinion in favor of United States Postal Service against Bloomberg L.P., Dow Jones & Company, Inc. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Opinion and Order dated June 13, 2023, Defendant's December 9, 2022 motion for summary judgment is granted. The Plaintiffs' January 20, 2023 motion for summary judgment is denied; accordingly, the case is closed. (Signed by Judge Denise L. Cote on 6/14/2023) (Attachments: # 1 Appeal Package) (tp) (Entered: 06/14/2023) |
| 07/07/2023 | 37 | **FILING ERROR – NO ORDER SELECTED FOR APPEAL** – NOTICE OF APPEAL. Document filed by Bloomberg L.P., Dow Jones & Company, Inc.. Filing fee $ 505.00, receipt number ANYSDC–27968822. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Townsend, Katielynn) Modified on 7/7/2023 (km). (Entered: 07/07/2023) |
| 07/07/2023 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT APPEAL. Notice to attorney Katielynn Townsend to RE–FILE Document No. 37 Notice of Appeal. The filing is deficient for the following reason(s): the order/judgment being appealed was not selected. Re–file the appeal using the event type Notice of Appeal found under the event list Appeal Documents – attach the correct signed PDF – select the correct named filer/filers – select the correct order/judgment being appealed. (km)** (Entered: 07/07/2023) |
| 07/07/2023 | 38 | NOTICE OF APPEAL from 36 Clerk's Judgment,, 35 Memorandum & Opinion,,. Document filed by Bloomberg L.P., Dow Jones & Company, Inc.. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Townsend, Katielynn) Modified on 7/7/2023 (nd). (Entered: 07/07/2023) |
| 07/07/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 38 Notice of Appeal,..(nd) (Entered: 07/07/2023) |
| 07/07/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 38 Notice of Appeal, filed by Dow Jones & Company, Inc., Bloomberg L.P. were transmitted to the U.S. Court of Appeals..(nd) (Entered: 07/07/2023) |
| 07/07/2023 | | Appeal Fee Paid electronically via Pay.gov: for 38 Notice of Appeal,. Filing fee $ 505.00. Pay.gov receipt number ANYSDC–27968822., paid on 7/7/2023..(nd) (Entered: 07/07/2023) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| BLOOMBERG L.P.<br><br>and<br><br>DOW JONES & COMPANY, INC.,<br><br>         Plaintiffs,<br>   v.<br><br>UNITED STATES<br>POSTAL SERVICE,<br><br>        Defendant. | Civil Action No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Bloomberg L.P. ("Bloomberg") and Dow Jones & Company, Inc. ("Dow Jones") (collectively, "Plaintiffs"), by and through undersigned counsel, hereby allege as follows:

1.      This is an action under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA" or the "Act"), for declaratory, injunctive, and other appropriate relief brought by Bloomberg and Dow Jones.

2.      By this action, Plaintiffs seek to compel the United States Postal Service ("USPS") to comply with its obligations under FOIA to release records that Plaintiffs requested from USPS. Plaintiffs are statutorily entitled to disclosure of the requested records, which Defendant has withheld in violation of the Act.

## PARTIES

3.      Plaintiff Bloomberg is the owner and operator of Bloomberg News. Bloomberg's newsroom of more than 2,700 journalists and analysts delivers thousands of stories a day, producing content that is featured across multiple platforms, including digital, TV, radio, print and

live events. Bloomberg's publications include Bloomberg CityLab (https://www.bloomberg.com/citylab), which reports on the world's cities and neighborhoods. Bloomberg is a limited partnership; its general partner is Bloomberg Inc., which is privately held. Bloomberg's headquarters are located at 731 Lexington Avenue, New York, NY 10022.

4.      Plaintiff Dow Jones is a leading provider of news and business information through *The Wall Street Journal*, *Barron's*, MarketWatch, Dow Jones Newswires and its other publications. *The Wall Street Journal* engages readers across print, digital, mobile, social, podcast and video. Building on its heritage as the preeminent source of global business and financial news, the *Journal* includes coverage of U.S. & world news, politics, arts, culture, lifestyle, sports, and health. Dow Jones is an indirect subsidiary of News Corporation, a publicly held company. Dow Jones's headquarters are located at 1211 Avenue of the Americas, New York, NY 10036.

5.      Defendant United States Postal Service is an agency of the federal government within the meaning of 5 U.S.C. § 551 and 5 U.S.C. § 552(f) that has possession, custody, and/or control of the records Plaintiffs seek. USPS's headquarters are located at 475 L'Enfant Plaza, Washington, DC 20590.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action and personal jurisdiction over Defendant pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

7.      Venue lies in this district under 5 U.S.C. § 552(a)(4)(B).

## FACTS

### Background

8.      When individuals, families, or businesses in the United States move, they can file change-of-address ("COA") requests with USPS.

9.     USPS maintains data from COA requests for individuals, families, and businesses (the "COA Data").  USPS's COA Data includes, *inter alia*, an origin county and ZIP code, destination county and ZIP code, and whether a COA request is temporary or permanent.

10.     USPS has previously released, in response to FOIA requests from Dow Jones and Bloomberg, COA Data showing how many permanent and temporary COA requests were submitted by individuals, households, and businesses, along with the origin county or ZIP code and destination county or ZIP code, for particular months, so long as the number of COA requests was greater than 10.

11.     Using COA Data previously provided by USPS, Dow Jones and Bloomberg have been able to analyze and report on the flow of individuals, families, and businesses between specific geographic areas.

12.     For example, COA Data previously provided by USPS to Dow Jones in response to a prior FOIA request shows 36 households filed requests in May, 2020, to permanently change their address from the District of Columbia to Philadelphia County, PA.  Likewise, COA Data provided by USPS to Dow Jones in response to a prior FOIA request shows 48 households filed requests in May, 2020, to permanently change their address from Philadelphia County, PA, to the District of Columbia.  Combined, the data provided by USPS can be used to show a permanent net flow of +12 household COA requests from Philadelphia County, PA, to the District of Columbia in May, 2020.

13.     Bloomberg CityLab has used USPS COA Data obtained through prior FOIA requests for a groundbreaking story showing the movement of Americans during the COVID-19 pandemic.  *See* Marie Patino *et al*., *More Americans Are Leaving Cities, But Don't Call It an Urban Exodus*, BLOOMBERG (Apr. 26, 2021), https://bloom.bg/3M7fu05.

3

**JA007**

14.     Using USPS COA data provided in response to a prior FOIA request, *The Wall Street Journal* has reported that more than seven million households moved to a different county between the start of the COVID-19 pandemic and May 11, 2021.  *See* Yan Wu & Luis Melgar, *Americans Up and Moved During the Pandemic. Here's Where They Went.*, WALL ST. J. (May 11, 2021), https://on.wsj.com/3NgWCx2.  COA Data allowed the *Journal* to examine how New York County, which covers Manhattan, lost considerable residents to neighboring New Jersey; how the net loss of residents from Washington, DC had doubled from the previous calendar year; and how Californian cities like Los Angeles and San Francisco lost substantial residents for mountain states and the Southwest.  *See id.*

15.     In or about August, 2021, USPS posted a letter regarding the publication of certain COA "stats" in its online FOIA library.  *RE: Change-of-Address Stats on USPS FOIA Website*, USPS (Aug. 4, 2021), https://perma.cc/WT4Y-6DA7.

16.     The COA "stats" provided by USPS on its website (the "COA Stats") are separated into one file per year.  *See FOIA Library*, USPS, https://perma.cc/CZ9R-8LL3 (last accessed May 19, 2022).

17.     The COA Stats do not show how many businesses, individuals, or families moved from specific ZIP codes or counties to other specific ZIP codes or counties.

18.     The COA Stats also do not include data showing how many COA requests were permanent or temporary by individuals, families, or businesses.

19.     For example, the COA Stats published for 2020 show that in May, 2020, ZIP Code 20036 had a total of 219 "from" (i.e., outbound) COA requests, and a total of 112 "to" (i.e., inbound) COA requests.  The COA Stats published for 2020 do not include geographic data showing where the COA requests "from" ZIP Code 20036 went "to," nor do they include

**JA008**

geographic data showing where the COA requests "to" ZIP Code 20036 came "from," nor do they identify how many individual, family, or business COA requests were permanent or temporary.

**Plaintiffs' FOIA Requests**

<u>The Dow Jones Request</u>

20.     On September 15, 2021, Dow Jones, through its *Wall Street Journal* reporter Paul Overberg, submitted a FOIA request to USPS via FOIA portal (the "Dow Jones Request"). A true and correct copy of the Dow Jones Request is attached hereto as **Exhibit A**[1] and is incorporated by reference herein.

21.     The Dow Jones Request sought records of COA requests submitted between January and June 2021, including origin and destination data. *See* Ex. A.

22.     Specifically, the Dow Jones Request sought "monthly summary data showing the number of residential postal customers who filed change-of-address requests" containing columns for year and month, "Old County," "Old State," "New County," "New State," "Total Perm," and "Total Temp" for January to June, 2021. *Id.*

23.     The Dow Jones Request asked that the responsive records be produced in Excel format.

24.     The Dow Jones Request identified its publication *The Wall Street Journal* and its reporter Mr. Overberg as representatives of the news media for fee category purposes per 5 U.S.C § 552(a)(4)(A)(ii)(II). *See* Ex. A.

25.     By letter dated September 17, 2021, USPS denied the Dow Jones Request. A true and correct copy of USPS's denial letter is attached hereto as **Exhibit B** (the "September 17

---

[1]     The full text of Plaintiff Dow Jones's request is cut off due to technical limitations in the USPS FOIA portal.

Denial"). USPS's denial of the Dow Jones Request noted that the Dow Jones Request had been assigned tracking number 2021-FPRO-03224.

26. In the September 17 Denial, USPS cited FOIA Exemption 3, 5 U.S.C. § 552(b)(3), in conjunction with 39 U.S.C. §410(c)(2). *See* Ex. B.

27. In the September 17 Denial, USPS provided a link to the COA Stats in its online FOIA Library. *See id.*

28. The COA Stats in the USPS's online FOIA Library do not satisfy the Dow Jones Request.

29. On November 24, 2021, Dow Jones administratively appealed USPS's denial of the Dow Jones Request. A true and correct copy of Dow Jones's administrative appeal is attached hereto as **Exhibit C** (the "Dow Jones Administrative Appeal") and is incorporated by reference herein.

30. The Dow Jones Administrative Appeal noted that USPS had previously granted FOIA requests for the same COA data sought by the Dow Jones Request for other time periods, *see* Ex. C, and argued that USPS's invocation of 39 U.S.C. §410(c)(2) to withhold the requested data was improper, *see id.*

31. On or about December 9, 2021, USPS's Office of the General Counsel denied the Dow Jones Administrative Appeal, which it had assigned tracking number 2022-APP-00041. A true and correct copy of USPS's "Opinion and Order" pertaining to the Dow Jones Administrative Appeal is attached hereto as **Exhibit D**.

<u>The Bloomberg Request</u>

32. On March 30, 2021, Bloomberg, through its Bloomberg CityLab reporter, Marie Patino, submitted a FOIA request to USPS via FOIA portal (the "Bloomberg Request"). A true

and correct copy of the Bloomberg Request is attached hereto as **Exhibit E**[2] and is incorporated by reference herein.

33.     The Bloomberg Request sought change of address data, per ZIP code, for the month of December 2020, including origin/destination information.  *See* Exs. E, F.

34.     The Bloomberg Request identified Bloomberg and its Bloomberg CityLab reporter, Ms. Patino, as representatives of the news media for fee category purposes per 5 U.S.C § 552(a)(4)(A)(ii)(II).  *See* Ex. E.

35.     On March 30, 2021, USPS acknowledged receipt of the Bloomberg Request, assigning it tracking number 2021-FPRO-01469.

36.     By letter dated April 19, 2021, USPS denied the Bloomberg Request.  A true and correct copy of USPS's denial letter is attached hereto as **Exhibit F** (the "April 19 Denial").

37.     In the April 19 Denial, USPS cited FOIA Exemption 3, 5 U.S.C. § 552(b)(3), in conjunction with 39 U.S.C. §410(c)(2).  *See* Ex. F.

38.     On June 29, 2021, Bloomberg administratively appealed USPS's denial of the Bloomberg Request.  A true and correct copy of Bloomberg's administrative appeal, excluding attachments A–B, is attached hereto as **Exhibit G** (the "Bloomberg Administrative Appeal") and is incorporated by reference herein.

39.     The Bloomberg Administrative Appeal noted that USPS had previously granted requests for the same COA data sought by the Bloomberg Request for other time periods, *see* Ex. G, and argued that USPS's invocation of 39 U.S.C. §410(c)(2) to withhold the requested data was improper, *see id.*

---

[2]     The full text of Plaintiff Bloomberg's request is cut off due to technical limitations in the USPS FOIA portal.

40.     By letter dated July 29, 2021, USPS's Office of the General Counsel denied the Bloomberg Administrative Appeal, which it had assigned tracking number 2021-APP-00141.  A true and correct copy of USPS's denial of the Bloomberg Administrative Appeal is attached hereto as **Exhibit H**.

### Current Status of the Dow Jones and Bloomberg Requests

41.     As of the filing of this Complaint, Plaintiffs have received no further communication from USPS with respect to either the Dow Jones Request or the Bloomberg Request.

42.     As of the filing of this Complaint, USPS has not provided all the records requested by Dow Jones and Bloomberg.

### CAUSE OF ACTION

### COUNT I
### VIOLATION OF FOIA FOR UNLAWFUL
### WITHHOLDING OF AGENCY RECORDS

43.     Plaintiffs repeat, reallege, and incorporate the allegations set forth in the foregoing Paragraphs 1 through 42 as though fully set forth herein.

44.     Defendant is an agency subject to FOIA.  5 U.S.C. §§ 552(f), 551.

45.     The Dow Jones Request and Bloomberg Request properly seek records within the possession, custody, and/or control of Defendant under FOIA.

46.     The Dow Jones Request and Bloomberg Request complied with all applicable regulations regarding the submission of FOIA requests.

47.     Defendant has not released all records or portions thereof that are responsive to the Dow Jones Request or the Bloomberg Request.

48.     The records sought by the Dow Jones Request and Bloomberg Request are not "information of a commercial nature," as set forth in 39 U.S.C. § 410(c)(2).

**JA012**

49.     Defendant has not identified whether or how release of the records sought by the Dow Jones Request and Bloomberg Request would foreseeably harm an interest protected by a FOIA exemption and/or why disclosure is prohibited by law.  5 U.S.C. § 552(a)(8).

50.     Defendant has improperly withheld records responsive to the Dow Jones Request and Bloomberg Request in violation of FOIA.  5 U.S.C. § 552(a)(3)(A).

51.     Plaintiffs have and/or are deemed to have exhausted applicable administrative remedies with respect to the Dow Jones Request and Bloomberg Request.  5 U.S.C. §§ 552(a)(6)(A)(ii); *id*. § 552(a)(6)(C)(i).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court:

(1) Order Defendant to conduct a search reasonably calculated to identify all records responsive to the Dow Jones Request and Bloomberg Request;

(2) Order Defendant to immediately disclose, in their entirety, all records responsive to the Dow Jones Request and Bloomberg Request;

(3) Issue a declaration that Plaintiffs are entitled to disclosure of the requested records;

(4) Enjoin Defendant from continuing to withhold any and all records responsive to the Dow Jones Request and Bloomberg Request;

(5) Award Plaintiffs reasonable attorney's fees and costs reasonably incurred in this action pursuant to 5 U.S.C. § 552(a)(4)(E); and

(6) Grant such other relief as the Court may deem just and proper.

Dated: July 18, 2022

Respectfully submitted,

/s/ *Katie Townsend*
Katie Townsend

9

**JA013**

NY Bar No. 5480199
Email: ktownsend@rcfp.org
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, DC 20005
Phone: 202.795.9303
Facsimile: 202.795.9310

*Counsel for Plaintiffs*

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
By:    TOMOKO ONOZAWA
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2721
Facsimile: (212) 637-2717
Email: tomoko.onozawa@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| BLOOMBERG L.P. and DOW JONES & COMPANY, INC., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES POSTAL SERVICE, <br><br> Defendant. | 22 Civ. 6112 (DLC) <br><br> **ANSWER OF DEFENDANT UNITED STATES POSTAL SERVICE** |

Defendant United States Postal Service ("USPS" or "Defendant"), by its attorney,

Damian Williams, United States Attorney for the Southern District of New York, hereby answers

the complaint of plaintiffs Bloomberg L.P. ("Bloomberg") and Dow Jones & Company, Inc.

("Dow Jones") (jointly, "Plaintiffs") upon information and belief as follows:

1.      Paragraph 1 constitutes Plaintiffs' characterization of their claims in this lawsuit,

to which no response is required.  To the extent Paragraph 1 contains factual allegations to which

a response is required, denies the allegations in Paragraph 1.

2.      Paragraph 2 constitutes Plaintiffs' characterization of their claims in this lawsuit,

to which no response is required.  To the extent Paragraph 2 contains factual allegations to which

a response is required, denies the allegations in Paragraph 2.

**JA015**

## PARTIES[1]

3.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3.

4.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 4.

5.     Admits that USPS is an independent establishment of the executive branch, that it is an agency subject to FOIA, that its headquarters is located at 475 L'Enfant Plaza, Washington, DC, and that some records sought by Plaintiffs are within its possession, custody and control, and denies the remainder of the allegations in Paragraph 5.

## JURISDICTION AND VENUE

6.     Paragraph 6 constitutes conclusions of law, to which no response is required.

7.     Paragraph 7 constitutes conclusions of law, to which no response is required.

## FACTS

8.     Paragraph 8 constitutes alleged background information, not allegations of fact pertinent to the resolution of the claims at issue in this FOIA action, to which no response is required.  To the extent Paragraph 8 contains factual allegations to which a response is required, avers that individuals, families, or businesses in the United States who are moving may submit change-of-address ("COA") requests to USPS, and denies the remainder of the allegations in Paragraph 8.

9.     Paragraph 9 constitutes alleged background information, not allegations of fact pertinent to the resolution of the claims at issue in this FOIA action, to which no response is

---

[1] For convenience, section headings of the complaint are included, but they are not part of Defendant's response to the complaint.

required. To the extent Paragraph 9 contains factual allegations to which a response is required, admits that USPS maintains some data related to the COA request, which can include the data set forth in Paragraph 9.

10. Paragraph 10 constitutes alleged background information, not allegations of fact pertinent to the resolution of the claims at issue in this FOIA action, to which no response is required. To the extent Paragraph 10 contains factual allegations to which a response is required, admits that USPS has previously released certain COA data in response to prior FOIA requests, avers that those releases were made prior to the development of a specific paid-for service relating to COA data, and denies the remainder of the allegations in Paragraph 10.

11. Paragraph 11 constitutes alleged background information, not allegations of fact pertinent to the resolution of the claims at issue in this FOIA action, to which no response is required. To the extent Paragraph 11 contains factual allegations to which a response is required, denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 11.

12. Paragraph 12 constitutes alleged background information, not allegations of fact pertinent to the resolution of the claims at issue in this FOIA action, to which no response is required. To the extent Paragraph 12 contains factual allegations to which a response is required, denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12.

13. Paragraph 13 constitutes alleged background information, not allegations of fact pertinent to the resolution of the claims at issue in this FOIA action, and Plaintiffs' characterization of an online article, to which no response is required. To the extent a response is required, Defendant respectfully refers the Court to the webpage cited in Paragraph 13 for a

true and complete statement of its contents, and denies the allegations to the extent they fail to

reflect or accurately characterize its true contents.

14.     Paragraph 14 constitutes alleged background information, not allegations of fact

pertinent to the resolution of the claims at issue in this FOIA action, and Plaintiffs'

characterization of a news article, to which no response is required.  To the extent a response is

required, Defendant respectfully refers the Court to the article cited in Paragraph 14 for a true

and complete statement of its contents, and denies the allegations to the extent they fail to reflect

or accurately characterize its true contents.

15.     Paragraph 15 constitutes alleged background information, not allegations of fact

pertinent to the resolution of the claims at issue in this FOIA action, and Plaintiffs'

characterization of a USPS letter, to which no response is required.  To the extent a response is

required, Defendant respectfully refers the Court to the letter cited in Paragraph 15 for a true and

complete statement of its contents and denies the allegations to the extent they fail to reflect or

accurately characterize its true contents.

16.     Paragraph 16 constitutes alleged background information, not allegations of fact

pertinent to the resolution of the claims at issue in this FOIA action, and Plaintiffs'

characterization of information available on a USPS website, to which no response is required.

To the extent a response is required, Defendant respectfully refers the Court to the website cited

in Paragraph 16 for a true and complete statement of its contents, and denies the allegations to

the extent they fail to reflect or accurately characterize its true contents.

17.     Paragraph 17 constitutes alleged background information, not allegations of fact

pertinent to the resolution of the claims at issue in this FOIA action, and Plaintiffs'

characterization of information available on a USPS website, to which no response is required.

**JA018**

To the extent a response is required, Defendant respectfully refers the Court to the website cited in Paragraph 17 for a true and complete statement of its contents, and denies the allegations to the extent they fail to reflect or accurately characterize its true contents.

18.     Paragraph 18 constitutes alleged background information, not allegations of fact pertinent to the resolution of the claims at issue in this FOIA action, and Plaintiffs' characterization of information available on a USPS website, to which no response is required. To the extent a response is required, Defendant respectfully refers the Court to the website cited in Paragraph 18 for a true and complete statement of its contents, and denies the allegations to the extent they fail to reflect or accurately characterize its true contents.

19.     Paragraph 19 constitutes alleged background information, not allegations of fact pertinent to the resolution of the claims at issue in this FOIA action, and Plaintiffs' characterization of information available on a USPS website, to which no response is required. To the extent a response is required, Defendant respectfully refers the Court to the website cited in Paragraph 19 for a true and complete statement of its contents, and denies the allegations to the extent they fail to reflect or accurately characterize its true contents.

### Plaintiffs' FOIA Requests

### <u>The Dow Jones Request</u>

20.     Admits that Dow Jones submitted a FOIA request to USPS on September 15, 2021 ("Dow Jones FOIA Request"), respectfully refers the Court to the Dow Jones FOIA Request for a true and complete statement of its contents, and denies the allegations to the extent they fail to reflect or accurately characterize the Request's true contents.

21.     Paragraph 21 constitutes Plaintiffs' characterization of the Dow Jones FOIA Request, to which no response is required. To the extent Paragraph 21 contains factual

JA019

allegations to which a response is required, respectfully refers the Court to the Dow Jones FOIA Request described therein for a true and complete statement of its contents, and denies the allegations to the extent they fail to reflect or accurately characterize the Request's full contents.

22.     Paragraph 22 constitutes Plaintiffs' characterization of the Dow Jones FOIA Request, to which no response is required.  To the extent Paragraph 22 contains factual allegations to which a response is required, respectfully refers the Court to the Dow Jones FOIA Request described therein for a true and complete statement of its contents, and denies the allegations to the extent they fail to reflect or accurately characterize the Request's full contents.

23.     Paragraph 23 constitutes Plaintiffs' characterization of the Dow Jones FOIA Request, to which no response is required.  To the extent Paragraph 23 contains factual allegations to which a response is required, respectfully refers the Court to the Dow Jones FOIA Request described therein for a true and complete statement of its contents, and denies the allegations to the extent they fail to reflect or accurately characterize the Request's full contents.

24.     Paragraph 24 constitutes Plaintiffs' characterization of the Dow Jones FOIA Request, to which no response is required.  To the extent Paragraph 24 contains factual allegations to which a response is required, respectfully refers the Court to the Dow Jones FOIA Request described therein for a true and complete statement of its contents, and denies the allegations to the extent they fail to reflect or accurately characterize the Request's full contents.

25.     Admits that by letter dated September 17, 2021, USPS responded to the Dow Jones FOIA Request, respectfully refers the Court to the letter for a true and complete statement of its contents, and denies the allegations to the extent they fail to reflect or accurately characterize the letter's full contents.

26.     Paragraph 26 constitutes Plaintiffs' characterization of USPS's September 17,

JA020

2021, response to the Dow Jones FOIA Request, respectfully refers the Court to the letter for a true and complete statement of its contents, and denies the allegations to the extent they fail to reflect or accurately characterize the letter's full contents.

27.     Paragraph 27 constitutes Plaintiffs' characterization of USPS's September 17, 2021, response to the Dow Jones FOIA Request, respectfully refers the Court to the letter for a true and complete statement of its contents, and denies the allegations to the extent they fail to reflect or accurately characterize the letter's full contents.

28.     Denies the allegations in Paragraph 28.

29.     Admits that by letter dated November 24, 2021, Dow Jones submitted an administrative appeal of USPS's September 17, 2021, letter response, respectfully refers the Court to the letter for a true and complete statement of its contents and denies the allegations to the extent they fail to reflect or accurately characterize the letter's full contents.

30.     Paragraph 30 constitutes Plaintiffs' characterization of Dow Jones's November 24, 2021, administrative appeal, respectfully refers the Court to the letter for a true and complete statement of its contents and denies the allegations to the extent they fail to reflect or accurately characterize the letter's full contents.

31.     Admits that on December 9, 2021, USPS issued an Opinion and Order relating to Dow Jones's administrative appeal dated November 24, 2021, respectfully refers the Court to the Opinion and Order for a true and complete statement of its contents and denies the allegations to the extent they fail to reflect or accurately characterize the Opinion and Order's full contents.

<u>The Bloomberg Request</u>

32.     Admits that Bloomberg submitted a FOIA request to USPS on March 30. 2021 ("Bloomberg FOIA Request"), respectfully refers the Court to the Bloomberg FOIA Request for

7

JA021

a true and complete statement of its contents, and denies the allegations to the extent they fail to reflect or accurately characterize the Request's true contents.

33.     Paragraph 33 constitutes Plaintiffs' characterization of the Bloomberg FOIA Request, to which no response is required.  To the extent Paragraph 33 contains factual allegations to which a response is required, respectfully refers the Court to the Dow Jones FOIA Request described therein for a true and complete statement of its contents, and denies the allegations to the extent they fail to reflect or accurately characterize the Request's full contents.

34.     Paragraph 34 constitutes Plaintiffs' characterization of the Bloomberg FOIA Request, to which no response is required.  To the extent Paragraph 34 contains factual allegations to which a response is required, respectfully refers the Court to the Bloomberg FOIA Request described therein for a true and complete statement of its contents, and denies the allegations to the extent they fail to reflect or accurately characterize the Request's full contents.

35.     Admits the allegations in Paragraph 35.

36.     Admits that by letter dated April 19, 2021, USPS responded to the Bloomberg FOIA Request, respectfully refers the Court to the letter for a true and complete statement of its contents, and denies the allegations to the extent they fail to reflect or accurately characterize the letter's full contents.

37.     Paragraph 37 constitutes Plaintiffs' characterization of USPS's April 19, 2021, letter response, respectfully refers the Court to the letter for a true and complete statement of its contents and denies the allegations to the extent they fail to reflect or accurately characterize the letter's full contents.

38.     Admits that by letter dated June 29, 2021, Bloomberg submitted an administrative appeal of USPS's April 19, 2021, letter response, respectfully refers the Court to the letter for a

JA022

true and complete statement of its contents and denies the allegations to the extent they fail to reflect or accurately characterize the letter's full contents.

39. Paragraph 39 constitutes Plaintiffs' characterization of Bloomberg's April 19, 2021, administrative appeal, respectfully refers the Court to the letter for a true and complete statement of its contents and denies the allegations to the extent they fail to reflect or accurately characterize the letter's full contents.

40. Admits that on July 29, 2021, USPS issued an Opinion and Order relating to Bloomberg's administrative appeal dated April 19, 2021, respectfully refers the Court to the Opinion and Order for a true and complete statement of its contents and denies the allegations to the extent they fail to reflect or accurately characterize the Opinion and Order's full contents.

41. Admits the allegations in Paragraph 41.

42. Admits the allegations in Paragraph 42. Defendant avers that it has provided all the records that Plaintiffs are entitled to under FOIA.

## CAUSE OF ACTION

### Count I

43. Defendant repeats each and every response set forth herein to the allegations in Paragraphs 1–42 of the Complaint.

44. Admits the allegations in Paragraph 44.

45. Paragraph 45 contains conclusions of law to which no response is required. To the extent Paragraph 45 contains factual allegations to which a response is required, denies the allegations in Paragraph 45.

46.     Paragraph 46 contains conclusions of law to which no response is required.  To the extent Paragraph 46 contains factual allegations to which a response is required, denies the allegations in Paragraph 46.

47.     Admits the allegations in Paragraph 47. Defendant avers that it has produced all records Plaintiffs are entitled to under FOIA.

48.     Paragraph 48 contains conclusions of law to which no response is required.  To the extent Paragraph 48 contains factual allegations to which a response is required, denies the allegations in Paragraph 48.

49.     Paragraph 49 contains conclusions of law to which no response is required.  To the extent Paragraph 49 contains factual allegations to which a response is required, denies the allegations in Paragraph 49.

50.     Paragraph 50 contains conclusions of law to which no response is required.  To the extent Paragraph 50 contains factual allegations to which a response is required, denies the allegations in Paragraph 50.

51.     Paragraph 51 contains conclusions of law to which no response is required.  To the extent Paragraph 51 contains factual allegations to which a response is required, denies the allegations in Paragraph 51.

## **REQUEST FOR RELIEF**

The paragraphs following Paragraph 51 contain Plaintiffs' prayer for relief, to which no response is required.  To the extent a response is required, deny that Plaintiffs are entitled to the requested relief, or to any relief whatsoever.

## **AFFIRMATIVE AND OTHER DEFENSES**

Any allegations not specifically admitted, denied, or otherwise answered are hereby

denied.  For further defenses, Defendant alleges as follows:

### FIRST DEFENSE

The information requested in Plaintiffs' FOIA Requests are exempt in whole or in part under the FOIA.  *See* 5 U.S.C. § 552(b).

### SECOND DEFENSE

The Court lacks subject matter jurisdiction over Plaintiffs' requests for relief that exceed the relief authorized by statute under FOIA, 5 U.S.C. § 552.

### THIRD DEFENSE

The Court lacks subject matter jurisdiction over Plaintiffs' requests for any relief beyond the scope of Plaintiffs' FOIA request at issue in this lawsuit.

### FOURTH DEFENSE

Plaintiffs are not entitled to attorneys' fees or costs under 5 U.S.C. § 552(a)(4)(E).

### FIFTH DEFENSE

Plaintiffs' complaint should be dismissed in whole or in part for failure to state a claim on which relief may be granted, as Defendant has not unlawfully withheld any records or information within the meaning of FOIA.

\*     \*     \*

Defendant may have additional defenses that are presently unknown but may be ascertained at a later time.  Defendant reserves the right to assert each and every affirmative or other defense that may be available, including any defenses pursuant to Federal Rules of Civil Procedure 8 and 12.

**JA025**

Dated: New York, New York
August 26, 2022

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

By:     _/s/ Tomoko Onozawa_____
TOMOKO ONOZAWA
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007
Tel.: (212) 637-2721
Fax: (212) 637-2717
E-mail: tomoko.onozawa@usdoj.gov

**JA026**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BLOOMBERG L.P. and DOW JONES & COMPANY, INC.,

Plaintiffs,

-v-

UNITED STATES POSTAL SERVICE,

Defendant.

22 Civ. 6112 (DLC)

---

## DECLARATION OF JEFFREY TACKES

I, Jeffrey Tackes, make the following Declaration in lieu of an affidavit in accordance with the provisions of 28 U.S.C. § 1746. I understand that my declaration may be introduced into the record of the above captioned action.

1. I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2. I hold a Bachelor of Science degree in Industrial Engineering from the University of Wisconsin, Madison.

3. I currently hold the position of Director, Digital Business Services in the United States Postal Service ("USPS" or the "Postal Service"). I have been in this position since January 2020. Prior to my return to USPS in 2014, I spent seven years at Dun & Bradstreet as a senior data consultant advising federal government agencies on commercial data use and value. My responsibilities in that position included assessing the data needs of commercial and government clients and providing input on the value these clients could extract from the commercial data services available. A large part of my role as a data consultant was assessing

1

JA027

the data elements, pricing, delivery options and terms best suited for each client engagement. The highest value data elements typically contain summary insights built upon a broad base of source data.  The USPS's nationwide network of daily acceptance, processing, and delivery generates a broad base of source data, refreshed at an unparalleled rate, and communicated in near real time, establishing the foundation for high market-value data offerings.

  4. In my current official capacity as Director, Digital Business Services, I report to the Vice President, Innovative Business Technology within the Chief Technology Office of the USPS.  The Digital Business Services team is responsible for developing new revenue opportunities to support USPS operations, including services that fall under our authority to license intellectual property.  I oversee development of new services that generate additional non-postal revenue in support of USPS operations.

  5. Congress has repeatedly instructed that the Postal Service be run more like a private business, including through passage of several pieces of legislation.  In 1970, Congress enacted the Postal Reorganization Act of 1970, Pub. L. No. 91–375, 84 Stat. 719–768, 84 Stat. 769–787 (1970), codified at 39 U.S.C. § 101 *et seq.*, which abolished the United States Post Office Department and reorganized the Postal Service to operate more like a private enterprise. *See Franchise Tax Bd. v. USPS,* 467 U.S. 512, 519–520 (1984) ("In passing the Postal Reorganization Act of 1970 . . . Congress [] indicated that it wished the Postal Service to be run more like a business than had its predecessor, the Post Office Department.").  In 2006, Congress enacted the Postal Accountability and Enhancement Act of 2006, Pub. L. No. 109–435, 120 Stat. 3198 (2006), which granted the Postal Service significantly more flexibility with respect to the development of competitive products to give the agency the ability to compete fairly within the marketplace.

6.    Pursuant to Congress' intent, as set forth in federal statutes, USPS operates akin to a private sector business when licensing intellectual property and therefore must explore all avenues to ensure a sustainable future for USPS.  Like any business, new revenue sources are a vital part of future growth in USPS revenue.  The Postal Service works to create new revenue sources by implementing solutions based on customer and marketplace needs that correspond with existing USPS capabilities and data.  These new revenue sources allow USPS to compete more effectively and further sustain universal service and access.

7.    The USPS operates one of the nation's largest physical and digital networks, and in 2021 generated terabytes of data while adding 1.7 million new delivery points and processing 36 million address changes.  In so doing, the USPS generates intellectual property in the form of data that competes directly with data assets and services offered by other data creators and data brokers in the marketplace.  Private businesses commonly monetize data assets, particularly those that generate unique value in the marketplace.

8.    Individuals, families, and businesses can notify the USPS of a temporary or permanent change to their mailing address by either filing an online change of address ("COA") request at https://usps.com/move, or by filling out a PS Form 3575 (Mail Forwarding Change of Address Order) and either submitting the form to a local post office or mailing it to a designated USPS address.

9.    USPS maintains data from COA filings for individuals, families, and business, and publishes generalized data on COA filings on its FOIA website.  *See Change of Address Stats*, USPS FOIA LIBRARY, *available at* https://about.usps.com/who/legal/foia/library.htm.  The COA data on USPS's FOIA website is separated into one .csv file per calendar year and is updated every month.  Each annual .csv file contains: a list of every ZIP code in the United

3

**JA029**

States; the total numbers of COA filings into and out of a given ZIP code; the total numbers of

individuals, families, and businesses submitting COA filings into and out of a given ZIP code;

and the total numbers of temporary and permanent COA requests.

10.     The COA data in the public domain only shows the total number of COA filings

into and out of a specific ZIP code, but does <u>not</u> show how many individuals, families, and

business moved from specific ZIP codes to other specific ZIP codes, and also does not show how

many COA requests were permanent or temporary by individuals, families, or businesses.

### **The FOIA Requests**

#### The Dow Jones Request

11.     By correspondence dated September 15, 2021 and received by USPS on

September 16, 2021, plaintiff Dow Jones & Company, Inc. ("Dow Jones"), through its *Wall

Street Journal* reporter Paul Overberg, submitted a Freedom of Information Act ("FOIA")

request under 5 U.S.C. § 552 (the "Dow Jones FOIA Request") through the USPS FOIA portal.

Attached as **<u>Exhibit A</u>** is a true and correct copy of the Dow Jones FOIA Request.

12.     The Dow Jones FOIA Request sought "monthly summary data showing the

number of residential postal customers who filed change-of-address requests" between January

2021 and June 2021, and specifically sought "separate tallies for temporary and permanent

requests."  The Dow Jones FOIA Request asked USPS to send its response as an Excel file with

columns named: (a) YYYYMM (b) Old County; (c) Old State; (d) New County; (e) New State;

(f) Total Perm[anent]; and (g) Total Temp[orary].

13.     USPS assigned the Dow Jones FOIA Request an internal tracking number, 2021-

FPRO-03224.

14.     On September 17, 2021, Tai Thompson, a USPS Government Information Specialist, issued an initial decision in response to the Dow Jones FOIA Request ("September 2021 USPS Decision").  Attached as **Exhibit B** is a true and correct copy of the September 2021 USPS Decision.

15.     In this decision, Ms. Thompson advised Mr. Overberg that some of the requested records had been made publicly available in public and/or in electronic reading rooms, and referred him to USPS's FOIA Library website.  As explained above, the publicly available data shows aggregated COA filings out of and into each ZIP code but does not show the relationship between old and new filing counts.  Ms. Thompson advised that the publicly-available portions of the records requested in the Dow Jones FOIA Request would not be processed, pursuant to 5 U.S.C. § 552(a)(3).

16.     The Dow Jones FOIA Request, however, also sought information showing the association between filers' "Old County"/"Old State" and their "New County"/"New State" by ZIP code.  In other words, the Dow Jones FOIA Request sought data that makes associations between counties and filers' ZIP codes, cities, and states, thereby showing the associated movement of COA filers and filings between ZIP codes and old/new counties, and between ZIP codes and old/new states.  The correlated data sought by the Dow Jones FOIA request allows the public to obtain more granular demographic and socioeconomic information that has market value.

17.     As a result, Ms. Thompson stated that these records are exempt from disclosure under FOIA Exemption 3, 5 U.S.C. § 552(b)(3), in conjunction with 39 U.S.C. § 410(c)(2).  Ms. Thompson further informed Dow Jones that the additional portions of its FOIA Request that are not publicly available "qualify as 'information of a commercial nature'" under 39 U.S.C.

5

**JA031**

§ 410(c)(2) "because it is related to COA counts by origin and destination which is information that is now, at the moment, currently under development for a commercial product."  Ms. Thompson therefore stated that "[r]equests for COA data that seek the originating and destination location, at any level, is no longer releasable under the FOIA," and informed Dow Jones that it could file an administrative appeal of the September 2021 USPS Decision within 90 days.

18.    On November 24, 2021, plaintiff Dow Jones appealed the September 2021 USPS Decision ("November 2021 Dow Jones Appeal").  Attached as **Exhibit C** is a true and correct copy of the November 2021 Dow Jones Appeal.  The November 2021 Dow Jones Appeal asserted that the documents withheld under Exemption 3, in conjunction with 39 U.S.C. § 410(c)(2), did not qualify as "information of a commercial nature" and that even if they did, the Postal Service has not established that the information would not be disclosed under "good business practice."

19.    On December 9, 2021, USPS's Office of the General Counsel issued an Opinion and Order affirming the agency's September 2021 USPS Decision ("December 2021 USPS Opinion & Order).  Attached as **Exhibit D** is a true and correct copy of the December 2021 USPS Opinion & Order.  The December 2021 USPS Opinion & Order reaffirmed that the data sought by the Dow Jones FOIA Request which was not already publicly available through USPS's FOIA website was subject to withholding under FOIA Exemption 3 and 39 U.S.C. § 410(c)(2) because the request for "COA data aggregated by origin/destination was properly classified as commercial information that would not be disclosed under good business practice."

### The Bloomberg Request

20.     On or about March 30, 2021, plaintiff Bloomberg, L.P., through one of its reporters, Marie Patino, submitted a FOIA request (the "Bloomberg FOIA Request") through the USPS FOIA portal.  Ms. Patino sought change of address data, per ZIP code, for the month of December 2020, including origin/destination information.  Attached as **Exhibit E** is a true and correct copy of the Bloomberg FOIA Request.

21.     USPS assigned the Dow Jones FOIA Request an internal tracking number, 2021-FPRO-01469.

22.     On April 19, 2021, James D. Wilson, who at the time was the Director of Addressing and Geospatial Technology at USPS, issued an initial decision in response to the Bloomberg FOIA Request ("April 2021 USPS Decision.").  Attached as **Exhibit F** is a true and correct copy of the April 2021 USPS Decision.  In this decision, Mr. Wilson explained that these records are exempt from disclosure under FOIA Exemption 3, 5 U.S.C. § 552(b)(3), in conjunction with 39 U.S.C. § 410(c)(2), because "the information is related to change-of-address counts which provides information that is under development for a commercial product."

23.     On June 29, 2021, plaintiff Bloomberg appealed the April 2021 USPS Decision (the "June 2021 Bloomberg Appeal").  Attached as **Exhibit G** is a true and correct copy of the June 2021 Bloomberg Appeal.  The June 2021 Bloomberg Appeal asserted that the documents withheld under Exemption 3, in conjunction with 39 U.S.C. § 410(c)(2), did not qualify as "information of a commercial nature," and that even if they did, the Postal Service had not established that the information would not be disclosed under "good business practice."

24.     On July 29, 2021, USPS's Office of the General Counsel issued an Opinion and

Order affirming the agency's June 2021 USPS Decision ("July 2021 USPS Opinion & Order).

Attached as **Exhibit H** is a true and correct copy of the July 2021 USPS Opinion & Order.

25.     The July 2021 USPS Opinion & Order reaffirmed that the information sought by

the Bloomberg FOIA Request was subject to withholding under FOIA Exemption 3 and 39

U.S.C. § 410(c)(2) because the request for "records regarding the number of households that

changed their address from several ZIP codes to all other ZIP codes in the U.S." was "properly

categorized as being commercial in nature."  The decision further stated that "[t]he information

sought is currently being used in the development of a future commercial product," such that

disclosure "would benefit our competitors by providing them with specific details regarding the

components of the Postal 'service's new commercial product" and "could compromise the

product's development process."

### Data Withheld in Response to the FOIA Requests

26.     Section 552(b)(3) of the FOIA provides that the FOIA does not require the release

of matters that are specifically exempt from disclosure by statute, provided that such statutes: (A)

require that the matters be withheld from the public in such a manner as to leave no discretion on

the issue; or (B) establish particular criteria for withholding or refer to particular types of matter

to be withheld.  5 U.S.C. § 552(b)(3).  USPS has determined that the COA data sought in the

Dow Jones FOIA Request and the Bloomberg FOIA Request (together, the "FOIA Requests") is

information that falls squarely within the scope of a relevant withholding statute.

27.     The Postal Reorganization Act of 1970 provides the Postal Service with a broad

exemption under FOIA to withhold business-sensitive information under best business practices.

39 U.S.C. § 410(c)(2).  Specifically, section 410(c)(2) permits the Postal Service to withhold

"information of a commercial nature, including trade secrets, whether or not obtained from a person outside the Postal Service, which under good business practice would not be publicly disclosed."  *Id*.  Information of a commercial nature under Section 410(c)(2) is broadly defined by Postal Service regulations to include all information that "relates to commerce, trade, profit, or the Postal Service's ability to conduct itself in a businesslike manner."  39 C.F.R. § 265.14(b)(3).

28.     The Postal Service has long understood the Postal Reorganizational Act to constitute a withholding statute for purposes of Exemption 3 under FOIA.  Courts have routinely upheld the Postal Service's right to withhold materials that fall within the scope of the Act under FOIA.  In determining whether particular information is commercial in nature and therefore not subject to mandatory public disclosure under FOIA, the Postal Service considers six factors relating to whether the information sought is more akin to its role as a business entity, a competitor in the market, or a provider of basic public services.  *See* 39 C.F.R. § 265.14(b)(3)(i). The six factors are:

> (A) Relates to products or services subject to economic competition, including, but not limited to, "competitive" products or services as defined in 39 U.S.C. 3631, an inbound international service, or an outbound international service for which rates or service features are treated as nonpublic;

> (B) Relates to the Postal Service's activities that are analogous to a private business in the marketplace;

> (C) Would be of potential benefit to individuals or entities in economic competition with the Postal Service, its customers, suppliers, affiliates, or business partners or could be used to cause harm to a commercial interest of the Postal Service, its customers, suppliers, affiliates, or business partners;

> (D) Is proprietary or includes conditions or protections on distribution and disclosure, is subject to a nondisclosure agreement, or a third party has otherwise expressed an interest in protecting such information from disclosure;

> (E) Is the result of negotiations, agreements, contracts or business deals between the Postal Service and a business entity; or

9

(F) Relates primarily to the Postal Service's governmental functions or its activities as a provider of basic public services.

29.     The Postal Service considered each factor and determined that the COA data sought by the FOIA Requests relates to Postal Service activities that are analogous to those of a private business in the marketplace. USPS also determined that disclosure would benefit the Postal Service's competitors and undermine its ability to monetize its data.

30.     This data will be used in a planned licensed data offering called Population Mobility Trends. At this time, USPS anticipates that the Population Mobility Trends product will be released in the spring of 2023. Population Mobility Trends is a tabular data set updated every 30 days under a renewable annual license subscription, and will be accessed through the USPS electronic product fulfillment service. Population Mobility Trends includes granular data on aggregated population moves from one geographic region to another. In addition to what is available on USPS's FOIA website, Population Mobility Trends will show population movement from every ZIP code and includes the top three (where minimum thresholds are met) ZIP codes that those populations are moving to locally, both in-state and out-of-state.

31.     For example, for a specific ZIP Code, Population Mobility Trends will provide the total COA filing counts from that ZIP code to: (1) the top three "to" ZIP counts within the county (*i.e.* local moves); (2) the top three "to" ZIP codes within the state (*i.e.* in-state moves); and  (3) the top three "to" ZIPs outside the state (*i.e.* out-of-state moves). For each of these filing counts for the old and new ZIP codes, Population Mobility Trends will include the three most prevalent demographic attribute ranges (age, income, household size) identified for temporary, permanent, individual, family, and business filings.

32.     Each data file provided to a paying Population Mobility Trends licensee will be refreshed with COA activity from the prior 30 days, and the licensee will have the option to

10

**JA036**

license the prior 12-month or 48-month data sets when initiating its first annual license subscription. This means that the first offering of Population Mobility Trends will contain commercial data starting from the 2019–2020 calendar year.

33.     In developing the Population Mobility Trends data offering, USPS needed to complete several steps in the product development process to prepare this service as a market offering. These steps included: valuating the other services in the market; determining how those services are consumed, determining which licensing terms are applicable for this type of data offering; executing the legally required notice to the public for this particular data use; and defining the channels to be used for marketing, distribution, data governance, and audit. These steps have been completed as planned and USPS now moving into the production stage of this data offering.

34.     Services and data that provide insights on the migration of people are currently available in the competitive data marketplace. For example, location data intelligence is an established subsegment of analytics and business intelligence ("ADI") platforms, and location data sources are critical inputs used for location data intelligence, and often within ADI platforms, to process and/or visualize real world population movement trends. Location data intelligence is leveraged in many markets and use cases, including placement or staging of services (retail, real estate, construction, marketing, etc.) *See, e.g.,* HERE TECHNOLOGIES, https://here.com/ (last visited Dec. 9, 2022); SAFEGRAPH INC., https://safegraph.com (last visited Dec. 9, 2022); *What is Location Data?*, UNACAST INC., https://www.unacast.com/what-is-location-data (last visited Dec. 9, 2022). Based on my experience in advising federal government agencies on commercial data use and value, and my knowledge and experience with USPS's competitors in commercial data services, other private businesses that gather and sell

location data would not customarily release to the public information relating to population movement patterns and trends.

35.     USPS's effort to monetize data such as Population Mobility Trends is consistent with the commercial activities of leading companies in the marketplace.  In looking to license COA data, USPS is operating much like other private businesses.  Data monetization is a commonly understood practice and gaining traction as a revenue-generating asset.  *See, e.g., What is Data Monetization?*, TIBCO SOFTWARE INC.*,* https://www.tibco.com/reference-center/what-is-data-monetization (last visited Dec. 9, 2022); *Your Easy Guide to Data Monetization*, SISENSE INC., https://www.sisense.com/data-monetization/ (last visited Dec. 9, 2022).  USPS will forgo valuable sustainable revenue if it does not develop and support a commercial license offering such as Population Mobility Trends.

36.     The value of data in a competitive marketplace is determined by its availability, recency, completeness, and source accuracy.  Publicly releasing the requested COA data sought by the FOIA Requests will provide information and insights to marketplace data providers, data aggregators and data solutions that will harm USPS's ability to license this data for its full commercial value.  In addition, it is standard business practice when licensing data to include restrictions on use, access, distribution, and retention.  USPS data licenses include these restrictions.  Without these restrictions, USPS would have no control or recourse when protecting its data from unauthorized sale, distribution, or disclosure.

37.     At this time, USPS does not consider the publicly available COA data in its FOIA library to pose a negative impact on the forthcoming Population Mobility Trends product.  The Population Mobility Trends product is different from the publicly-available COA data because the product shows for each ZIP code, the top three ZIP codes that those populations are moving

**JA038**

to locally, in-state and out-of-state. The Population Mobility Trends product therefore provides up to nine times more data than the publicly available data published monthly on USPS's website.

38.    If USPS were compelled through FOIA to disclose the relationships between the origins of a move and the destinations of a move (such as that represented in the Population Mobility Trends data), those disclosures will negatively impact USPS's data licensing offerings, including the annual subscription and the optional historical file subscriptions that will be made available through Population Mobility Trends.  Protecting sensitive commercial information is critical to the Postal Service's ability to generate revenue in a highly competitive marketplace and allows the Postal Service to operate more like a business, as Congress intended.  Disclosure of information that reveals specific aspects of data that USPS intends to license in the commercial market will negatively impact the Postal Service's ability to monetize that data, thereby disadvantaging the Postal Service and harming its business.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing declaration is true and correct.

Executed in Washington, D.C., on December 9, 2022.

E-SIGNED by Jeffrey.J Tackes
on 2022-12-09 11:03:48 CST

_____

JEFFREY TACKES

13

**JA039**

# EXHIBIT A

# Submit New Request

## Requester Details

To modify request details please update your requester profile or contact the our office for assistance.

**Paul Overberg**
Wall Street Journal
1025 Connecticut Ave NW
Suite 800
Washington, DC  20036
Phone 202-862-9261
paul.overberg@wsj.com

Requester Default Category: News Media

## General Information

| | |
|---|---|
| Requester Service Center | HQ Records Office |
| Action Office Instructions | for Postal Service Headquarters controlled records including contracts, building leases, and other real estate transactions or employee listings |
| Requester Category | News Media |
| Send Response Via | E-mail |
| Payment Mode | Check |

## Shipping Address

| | |
|---|---|
| Address | 1025 Connecticut Ave NW |
| Apartment/Suite Number | Suite 800 |
| City | Washington |
| State(US) | District of Columbia |
| Country | United States |
| Zip Code | 20036 |

## Request Information

**Description of Request**

This letter constitutes a request under the federal Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

Thank you for quick fulfillment of two earlier requests, No. 2021-FPRO-00980 and No. 2021-FPRO-01334. They included monthly summary data showing the number of residential postal customers who filed change-of-address requests in 2017-2020. They contained separate tallies for temporary and permanent requests. They were sent as an Excel file with columns named:

YYYYMM
Old County
Old State
New County
New State
Total Perm
Total Temp

This request seeks the same data for January-June 2021 in the same format.

As a reporter for The Wall Street Journal, a news media organization, I request a waiver of fees. Release of this information is likely to contribute significantly to public understanding of pandemic effects, including on postal operations. (Please inform me if fees will exceed $100 before proceeding.)

Because I'm making this request as a journalist and this information has timely value, I would appreciate your communicating with me by telephone or email, rather than by postal mail, if you have questions. You may contact me at paul.overberg@wsj.com or 202-862-9261. I look forward to your response. Thank you in advance for your help.

Paul Overberg
The Wall Street Journal

## JA041

Date Range for Record
Search:From
Date Range for Record
Search:To
Description Document
Privacy Waiver & Authorization
Proof of Identity

## Fee Information

| | |
|---|---|
| Willing Amount | $100 |
| Fee Waiver Requested | Yes |
| Fee Waiver Request Reason | As a reporter for The Wall Street Journal, a news media organization, I request a waiver of fees. Release of this information is likely to contribute significantly to public understanding of pandemic effects, including on postal operations. |
| Willing to Pay All Fees | No |

## Expedite Information

| | |
|---|---|
| Expedited Processing Requested | No |
| Need for Expedited Processing | |

**JA042**

# EXHIBIT B

PRIVACY & RECORDS MANAGEMENT OFFICE

 **UNITED STATES**
**POSTAL SERVICE**

September 17, 2021

Via Email: paul.overberg@wsj.com

Paul Overberg
Wall Street Journal
1025 Connecticut Ave NW, Suite 800
Washington, DC 20036

RE: FOIA Case No. 2021-FPRO-03224

Dear Mr. Overberg:

This responds to your Freedom of Information Act (FOIA) requests dated September 15, 2021 in which you seek access to Postal Service county-level change-of-address (COA) records between January and June 2021, including origin/destination data.

There is a longstanding practice of limiting the data reported for COA orders. During Hurricane Katrina, a policy was established that prohibits disclosure of COA volume where the count is less than ten (10). The purpose of this policy was to minimize the ability of a data recipient to identify where any specific individual(s) may have moved from or to, which would be a violation of our responsibility to safeguard the privacy interests of customers submitting COA orders.

Please note that some of the records you have requested are records that the Postal Service has recently decided to make available for public inspection in accordance with the FOIA, 5 U.S.C. § 552(a)(2). The records you have requested consist of:

- Records that have been released to previous FOIA requesters and that the Postal Service has determined have become or are likely to become the subject of subsequent requests for substantially the same records; and

- Records that have been released to previous FOIA requesters and that have been requested three (3) or more times

Because the Postal Service has made these records publicly available in its public and/or electronic reading rooms, we will not process these records in response to your FOIA request made under 5 U.S.C. § 552(a)(3). Instead, please note that the records that you seek are available on our website under the *FOIA Library – Change of Address Stats.* Given the highly sought data of COA records, requests will no longer be processed under the FOIA as the information is available to the general public. It is available as an Excel spreadsheet which allows ease of customization by each individual data seeker after download. Any and all COA data to be released is available at the below-referenced FOIA Library website, which will be updated on a monthly basis:

https://about.usps.com/who/legal/foia/welcome.htm.

You may now obtain county level information by purchasing the Postal Service's *City State Product* or from another source. For more information regarding our *City State Product*, please contact the National Customer Support Center at 1-800-238-3150 as this information is no longer being processed under the FOIA.

In regard to the remaining portion of your request pertaining to origin/destination data, based on your description of records sought, it has been determined that this portion of the records you seek are now exempt from disclosure under FOIA Exemption 3, 39 U.S.C. §410(c)(2).

Exemption 3 allows an agency to withhold information that is "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3). Section 410(c)(2) of the Postal Reorganization Act qualifies as an Exemption 3 statute. 39 U.S.C. § 410(c)(2). Section 410(c)(2) permits the Postal Service to withhold "information of a commercial nature, including trade secrets, whether or not obtained from a person outside the Postal Service, which under good business practice would not be publicly disclosed." 39 U.S.C. §410(c)(2). Information of a commercial nature under Section 410(c)(2) is broadly defined to include all information that "relates to commerce, trade, profit, or the Postal Service's ability to conduct itself in a businesslike manner." 39 C.F.R. § 265.14(b)(3). In determining whether particular information is commercial in nature, the Postal Service considers six (6) factors relating to whether the information is more akin to its role as a business entity, a competitor in the market or a provider of basic public services. *See* 39 C.F.R. § 265.14(b)(3)(i).

Here, we find that the records you requested qualify as "information of a commercial nature" under Section 410(c)(2) because it is related to COA counts by origin and destination which is information that is now, at the moment, currently under development for a commercial product. Requests for COA data that seek the originating and destination location, at any level, is no longer releasable under the FOIA. Accordingly, this information is exempt from disclosure under Exemption 3 of the FOIA and Section 410(c)(2).

If you are not satisfied with the response to this request, you may file an administrative appeal within ninety (90) days of the date of this response letter by writing to the General Counsel U.S. Postal Service 475 L'Enfant Plaza SW Washington, DC 20260 or via email at FOIAAppeal@usps.gov. Your appeal must be postmarked or electronically transmitted within ninety (90) days of the date of the response to your request. The letter of appeal should include, as applicable:

(1) A copy of the request, of any notification of denial or other action, and of any other related correspondence;
(2) The FOIA tracking number assigned to the request;
(3) A statement of the action, or failure to act, from which the appeal is taken;
(4) A statement identifying the specific redactions to responsive records that the requester is challenging;
(5) A statement of the relief sought; and
(6) A statement of the reasons why the requester believes the action or failure to act is erroneous.

For further assistance and to discuss any aspect of your request, you may contact any of the following:

PRIVACY & RECORDS OFFICE
US POSTAL SERVICE
475 L'ENFANT PLAZA SW RM 1P830
WASHINGTON DC 20260-1101
Phone: (202) 268-2608
Fax: (202) 268-5353
FOIA Public Liaison: Nancy Chavannes-Battle

Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

Sincerely,

Tai Thompson
Government Information Specialist

# EXHIBIT C

 **DOW JONES**

Jacob P. Goldstein
Vice President, Associate General Counsel
1211 Avenue of the Americas
New York, NY 10036
212.416.2162
jacob.goldstein@dowjones.com

November 24, 2021

<u>**VIA E-MAIL**</u>

Thomas J. Marshall
General Counsel
U.S. Postal Service
475 L'Enfant Plaza SW
Washington, DC 20260
FOIAAppeal@usps.gov

      Re:    **Freedom of Information Act Appeal**
                <u>**FOIA Request 2021-FPRO-03224**</u>

Dear Mr. Marshall:

      I write on behalf of Paul Overberg and *The Wall Street Journal* (jointly, the "Journal").  Pursuant to 5 U.S.C. § 552(a)(6)(A) and 39 C.F.R. § 265.8, by this letter, we hereby appeal the denial of the Journal's September 15, 2021, request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

**BACKGROUND**

      On September 15, 2021, the Journal submitted to the U.S. Postal Service a FOIA request for certain records. Specifically, the Journal requested "monthly summary data showing the number of residential postal customers who filed change-of-address requests" for January-June 2021 in an Excel format with "separate tallies for temporary and permanent requests" and data for the following columns:

           YYYYMM
           Old County
           Old State
           New County
           New State
           Total Perm
           Total Temp

(the "Request"). The Request noted that the Postal Service had recently granted requests for the same change-of-address ("COA") data for other time periods, citing

FOIA requests No. 2021-FPRO-00980 and No. 2021-FPRO-01334. Copies of the Postal Service's letters granting those FOIA requests in February and March 2021 are enclosed for your reference.

On September 17, 2021, the Postal Service denied the Request (the "Denial"). The Denial stated that the Postal Service is making some of the data available to the general public because such COA records are "highly sought data," citing 5 U.S.C. § 552(a)(2)(D).

Recognizing that this alternative data source would not fully satisfy the Journal's Request because it does not include "origin/destination data,"[1] the Denial went on to say that "this portion of the records you seek are <u>now</u> exempt from disclosure under FOIA Exemption 3, 39 U.S.C. § 410(c)(2)" (emphasis added).  The Denial stated:

> [T]he records you requested qualify as "information of a commercial nature" under Section 410(c)(2) because it is related to COA counts by origin and destination which is information that is <u>now</u>, <u>at the moment</u>, <u>currently</u> <u>under development</u> for a commercial product. Requests for COA data that seek the originating and destination location, at any level, is <u>no longer</u> releasable under the FOIA. Accordingly, this information is exempt from disclosure under Exemption 3 of the FOIA and Section 410(c)(2) (emphases added).

By this letter, the Journal hereby appeals the Denial.  (A copy of the Denial is also enclosed for reference.)

## ARGUMENT

The Denial is contrary to law and should be swiftly reversed with the prompt provision of the records requested in full.

"FOIA's purpose is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed. FOIA favors disclosure and any member of the public is entitled to have access to any record maintained by a federal agency, unless that record is exempt from disclosure under one of the Act's nine exemptions. . . . [A]ll statutory exemptions must be construed narrowly." N.Y. Times Co. and Dow Jones v.

---

[1] The COA data proactively disclosed by the Postal Service on its FOIA website also fail to satisfy the Request because they do not separate residential from business COAs by type of change (permanent vs temporary).

D | DOW JONES

www.dowjones.com
jacob.goldstein@dowjones.com

1211 Avenue of the Americas
New York, NY 10036

JA048

Dep't of Health & Hum. Servs., 513 F. Supp. 3d 337, 345 (S.D.N.Y.), aff'd 15 F.4th 216 (2d Cir. 2021) (citations and quotation marks omitted).

The Postal Service's invocation of Section 410(c)(2) to withhold the requested origin/destination data defies law and logic. This provision exempts from disclosure "information of a commercial nature, including trade secrets, whether or not obtained from a person outside the Postal Service, which under good business practice would not be publicly disclosed." The exemption is narrowly construed. See Carlson v. U.S. Postal Serv., 504 F.3d 1123, 1129 (9th Cir. 2007).

The requested records do not qualify as "information of a commercial nature" even under a broad interpretation of that phrase. And even if they did, the Postal Service hasn't established that such information would not be disclosed under "good business practice."

The statute requires "that the information be of 'a commercial nature' in the first instance." Carlson, 504 F.3d at 1129 (emphasis added). Accordingly, in Carlson, the Court of Appeals for the Ninth Circuit rejected the Postal Service's arguments that records of "the names, addresses, telephone numbers, regular business hours, and final collection times for outgoing mail for every United States post office" were exempt even though the Postal Service claimed the information "has commercial value and attracts customers to the Post Office website." Id. at 1125, 1127. Here, too, even if the Postal Service could establish that COA records with origin/destination data might attract customers willing to pay for such information, this would not satisfy the statutory exemption for "information of commercial nature."

The Postal Service has not identified any of the regulatory factors leading it to conclude the requested data is "information of a commercial nature." None of them supports that conclusion, as is demonstrated by the fact that the requested data is unlike any of the examples of commercial information listed in 39 C.F.R. § 265.14(b)(3)(ii).

A record related "primarily to the Postal Service's governmental functions or its activities as a provider of basic public services,"  id. § 265.14(b)(3)(i)(F), "is subject to public inspection." CREW v. U.S. Postal Serv., 2021 WL 3662843, at *4 (D.D.C. Aug. 17, 2021). By contrast, cases upholding the Postal Service's withholding of information under § 410(c)(2) "have concerned proprietary information." Carlson, 504 F.3d at 1129 (collecting cases regarding "quantity and pricing information in contract", "figures and data in a contract", "clients, mailing agents, and charges", "pricing and rates " in "delivery agreements"); see also CREW, 2021 WL 3662843, at *4 (citing cases regarding "business information relating to employee compensation and decisions to 'improve customer service, generate revenue, manage costs, and enhance a

performance-based culture,'" and "the specifics of USPS's contract with another shipping logistics company").

The COA data requested by the Journal, including origin/destination data, is not proprietary information but rather is more akin to the records at issue in <u>Carlson</u>. As noted, the Postal Service has previously, repeatedly released COA records, including origin/destination data, in response to FOIA requests. In addition, the Postal Service recognizes that COA data is a record subject to FOIA that has been or is likely to become the subject of repeated requests, triggering its obligation to disclose the data proactively via its FOIA Library website. The Postal Service's August 4, 2021, letter regarding the availability of this data on its FOIA website acknowledges "an increased interest in COA data during the COVID-19 pandemic." <u>USPS Aug. 4, 2021, COA Stats on USPS FOIA Website</u>.

Indeed, there is substantial, legitimate public interest in the COA data, as demonstrated by articles in the Journal and other newspapers analyzing the records that the Postal Service had until recently disclosed under FOIA. <u>See</u>, <u>e.g.</u>, <u>How the Pandemic Did, and Didn't, Change Where Americans Move</u> (N.Y. Times Apr. 19, 2021); <u>More Americans Are Leaving Cities, But Don't Call It an Urban Exodus</u> (Bloomberg Apr. 26, 2021); <u>Only one US city saw a bigger pandemic exodus than San Francisco</u> (S.F. Chronicle June 22, 2021); <u>The Pandemic Changed Where Americans Live</u> (WSJ Apr. 27, 2021); <u>Americans Up and Moved During the Pandemic. Here's Where They Went.</u> (WSJ May 11, 2021); <u>Full-Time Residents Flock to Jersey Shore</u> (WSJ May 29, 2021); and <u>New Life and Work Choices Revitalize Exurbs, Bringing New Strains</u> (WSJ Aug. 29, 2021); <u>Californians Flee the Coast to Inland Cities in a Mass Pandemic-Era Exodus</u> (WSJ Nov. 21, 2021). And such reporting is only possible with the disclosure of COA records with origin/destination data.

The Postal Service's Denial offers no explanation for how the inclusion of origin/destination data magically transforms COA records from data that remain the subject of ongoing, proactive disclosure pursuant to its obligations under FOIA Section 552(a)(2)(D) into "information of a commercial nature" that is exempt from disclosure.

The only hint of a rationale is the Denial's oddly phrased explanation that the Postal Service "now, at the moment, currently" has "under development" a "commercial product." But a plan to develop in the future a commercial product based on information that has historically been disclosed to the public under FOIA cannot transform such records into information that is exempt from disclosure under Section 410(c)(2). If the Denial's logic prevailed, the Postal Service would be able simply to announce the contemplation of a prospect of turning records into items for sale and thereby unilaterally evade its obligations under FOIA, all while charging prices for "commercial products" that have been and should be disclosed to the public pursuant

**DJ** | **DOW JONES**

www.dowjones.com
jacob.goldstein@dowjones.com

1211 Avenue of the Americas
New York, NY 10036

to FOIA's fee regime. Neither the <u>Carlson</u> court nor the <u>CREW</u> court would countenance this result; and neither should you.

To be sure, under FOIA, agencies may decline to make certain categories of records available for public inspection and copying if such "materials are promptly published and copies offered for sale." 5 U.S.C. § 552(a)(2). But the Denial's speculative, vague suggestion of a future ability to purchase detailed COA data does not satisfy FOIA's requirements.

## CONCLUSION

For the foregoing reasons, the Journal respectfully submits that the Denial must be vacated, the Request must be processed promptly under FOIA, and the Journal must be provided access to the data files as requested, in the manner set forth in the FOIA Request, with all fees waived.

Because of the importance of the information the Journal seeks and the urgency of the newsgathering process, we would appreciate your prompt consideration and look forward to receiving your response by email as quickly as possible, and certainly within 20 days, as the law requires. Please call me with any questions you may have regarding the above. Thank you for your attention in this matter.

Respectfully submitted,

Jacob P. Goldstein

cc:     Paul Overberg

# EXHIBIT D


**UNITED STATES**
**POSTAL SERVICE**

**OFFICE OF THE GENERAL COUNSEL**
HEADQUARTERS, WASHINGTON, D.C.

IN RE, APPEAL OF CASE NO.
2021-FPRO-03224

APPEAL NO. 2022-APP-00041

ATTORNEY CHRISTOPHER DOYLE
ON BEHALF OF GENERAL COUNSEL THOMAS J. MARSHALL

OPINION AND ORDER

After careful consideration, this office is affirming in full the action of Government Information Specialist Tai Thompson, on Freedom of Information Act ("FOIA") request 2021-FPRO-03224.

I.     STATEMENT OF FACTS

1.  On September 15, 2021, the requester submitted a FOIA request seeking the number of residential postal customer who filed temporary and permanent Change of Address ("COA") requests from January 1, 2021 to June 30, 2021. The request sought the information delineated by the customer's former and new county and former and new state.

2.  By correspondence dated September 17, 2021, Government Information Specialist Tai Thompson responded to the request. Ms. Thompson informed the requester that some of the information requested has been made publicly available pursuant to 5 U.S.C. § 552(a)(2), due to the fact that the information is frequently requested under the FOIA. The requester was further provided the URL address for the FOIA Library website where the requester could access those records. In addition, Ms. Thompson informed the requester that county level COA data could be purchased through the Postal Service's City State Product. Finally, the remainder of the requested information was withheld in full pursuant to Exemption 3 and 39 U.S.C. 410(c)(2), which permits the Postal Service to withhold information of a commercial nature that would not be disclosed under good business practice.

3.  By email dated November 24, 2021, the requester appealed the action of Ms. Thompson. The requester challenged the application of Exemption 3 and 39 U.S.C. 410(c)(2). In the appeal, the requester asserts that the origin/destination COA information is not "commercial in nature," and rather, should be classified as information related primarily to the Postal Service's governmental functions or its activities as a provider of basic public services.

II.    APPLICABLE LAW

Congress enacted the FOIA to "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976) (quoting *Rose v. Dep't of the Air Force*, 495 F.2d 261, 263 (2d Cir. 1974). Congress balanced this objective by recognizing that "legitimate governmental and private interests could be harmed by release of certain types of information." *Fed. Bureau of Investigation v. Abramson*, 456 U.S. 615, 621 (1982). The FOIA "requires federal agencies to make Government records available to the public, subject to nine exemptions." *Milner v. Dep't of the Navy*, 562 U.S. 562, 564 (2011). In addition, other laws allow the Postal Service to withhold certain categories of records and information. *See, e.g.*, 39 U.S.C. § 410(c).

If information is "specifically exempted from disclosure by statute," then it is also exempt from mandatory disclosure under the FOIA by incorporation. 5 U.S.C. § 552(b)(3) ("Exemption 3"). One statute that exempts information from disclosure is Section 410(c)(2) of the Postal Reorganization Act. 39 U.S.C. §

410(c)(2) ("Section 410(c)(2)"); *see also Wickwire Gavin v. U.S. Postal Serv.*, 356 F.3d 588, 592 n.6 (4th Cir. 2004); *Carlson v. U.S. Postal Serv.*, No. 13-cv-06017-JSC, 2015 WL 9258072, at *4 (N.D. Cal. Dec. 18, 2015); *Airline Pilots Ass'n v. U.S. Postal Serv.*, No. 03-2384 (ESH), 2004 WL 5050900, at *5 (D.D.C. June 24, 2004). This statute operates independently of the FOIA to exempt certain information from mandatory disclosure.

Section 410(c)(2) permits the Postal Service to withhold "information of a commercial nature, including trade secrets, whether or not obtained from a person outside the Postal Service, which under good business practice would not be publicly disclosed." 39 U.S.C. § 410(c)(2). "Information is of a commercial nature if it relates to commerce, trade, profit, or the Postal Service's ability to conduct itself in a businesslike manner." 39 C.F.R. § 265.14(b)(3); *see also Carlson v. U.S. Postal Serv.*, 504 F.3d 1123, 1128-29 (9th Cir. 2007)(applying the common meaning of the term "commercial" to include all information that relates to commerce, trade, or profit). Section 410(c)(2) permits the withholding of a broader range of commercial information than similar FOIA exemptions. *See Carlson*, 504 F.3d at 1129 (applying the "common meaning" of the term "commercial"). This broader scope exists because the Postal Service is commissioned to operate like a private corporation and, therefore, must follow sound business principles. *Id.* at 1127-28.

In determining whether particular information is "commercial" in nature, the Postal Service considers six factors relating to whether the information is more akin to its role as a business entity competing in the market or its role as a provider of public services. *See* 39 C.F.R. § 265.14(b)(3)(i). No single factor is determinative, but all are considered to determine the overall character of the information. 39 C.F.R. § 265.14(b)(3)(ii). In addition, the Postal Service has identified an extensive, though not exhaustive, list of types of information that are considered commercial and, thus, exempt from disclosure under Section 410(c)(2). *See* 39 C.F.R. § 265.14(b)(3)(ii).

If the information is commercial in nature and would not be disclosed "under good business practice," then the FOIA does not require the Postal Service to disclose the information. *Wickwire Gavin*, 356 F.3d at 594-95. No separate analysis is necessary to consider whether disclosure would cause competitive harm or to balance the commercial interest with the public's interest in knowing the information. *See Id.*; *Carlson*, 2015 WL 9258072 at *8-10. "[T]he contours of the good business practice exemption [are] to be gleaned by looking to the commercial world, management techniques, and business law, as well as to the standards of practice adhered to by large corporations." *Wickwire Gavin*, 356 F.3d at 592.

III.   LEGAL ANALYSIS

In order for the Postal Service to properly withhold the requested information under Exemption 3 and Section 410(c)(2), it must be (1) commercial in nature and (2) information that would not be publicly disclosed under good business practice. 39 U.S.C. § 410(c)(2). Here, the requester sought the total number of COA requests made by customers from January 2021 to June 2021. Specifically, information pertaining to origin/destination data was withheld pursuant to Section 410(c)(2). After reviewing the actions taken in this matter by the records custodian, we have determined that COA data aggregated by origin/destination was properly classified as commercial information that would not be disclosed under good business practice.

As stated in the response letter dated September 17, 2021, the COA information sought is currently being used in the development of a commercial product. Unlike other federal government agencies, the Postal Service is not funded through taxpayer dollars. Instead, the Postal Service relies on the revenue it generates through both services and products it provides to the public. As such, the information is commercial in nature, as it pertains to the Postal Service's ability to obtain a profit. *See e.g.*, *Carlson*, 504 F.3d at 1129 (applying the common meaning of the term "commercial" to include all information that relates to commerce, trade, or profit). Additionally, the fact that the product is still in the development phase strengthens the argument that the requested information was properly withheld under Exemption 3 and 410(c)(2). One of the six (6) factors considered by the Postal Service when determining whether information is commercial in nature is whether "the information would be of potential benefit to individuals or entities in economic competition with the Postal Service, its customers, suppliers, affiliates, or business

partners or could be used to cause harm to a commercial interest of the Postal Service, its customers, suppliers, affiliates, or business partners." 39 C.F.R. § 265.14(b)(3)(i)(C). Disclosing this information would benefit our competitors by providing them with specific details regarding the components of the new commercial product, and the information being used to develop the product. This information could be used by competing individuals and entities to produce products similar in nature and in direct competition to our product currently in development.

The requester asserts that the COA data is not proprietary and therefore is not protected by Section 410(c)(2). Because the information is being used to develop a commercial product for the Postal Service, we note that the information may, indeed, be "proprietary." Nevertheless, the language of Section 410(c)(2) does not require the information to be proprietary or a trade secret in order to be withheld from disclosure. Instead, the statute protects "commercial information" from disclosure. "Commercial information" could include trade secrets, but is not limited to trade secrets and proprietary information. The requester further argues that the COA information is not comparable to the specific examples of commercial information provided by the Postal Service in 39 C.F.R. § 265.14(b)(3)(ii). However, we note that the list the requester references is not meant to be exhaustive. As noted above, when applying the factors in the Postal Service's regulations, this information qualifies as "commercial information." Thus, the requested information is commercial in nature and satisfies the first prong of Section 410(c)(2)'s test.

We also find that the requested information would not be publicly released as part of good business practice. Because this information is currently being used to develop a commercial product, release of these records would compromise the product's development process. Additionally, private businesses do not disclose the specific details of their commercial business initiatives or products as they are being developed. *See Wickwire Gavin*, 356 F.3d at 594 ("In determining whether Exemption 3 applies, it is uncontroverted that the statutory term 'good business practice' should be decided with reference to what businesses normally do."); *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.,* 742 F. Supp. 2d 76, 82 (D.D.C. 2010) ("[I]n determining whether it would be good business practice to disclose requested commercial information, the Postal Service should be expected to evaluate the information in the same manner as a corporation in the commercial world."). And, since the information would not be disclosed under good business practice, we are not required to assess the public's interest in the information or whether disclosure would cause competitive harm. *Wickwire Gavin*, 356 F.3d at 594-95. The material inquiry is whether it would be good business practice for the Postal Service to disclose the commercial information sought. Accordingly, because the records satisfy both prongs of Section 410(c)(2)'s test, the records were properly withheld from disclosure under Exemption 3 of the FOIA and Section 410(c)(2).

IV.    CONCLUSION

For the reasons stated above, we conclude that the withheld records contain commercial information which would not be disclosed under good business practice pursuant to Exemption 3 and Section 410(c)(2). Therefore, the action of Government Information Specialist Tai Thompson is affirmed in full.

For the General Counsel,

*Christopher Doyle*

Christopher Doyle
Attorney
Ethics and Legal Compliance

# EXHIBIT E

# Submit New Request

## Requester Details

To modify request details please update your requester profile or contact the our office for assistance.

**Ms. Marie P Patino**
Journalist
Bloomberg LP
1101 New York Avenue NW
Floor 9A - Bloomberg LP
Washington, D.C., DC  20005
Phone 202-807-2344
mpatino14@bloomberg.net

Requester Default Category: News Media

## General Information

| | |
|---|---|
| Requester Service Center | HQ Records Office |
| Action Office Instructions | for Postal Service Headquarters controlled records including contracts, building leases, and other real estate transactions or employee listings |
| Requester Category | News Media |
| Send Response Via | E-mail |
| Payment Mode | |

## Shipping Address

| | |
|---|---|
| Address | 1101 New York Avenue NW |
| Apartment/Suite Number | Floor 9A - Bloomberg LP |
| City | Washington, D.C. |
| State(US) | District of Columbia |
| Country | United States |
| Zip Code | 20005 |

## Request Information

| | |
|---|---|
| Description of Request | Hello, Sorry for yet another request of this dataset -- change of addresses data, per zip, but only for the month of December 2020. I realized too late this month was missing from a previous request. Thanks so much, Marie |
| Date Range for Record Search:From | 01/12/2020 |
| Date Range for Record Search:To | 01/01/2021 |
| Description Document | |
| Privacy Waiver & Authorization | |
| Proof of Identity | |

## Fee Information

| | |
|---|---|
| Willing Amount | $25 |
| Fee Waiver Requested | Yes |
| Fee Waiver Request Reason | News media -- this is to inform the public of migration patterns during the pandemic. |
| Willing to Pay All Fees | No |

## Expedite Information

| | |
|---|---|
| Expedited Processing Requested | No |
| Need for Expedited Processing | |

**JA057**

# EXHIBIT F

ADDRESSING & GEOSPATIAL TECHNOLOGY
NATIONAL CUSTOMER SUPPORT CENTER


UNITED STATES
POSTAL SERVICE

April 19, 2021

Ms. Marie P. Patino
Journalist
Bloomberg LP
1101 New York Avenue Northwest Floor 9A
Washington, DC 2005-4269
VIA Email: mpatino14@bloomberg.net

RE: FOIA Case No. 2021-FPRO-01469

Dear Ms. Patino:

Your Freedom of Information Act (FOIA) requests for information from the United States Postal
Service® has been forwarded to my office for response. Your request sought the following:

> Change-of-address (COA) data of December 2020, aggregated by ZIP Code. Data to
> include origin/destination information.

Information is maintained in the United States Postal Service change-of-address system for a
maximum of four (4) years from the date a customer indicates on their change-of-address order to
begin mail forwarding. After the four-year retention period, the change-of-address information is
permanently deleted from the change-of-address system and no longer available for inquiry.

Based on your description of records sought, it has been determined that the records you seek are
exempt from disclosure under FOIA Exemption 3, 39 U.S.C. §410(c)(2).

Exemption 3 allows an agency to withhold information that is "specifically exempted from disclosure by
statute." 5 U.S.C. § 552(b)(3). Section 410(c)(2) of the Postal Reorganization Act qualifies as an
Exemption 3 statute. 39 U.S.C. § 410(c)(2). Section 410(c)(2) permits the Postal Service to withhold
"information of a commercial nature, including trade secrets, whether or not obtained from a person
outside the Postal Service, which under good business practice would not be publicly disclosed." 39
U.S.C. § 410(c)(2). Information of a commercial nature under Section 410(c)(2) is broadly defined to
include all information that "relates to commerce, trade, profit, or the Postal Service's ability to conduct
itself in a businesslike manner." 39 C.F.R. § 265.14(b)(3). In determining whether information is
commercial in nature, the Postal Service considers six (6) factors relating to whether the information is
more akin to its role as a business entity, a competitor in the market or a provider of basic public
services. *See* 39 C.F.R. § 265.14(b)(3)(i). In addition, the Postal Service has identified an extensive,
though not exhaustive, list of information that is commercial in nature and thus, exempt from disclosure
under Section 410(c)(2). *See* 39 C.F.R. § 265.14(b)(3)(ii).

Here, we find that the records you requested qualifies as "information of a commercial nature" under
Section 410(c)(2) because the information is related to change-of-address counts which provides
information that is under development for a commercial product. Accordingly, this information is
exempt from disclosure under Exemption 3 of the FOIA and Section 410(c)(2).

As information, we do have change-of-address data for the last four years on our FOIA website, which
can be found at https://about.usps.com/who/legal/foia/welcome.htm.

225 N HUMPHREYS BLVD STE 501
MEMPHIS TN 38188-1001
800-331-5746
FAX 901-767-8853

If you are not satisfied with the response to this request, you may file an administrative appeal within 90 days of the date of this response letter by writing to the General Counsel, U.S. Postal Service, 475 L'Enfant Plaza SW, Washington, DC 20260 or *via* email at FOIAAppeal@usps.gov. Your appeal must be postmarked or electronically transmitted within 90 days of the date of the response to your request. The letter of appeal should include, as applicable:

(1) A copy of the request, of any notification of denial or other action, and of any other related correspondence;
(2) The FOIA tracking number assigned to the request;
(3) A statement of the action, or failure to act, from which the appeal is taken;
(4) A statement identifying the specific redactions to responsive records that the requester is challenging;
(5) A statement of the relief sought; and
(6) A statement of the reasons why the requester believes the action or failure to act is erroneous.

For further assistance and to discuss any aspect of your request, you may contact any of the following:

Michelle Evans
Addressing & Geospatial Technology
United States Postal Service
225 North Humphreys Boulevard Suite 501
Memphis, TN 38188-1001
Phone: 901-681-4474

Privacy & Records Office
United States Postal Service
475 L'Enfant Plaza Southwest Room 1P830
Washington, DC 20260-1101
Phone: 202-268-2608
Fax: 202-268-5353
FOIA Public Liaison: Nancy Chavannes-Battle

Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer. The contact information for OGIS is as follows:

Office of Government Information Services
National Archives and Records Administration
8601 Adelphi Road-OGIS
College Park, MD 20740-6001
Email: ogis@nara.gov
Telephone: 202-741-5770
Toll free: 1-877-684-6448
Facsimile: 202-741-5769

Sincerely,

*Kim Wilson*

James D. Wilson
Director, Addressing and Geospatial Technology

cc: Records Office

# EXHIBIT G



**Davis Wright Tremaine LLP**

21st Floor
1251 Avenue of the Americas
New York, NY 10020-1104

**Jeremy Chase**
212-489-8230 tel
212-489-8340 fax

jeremychase@dwt.com

June 29, 2021

**VIA ELECTRONIC MAIL: FOIAAppeal@usps.gov**

General Counsel, U.S. Postal Service
475 L'Enfant Plaza SW
Washington, DC 20260

Re:     **FREEDOM OF INFORMATION ACT APPEAL – FOIA Request 2021-FPRO-01469**

To Whom It May Concern:

We represent Bloomberg L.P. and its reporter Marie Patino (collectively, "Bloomberg" or "Requestors").  Pursuant to the Freedom of Information Act, 5 U.S.C. § 552, *et seq.* ("FOIA"), Bloomberg hereby submits this appeal of the determination of the United States Postal Service ("USPS") on the above-referenced FOIA request (the "Request").  As set forth in full detail below, the exemption cited by USPS in its response to the Request is completely irreconcilable with the facts underlying the materials sought by Bloomberg.

## FACTUAL BACKGROUND

Bloomberg, through its reporter, Ms. Patino, submitted a FOIA request to USPS on March 30, 2021 seeking "[c]hange-of-address (COA) data of December 2020, aggregated by ZIP Code. Data to include origin/destination information" ("the Records").  *See* Attachment A.

Requestors sought this data for an ongoing series of articles tracking migration patterns in the United States and analyzing the pandemic's potential impact on migration trends relating to the population in-flow and out-flow of major metropolitan areas.[1]  Accurate and timely reporting of the requested data can significantly affect public policies responding to these population changes.  As an earlier article in the series notes, "These trends matter to cities as they reckon with

---

[1] *See, e.g.*, Marie Patano, Aaron Kessler, and Sarah Holder, *More Americans Are Leaving Cities, But Don't Call It an Urban Exodus*, BLOOMBERG CITYLAB (Apr. 26, 2021), https://www.bloomberg.com/graphics/2021-citylab-how-americans-moved/?sref=Y5NzbMHF.

**DWT.COM**

Anchorage | Bellevue | Los Angeles | New York
Portland | San Francisco | Seattle | Washington, D.C.

**JA062**

General Counsel, U.S. Postal Service
June 29, 2021
Page 2

the pandemic's economic fallout. Migration patterns can affect housing prices, tax revenue, job opportunities and cultural vibrancy."[2]

On April 19, 2021, USPS issued a final determination on the Request, stating that it was withholding responsive records based on FOIA Exemption 3, 5 U.S.C. § 552(b)(3) ("Exemption 3"), which permits an agency to withhold information that is "specifically exempted from disclosure by statute." *See* Attachment B. The statute invoked in the Appeal Denial letter was Section 410(c)(2) of the Postal Reorganization Act, which permits USPS to withhold "information of a commercial nature, including trade secrets, whether or not obtained from a person outside the Postal Service, which under good business practice would not be publicly disclosed." *Id.* (citing U.S.C. § 410(c)(2)). The Appeal Denial stated that the requested records "qualif[y] as 'information of a commercial nature' under Section 410(c)(2) because the information is related to change-of-address counts which provides information that is under development for a commercial product. Accordingly, this information is exempt from disclosure under Exemption 3 of the FOIA and Section 410(c)(2)." *Id.* Simultaneously, the Appeal Denial letter disclosed that USPS did maintain "change-of-address data for the last four years on our FOIA website. . . ." *Id.* However, the change-of-address data on the USPS' FOIA website does not detail moves between ZIP codes as sought by the FOIA request. Nor does the data on USPS' FOIA website provide information about moves between counties or count less than ten moves to or from a ZIP code, meaning that thousands of moves are not reflected in USPS' online data.

Although USPS now invokes Exemption 3 and Section 410(c)(2), the withheld records are virtually identical to the records that Requestors had sought and received from USPS earlier this year. On December 30, 2020, for instance, Bloomberg filed a request seeking "Change-of-address (COA) requests filed between January 2019 and December 2020. Information should be aggregated at ZIP Code level, preferably on a weekly basis and include type of move, temporary or permanent." *See* Attachment C. On January 5, 2021, USPS provided the requested information in the form of a report reflecting "the total change-of-address requests filed between January 1, 2019 and November 30, 2020. The information includes origin and destination ZIP Codes, move types and is broken down by month and year." *See* Attachment D. At no point did USPS invoke any exemption in its response to this request. And on February 2, 2021 Bloomberg filed a similar request seeking "National Change of Address (NCOA) data, aggregated at the county level, filed between January 2019 and December 2020. Information to include temporary and permanent moves." *See* Attachment E. Once again, on February 11, 2021, USPS provided this information,

---

[2] *Id.*

General Counsel, U.S. Postal Service
June 29, 2021
Page 3

without reference to any exemptions, in the form of a report that "reflects the total change-of-address requests filed between January 1, 2019 and December 30, 2020 at the county level." *See* Attachment F.

This administrative appeal follows.

## ANALYSIS

The U.S. Supreme Court has established that the "basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989). In keeping with this fundamental goal, FOIA exemptions should be construed as narrowly as possible. *See, e.g., Department of the Air Force v. Rose*, 425 U.S. 361 (1976) (finding that FOIA's exemptions "do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act."). USPS' improper and overbroad invocation of Exemption 3 cuts against these bedrock principles.

### A. FOIA Exemption 3 Is Inapplicable to These Records.

Exemption 3 permits an agency to withhold information specifically exempted from disclosure by statute, "if that statute requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). Exemption 3 affords agencies "only limited discretion" and authorizes withholding "only a narrowly drawn class of materials from disclosure." *Lessner v. U.S. Dep't of Com.*, 827 F.2d 1333, 1337 (9th Cir. 1987). USPS has invoked Section 410(c)(2) of the Postal Reorganization Act as such a statute. Section 410(c)(2) prohibits disclosure of "information of a commercial nature, including trade secrets . . . which under good practice would not be publically disclosed." 39 U.S.C. § 410(c)(2). The information Requestors seek—change of address data from December 2020—is plainly not the kind of "information of a commercial nature" contemplated by the statute. 39 U.S.C. § 410(c)(2).

Put simply, the information is not "commercial" within the meaning of Section 410(c)(2) at all. USPS asserts that the information is "commercial" because it "is related to change-of-address counts which provides information that is under development for a commercial product."

General Counsel, U.S. Postal Service
June 29, 2021
Page 4

*See* Attachment B. But the definition of "commercial" implicit in USPS' explanation is too broad and too attenuated to be proper under Exemption 3 and Section 410(c)(2).

*Carlson v. U.S. Postal Serv.* is instructive on this point. There, USPS attempted to withhold records revealing information about Post Office locations and hours under Section 410(c)(2) and Exemption 3, because "its Post Office locator database has commercial value and attracts customers to the Post Office website for marketing and advertising." *Id.* at 1127. But the Ninth Circuit disagreed, finding that the common definition of "commercial", *i.e.*, information that "relates to commerce, trade, or profit" undermined USPS' claim. *Id.* at 1127; 1128-29 (quoting *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.,* 353 F.3d 1051, 1061 (9th Cir. 2003) (*en banc*)). The Ninth Circuit determined that while mail service was "essential to commerce and trade" information about the "the names, addresses, telephone numbers, and regular business hours of post offices" was not commercial information, despite USPS' assertion that the information was commercial because it had "value." *Id.* at 1129. The Ninth Circuit deemed this explanation to rely on a "too broad definition of commercial", particularly in light of the fact that the class of nondisclosable matters under Exemption 3 is "narrow." *Id.* (citing *Lessner,* 827 F.2d at 1336).

As in *Carlson*, where USPS contended that the requested information drove traffic to its website, the fact that USPS is potentially developing a product to attract customers that uses change of address information (which, in and of itself does not "relate to commerce, trade, or profit"), does not render that information "commercial" under Exemption 3. Put differently, it is not *how* information is used or has the potential to be used, but the *type* of information at issue, that makes it commercial under Section 410(c)(2). Moreover, the fact that USPS has disclosed this precise type of information to Requestors in the past only underscores that it is not "commercial" information now, simply because USPS has found a way to extract "value" from it.

To that end, cases where USPS has successfully invoked Section 410(c)(2) to withhold "commercial" documents underscore that the underlying information itself must be commercial and proprietary for Section 410(c)(2) to apply. As the *Carlson* court observed, "[t]he majority of cases which have upheld USPS's withholding of information under § 410(c)(2) have concerned proprietary information," *Carlson v. U.S. Postal Serv.*, 504 F.3d 1123, 1129 (9th Cir. 2007). Proprietary information means information like spreadsheets detailing quantity and pricing information in contract between USPS and private contractor, USPS mailing permits for a private firm detailing the private firm's clients, mailing agents, and charges by USPS, and information in delivery agreements including pricing and rates, operational details and specifications, performance requirements and obligations, between USPS and Federal Express. *Id.* (internal

General Counsel, U.S. Postal Service
June 29, 2021
Page 5

quotations omitted). *See also*, *e.g.*, *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 742 F. Supp. 2d 76, 81 (D.D.C. 2010) (information containing "the agency's decisions regarding bonuses and salary increases for its employees, [which] are based on individual, unit and corporate performance indicators devised by the Postal Service" were properly considered commercial information and exempt pursuant to Exemption 3 and 39 U.S.C. § 410(c)(2)); *Braun v. United States Postal Serv.*, 317 F. Supp. 3d 540, 548–49 (D.D.C. 2018) (allowing redactions of unique identifiers assigned to authorized users of Postal Service information resources and a URL web address to an internal USPS information resource under Exemption 3 and § 410(c)(2)).

In each of these cases, information falls under the definition of "commercial" relied on by the Ninth Circuit in *Carlson* because it relates directly to "commerce, trade, or profit." By contrast, the requested change of address information does not reveal anything about the business of USPS – about its dealings with other corporations, details about its contracts and operations, payments it remits to employees, performance metrics, or access to internal USPS resources. Nor has USPS claimed that it does. Rather, USPS has deemed this information "commercial" only because it intends to use it in a future tool – not because it reflects anything about the commercial or financial workings of the agency.

Additionally, in the cases that found that Exemption 3 and 39 U.S.C. § 410(c)(2) applied to requested USPS records, courts relied on the fact that USPS or private firms would not typically disclose the particular type of information at issue. *See*, *e.g.*, *Am. Postal Workers Union, AFL-CIO*, 742 F. Supp. 2d, at 82 ("private sector delivery firms would not disclose this information"); *Airline Pilots Ass'n, Int'l*, 2004 WL 5050900, at *1 ("reasonable to credit the claim that any large company would not publicly disclose the details of such an agreement"); *Braun*, 317 F. Supp. 3d at 549 (finding that withheld information was the kind of information that USPS would not "normally disclose"). But USPS cannot advance this argument, because it has *previously disclosed this kind of information* to Requestors. *See* Attachments D and F. As such Exemption 3 and Section 410(c)(2) cannot be used to withhold records responsive to this Request.

## CONCLUSION

For the foregoing reasons, Bloomberg respectfully submits that USPS' refusal to release records responsive to the Request is contrary to the law and that USPS should be compelled to produce the requested records promptly. Because of the importance of the information requested and the urgency of Bloomberg receiving this information to avoid the compromise of a significant

General Counsel, U.S. Postal Service
June 29, 2021
Page 6

and recognized public interest, we would appreciate your prompt consideration and look forward
to receiving your response in no later than 10 calendar days pursuant to 43 C.F.R. § 2.20(h).

     If you have any questions regarding the above, please call or email me. Thank you for
your attention to this matter.

               Very truly yours,

               Davis Wright Tremaine LLP

               */s/ Jeremy Chase*

               Jeremy Chase

Encls.

# EXHIBIT H



*via* **email**

July 29, 2021

Ms. Marie Patino
mpatino@bloomberg.net

Re:  Freedom of Information Act Appeal No. 2021-APP-00141
FOIA Case No. 2021-FPRO-01469

Dear Ms. Patino:

This is in response to your attorney's email dated June 29, 2021, in which you appealed from the action of James D. Wilson, Director, Addressing and Geospatial Technology, on your request under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, for records regarding the zip code of households that changed their address in December 2020. After carefully considering your appeal, we are affirming Mr. Wilson's action on your request in full.  A decision on this matter is attached to this letter.

This is the final decision of the Postal Service regarding your right of access to records requested pursuant to the FOIA and the Privacy Act.  You may seek judicial review of this decision by bringing suit for that purpose in the United States District Court for the district in which you reside or have a principal place of business, the district in which the records are located, or in the District of Columbia.

The Office of Government Information Services (OGIS) offers mediation services to resolve disputes between FOIA requesters and federal agencies as a non-exclusive alternative to litigation.  Using OGIS services does not affect the requester's right to pursue litigation.  The contact information for OGIS is as follows:

Office of Government Information Services
National Archives and Records Administration
8601 Adelphi Road
Room 2510
College Park, MD 20740-6001
Email:  ogis@nara.gov
Telephone:  202-741-5770
Toll free:  1-877-684-6448
Facsimile:  202-741-5769

For the General Counsel,

*Lauren M Marino*

Lauren Marino
Attorney
Ethics & Legal Compliance

Enclosure

475 L'ENFANT PLAZA SW
WASHINGTON, DC 20260

https://about.usps.com/who/legal/foia/

cc:

Mr. Jeremy Chase, Esq.
jeremychase@dwt.com

James D. Wilson
Tai Thompson
FOIAAppeal@usps.gov

**JA070**


**UNITED STATES**
**POSTAL SERVICE**

**OFFICE OF THE GENERAL COUNSEL**
HEADQUARTERS, WASHINGTON, D.C.

IN RE, APPEAL OF CASE NO.
2021-FPRO-01469

APPEAL NO. 2021-APP-00141

ATTORNEY LAUREN MARINO
ON BEHALF OF GENERAL COUNSEL THOMAS J. MARSHALL

OPINION AND ORDER

After careful consideration, this office is affirming, in full, the action of records custodian James D. Wilson, Director, Addressing and Geospatial Technology, on FOIA request 2021-FPRO-01469.

I.   STATEMENT OF FACTS

1.   On March 30, 2021, the requester submitted a FOIA request under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, for change of address records regarding the number of households that changed their address, per zip code, for the month of December 2020.

2.   By correspondence dated April 19, 2021, James D. Wilson, Director, Addressing and Geospatial Technology, responded to the request. The responsive records were withheld, in full, pursuant to Exemption 3 and 39 U.S.C. 410(c)(2), which permits the Postal Service to withhold information of a commercial nature that would not be disclosed under good business practice.

3.   By email dated June 29, 2021, the requester appealed the action of Mr. Wilson. The requester challenged the application of Exemption 3 and 39 U.S.C. 410(c)(2). The requester further asserted that similar change of address data had been disclosed in the past.

II.   APPLICABLE LAW

Congress enacted the FOIA to "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976) (quoting *Rose v. Dep't of the Air Force*, 495 F.2d 261, 263 (2d Cir. 1974). Congress balanced this objective by recognizing that "legitimate governmental and private interests could be harmed by release of certain types of information." *Fed. Bureau of Investigation v. Abramson*, 456 U.S. 615, 621 (1982). The FOIA "requires federal agencies to make Government records available to the public, subject to nine exemptions." *Milner v. Dep't of the Navy*, 562 U.S. 562, 564 (2011). In addition, other laws allow the Postal Service to withhold certain categories of records and information. *See, e.g.*, 39 U.S.C. § 410(c).

If information is "specifically exempted from disclosure by statute," then it is also exempt from mandatory disclosure under the FOIA by incorporation. 5 U.S.C. § 552(b)(3) ("Exemption 3"). One statute that exempts information from disclosure is Section 410(c)(2) of the Postal Reorganization Act. 39 U.S.C. § 410(c)(2) ("Section 410(c)(2)"); *see also Wickwire Gavin v. U.S. Postal Serv.*, 356 F.3d 588, 592 n.6 (4th Cir. 2004); *Carlson v. U.S. Postal Serv.*, No. 13-cv-06017-JSC, 2015 WL 9258072, at *4 (N.D. Cal. Dec. 18, 2015); *Airline Pilots Ass'n v. U.S. Postal Serv.*, No. 03-2384 (ESH), 2004 WL 5050900, at *5 (D.D.C. June 24, 2004). This statute operates independently of the FOIA to exempt certain information from mandatory disclosure.

Section 410(c)(2) permits the Postal Service to withhold "information of a commercial nature, including trade secrets, whether or not obtained from a person outside the Postal Service, which under good

business practice would not be publicly disclosed." 39 U.S.C. § 410(c)(2). "Information is of a commercial nature if it relates to commerce, trade, profit, or the Postal Service's ability to conduct itself in a businesslike manner." 39 C.F.R. § 265.14(b)(3); *see also Carlson v. U.S. Postal Serv.*, 504 F.3d 1123, 1128-29 (9th Cir. 2007)(applying the common meaning of the term "commercial" to include all information that relates to commerce, trade, or profit). Section 410(c)(2) permits the withholding of a broader range of commercial information than similar FOIA exemptions. *See Carlson*, 504 F.3d at 1129 (applying the "common meaning" of the term "commercial"). This broader scope exists because the Postal Service is commissioned to operate like a private corporation and, therefore, must follow sound business principles. *Id.* at 1127-28.

In determining whether particular information is "commercial" in nature, the Postal Service considers six factors relating to whether the information is more akin to its role as a business entity competing in the market or its role as a provider of public services. *See* 39 C.F.R. § 265.14(b)(3)(i). No single factor is determinative, but all are considered to determine the overall character of the information. 39 C.F.R. § 265.14(b)(3)(ii). In addition, the Postal Service has identified an extensive, though not exhaustive, list of types of information that are considered commercial and, thus, exempt from disclosure under Section 410(c)(2). *See* 39 C.F.R. § 265.14(b)(3)(ii).

If the information is commercial in nature and would not be disclosed "under good business practice," then the FOIA does not require the Postal Service to disclose the information. *Wickwire Gavin*, 356 F.3d at 594-95. No separate analysis is necessary to consider whether disclosure would cause competitive harm or to balance the commercial interest with the public's interest in knowing the information. *See Id.*; *Carlson*, 2015 WL 9258072 at *8-10. "[T]he contours of the good business practice exemption [are] to be gleaned by looking to the commercial world, management techniques, and business law, as well as to the standards of practice adhered to by large corporations." *Wickwire Gavin*, 356 F.3d at 592.

III.   LEGAL ANALYSIS

In order for the Postal Service to properly withhold the requested information under Exemption 3 and Section 410(c)(2), it must be (1) commercial in nature and (2) information that would not be publicly disclosed under good business practice. 39 U.S.C. § 410(c)(2).

Here, the requester sought records regarding the number of households that changed their address from several ZIP codes to all other ZIP codes in the U.S. in December 2020. It appears to be a follow up of an earlier request for similar information. We have determined that this data was properly categorized as being commercial in nature. One of the six (6) factors considered by the Postal Service when determining whether information is commercial in nature is whether "the information would be of potential benefit to individuals or entities in economic competition with the Postal Service, its customers, suppliers, affiliates, or business partners or could be used to cause harm to a commercial interest of the Postal Service, its customers, suppliers, affiliates, or business partners." 39 C.F.R. § 265.14(b)(3)(i)(C). The information sought is currently being used in the development of a future commercial product. Disclosing this information would benefit our competitors by providing them with specific details regarding the components of the Postal Service's new commercial product. Thus, the requested information is commercial in nature and satisfies the first prong of Section 410(c)(2)'s test.

We also find that the requested information would not be publicly released as part of good business practice. Because this information is currently being used to develop a commercial product, release of these records could compromise the product's development process. Private businesses do not disclose the specific details of their commercial business initiatives or products as they are being developed. Since the information would not be disclosed under good business practice, we are not required to assess the public's interest in the information or whether disclosure would cause competitive harm. *Wickwire Gavin*, 356 F.3d at 594-95. Accordingly, because the records satisfy both prongs of Section 410(c)(2)'s test, the records were properly withheld from disclosure under Exemption 3 of the FOIA and Section 410(c)(2).

IV.    CONCLUSION

For the reasons stated above, we conclude that the withheld records contain commercial information which would not be disclosed under good business practice pursuant to Exemption 3 and Section 410(c)(2). Therefore, the action of James Wilson is affirmed in full.

For the General Counsel,

*Lauren M Marino*

Lauren Marino
Attorney
Ethics and Legal Compliance

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

BLOOMBERG L.P.

and

DOW JONES & COMPANY, INC.,

        Plaintiffs,

    v.

UNITED STATES
POSTAL SERVICE,

        Defendant.

---

Civil Action No. 22-cv-6112 (DLC)

---

**DECLARATION OF KATIE TOWNSEND**

I, Katie Townsend, declare as follows:

    1.    I am the Deputy Executive Director and Legal Director at the Reporters Committee for Freedom of the Press (the "Reporters Committee"), an unincorporated nonprofit association located in Washington, D.C. I have been the Reporters Committee's Legal Director since May 2018. Prior to becoming the Reporters Committee's Legal Director, I was the Reporters Committee's Litigation Director; I held that position from September 2014 to May 2018. I am a member in good standing of the bar of New York and am admitted to practice before this Court. I am one of the attorneys representing Plaintiffs Bloomberg, L.P. and Dow Jones & Company, Inc. in the above-captioned action, and I make this declaration in support of Plaintiffs' Cross-Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment. I have personal knowledge of the matters stated in this declaration.

    2.    Attached hereto as **Exhibit A** is a true and correct copy of a publicly available report found at the following link: *Workforce Report December 2022, New York City*, LinkedIn

(Dec. 1, 2022), https://www.linkedin.com/jobs/blog/linkedin-workforce-report-december-2022-new-york-ny?src=or-search&veh=www.google.com%7Cor-search.

3.     Attached hereto as **Exhibit B** is a true and correct copy of a publicly available report found at the following link: *2021 Allied x Zillow Magnet States Report*, Allied (last accessed Dec. 14, 2022), https://perma.cc/3KW5-PUVV.

4.     Attached hereto as **Exhibit C** is a true and correct copy of the following publicly available webpage: Jeff Tucker, *U.S. Movers Continued to seek Affordability in 2021, but in Different Areas*, Zillow (Dec. 20, 2021), https://www.zillow.com/research/moving-to-affordability-2021-30470/.

5.     Attached hereto as **Exhibit D** is a true and correct copy of the following publicly available report: *Where did Americans Move in 2022?*, NorthAmerican Moving Services (last accessed Jan. 20, 2023), https://www.northamerican.com/migration-map.

6.     Attached hereto as **Exhibit E** is a true and correct copy of the following publicly available webpage: Dana Anderson, *Homebuyers Are Looking to Relocate to Affordable Areas–Especially in Florida–Amid High Rates, Prices*, Redfin (Nov. 29, 2022), https://www.redfin.com/news/housing-migration-trends-october-2022/.

7.     Attached hereto as **Exhibit F** is a true and correct copy of the following publicly available article: Giovanni Bonaccorsi *et al.*, *Socioeconomic differences and persistent segregation of Italian territories during COVID-19 pandemic*, Scientific Reports (Oct. 27, 2021), https://www.nature.com/articles/s41598-021-99548-7.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 20, 2023, in Washington, D.C.

Respectfully submitted,

*/s/ Katie Townsend*
Katie Townsend

3

# EXHIBIT A

# Workforce Report December 2022

New York City

Jobs

## LinkedIn Workforce Report | New York City | December 2022

December 1, 2022

*With over 191 million LinkedIn members in the United States, we have unique insight into the real-time dynamics of Americans starting new jobs and moving to new cities. This month's LinkedIn Workforce Report looks at our latest national data on hiring and migration trends through November 2022.*

*For more insight into localized employment trends in 20 of the largest U.S. metro areas, check out this month's reports for: Atlanta, Austin, Boston, Chicago, Cleveland-Akron, Dallas-Ft. Worth, Denver, Detroit, Houston, Los Angeles, Miami-Ft. Lauderdale, Minneapolis-St. Paul, Nashville, New York City, Philadelphia, Phoenix, San Francisco Bay Area, Seattle, St. Louis, and Washington, D.C.*

*Our vision is to create economic opportunity for every member of the global workforce. Whether you're a worker, an employer, a new grad, or a policymaker, we hope you'll use these insights to better understand and navigate the dynamics of today's economy.*

## Hiring

Hiring was 1.5% lower in November 2022 compared to last month October 2022 and was 23.9% lower in November 2022 compared to last year November 2021. If you're interested in exploring new opportunities in New York City, check out **LinkedIn Jobs** to see what's out there!



**JA078**

New York City gained the most workers in the last 12 months from **Los Angeles, CA**; **Washington, D.C.**; and **Dallas-Fort Worth, TX**. So for every 10,000 LinkedIn members in New York City, 2.19 workers moved to the city in the last year from **Los Angeles, CA**.



**Miami-Ft. Lauderdale, FL**; **Austin, TX**; and Tampa Bay, FL gained the most workers from New York City in the last 12 months. So for every 10,000 LinkedIn members in New York City, 3.36 workers moved to **Miami-Ft. Lauderdale, FL** in the last year.



# EXHIBIT B

(800) 689-8684
Get a Quote

Menu

# The 2021 Allied x Zillow Magnet States Report

The Allied x Zillow 2021 Magnet States Report shows that consumers continue to flock to Florida, while people moving for work are going to Texas. The Magnet States Report analyzes moves by thousands of Allied customers and Zillow Home Value Index data from January 1, 2021 – December 15, 2021. Historical trends date back to January 1, 2016.

## National Movers Study

2021   Choose A State



High Inbound      Balanced      High Outbound

EMBED THIS MAP

# Top Inbound States in

# Top Outbound State

2021

in 2021

| South Carolina | 66% |
| Tennessee | 65% |
| North Carolina | 62% |
| Florida | 59% |
| Arizona | 57% |
| Texas | 54% |

| Illinois | 68% |
| California | 66% |
| New Jersey | 63% |
| Michigan | 60% |
| Pennsylvania | 58% |
| Maryland | 58% |

# Key Takeaways from the 2021 Allied x Zillow Magnet States Report

**Moving Trends**

For the last 5 years Texas, North Carolina, South Carolina, Florida and Arizona has been in the top 10 inbound states while California, Illinois, Michigan, and Pennsylvania have been in the top 10 outbound states. See where Californians are moving to.

The Phoenix metro area topped the rankings for the most net inbound moves in 2021, pulling in movers especially from Chicago, Seattle and Portland, OR.

Chicago tops the list of metro areas that originated the most net outbound moves, sending the most movers south and west to Phoenix, Los Angeles and Houston.

The top destination cities for people who moved for work in 2021 were Houston, Dallas and Chicago.

The top cities that people moved to for reasons other than work in 2021 were Phoenix, Dallas and Washington, DC.

The most popular day to move was Friday, and the most popular season was summer (June and July).

## Top Inbound Cities in 2021

## Top Outbound Cities in 2021

| Phoenix, AZ | Chicago, IL |
| Houston, TX | Washington, DC |
| Dallas, TX | Houston, TX |
| Denver, CO | Seattle, WA |
| Washington, DC | Los Angeles, CA |

Get a Quote

## Housing Trends

The average long distance mover in 2021 moved to a ZIP code where homes were about $35,800 cheaper than where they came from, amplifying a trend that first broke out in 2020, when movers began migrating from pricier to much more affordable locales.

The comparable average ZIP-level price decline in 2020 was about $29,500. Before the pandemic, people tended to move to ZIP codes with very similar average prices: the average ZIP-level price change was only a decrease of less than $7,500 in each year from 2016 to 2019.

The larger affordability gradient this year was driven by a remarkable rise in the average home value of people's origin ZIP codes: it rose by 14.0%, to reach $480,736. But, reflecting the year's hot housing market, the average value of homes in ZIP codes where interstate movers ended up in 2021 also rose substantially; by 13.5%, to $444,932.

The top destinations for net inbound moves in 2021 are mid-priced growing Sunbelt metro areas, while the top origins for net outbound moves are in places that are colder, pricier, or both.

Some of 2020's top destinations have lost their affordability edge, and now they're attracting fewer movers.

This year, people moving into the Phoenix metro area are moving from ZIP codes with an average home value of $528,712, and moving into ones in the Phoenix area where homes are worth roughly the same: $526,993, on average, or only about $1,700 less. In the comparable data for 2020, people moving to Phoenix saw ZIP-level price savings averaging over $48,000.

The diminished home price savings for people moving to Phoenix in 2021 reflects the likely effects of 2020's demand surge, which drove up the cost of homes in those metro areas faster than in any other major metropolitan area, thereby potentially shrinking the pool of movers in 2021.

**JA083**

# EXHIBIT C

**Zillow**  Manage Rentals  Advertise  Help  Sign in

Zillow Research  Data  Visuals  **Buyers/Sellers**  Renters  Policy/Politics  Fair Housing  Presentations

AFFORDABILITY, BUYING/SELLING

# U.S. Movers Continued to Seek Affordability in 2021, but in Different Areas

Some of 2020's most popular mover destinations have gotten so expensive, so quickly that they are losing some of their appeal as affordable options.



 Jeff Tucker  • DEC 20 2021

Share 

**RELATED POSTS**

Updates to conforming loan limits mean 2 million U.S. homes no longer require a jumbo loan

Bah, Humbug! Holiday Streets Have Lower Zestimates

November 2022 Existing Home Sales: Sales Plummet in Stale Market

Prairie Village, KS was Zillow's Most Popular City in 2022

Zillow Home Value and Sales Forecast: December 2022

More articles

- The average interstate mover in 2021 moved to a ZIP code where homes were about $35,800 cheaper than where they came from, up from the 2020 comparable average ZIP-level price decline of about $29,500.
- The average home value in movers' origin ZIP codes rose by 14%, to $480,736. The average value of homes in ZIP codes where interstate movers ended up in 2021 rose by 13.5%, to $444,932.
- People moving into the Austin metro – 2020's fourth most-popular moving destination – moved to ZIP codes with an average home value that was $25,000 less than where they moved from; in 2020, the comparable average ZIP level savings for similar moves was more than $140,000.

JA085

In 2021, Americans intensified a trend begun in 2020 of moving to more affordable areas, as rapidly rising home values and more remote-working jobs continue to push people to seek out locales where their home-buying dollar goes farther. But some of 2020's most popular destinations, including Phoenix and Austin, have gotten so expensive, so quickly that they are losing some of their appeal as affordable options.

The average interstate mover in 2021 moved to a ZIP code where homes were about $35,800 cheaper than where they came from, up from the 2020 comparable average ZIP-level price decline of about $29,500, according to a Zillow analysis of local home value data and mover data from Allied Van Lines. Before the pandemic, people tended to move to ZIP codes with very similar average prices: the average ZIP-level price change was a decrease of less than $7,500 in each year from 2016 to 2019.

The larger affordability gradient this year was driven by a remarkable rise in the average home value of people's origin ZIP codes: it rose by 14%, to reach $480,736. But, reflecting the year's hot housing market, the average value of homes in ZIP codes where interstate movers ended up in 2021 also rose substantially; by 13.5%, to $444,932.

| Year | Average origin ZIP home value | Average destination ZIP home value | Average ZIP-level home value change |
|------|------------------------------|-----------------------------------|-------------------------------------|
| 2016 | $344,309 | $342,675 | -$1,634 |
| 2017 | $369,549 | $362,117 | -$7,432 |
| 2018 | $391,327 | $390,829 | -$498 |
| 2019 | $400,305 | $394,177 | -$6,129 |
| 2020 | $421,641 | $392,112 | -$29,530 |
| 2021 | $480,736 | $444,932 | -$35,803 |

The top destinations for net inbound moves in 2021 were mid-priced growing Sunbelt metro areas, while the top origins for net outbound moves were in places that are generally colder, pricier, or both. The Dallas-Fort Worth metro area topped the rankings for the most net inbound moves in 2021, pulling in movers especially from pricey Los Angeles and chilly Chicago, as well as fast-growing Phoenix.

**Origins for people moving to the top destination metro areas:**

| Destination Metro | 1 | 2 | 3 |
|-------------------|---|---|---|
| Dallas-Fort Worth, TX | Los Angeles, CA | Chicago, IL | Phoenix, AZ |
| Charlotte, NC | New York, NY | Chicago, IL | Washington, DC |
| Sarasota, FL | Chicago, IL | New York, NY | Washington, DC |
| Nashville, TN | Chicago, IL | Los Angeles, CA | New York, NY |
| Tampa, FL | New York, NY | Chicago, IL | Atlanta, GA |

JA086

Chicago tops the list of metro areas that originated the most net outbound moves, sending the most movers south and west to Phoenix, Dallas-Fort Worth and Los Angeles.

**Destinations for people leaving the top origin metro areas:**

| Origin Metro | 1 | 2 | 3 |
| --- | --- | --- | --- |
| Chicago, IL | Phoenix, AZ | Dallas-Fort Worth, TX | Los Angeles, CA |
| Los Angeles, CA | Dallas-Fort Worth, TX | Phoenix, AZ | Seattle, WA |
| New York, NY | Miami, FL | Los Angeles, CA | Tampa, FL |
| San Diego, CA | Dallas-Fort Worth, TX | Phoenix, AZ | Houston, TX |
| Detroit, MI | Los Angeles, CA | Tampa, FL | Chicago, IL |

## Losing an Edge

Some of 2020's top destinations have lost their affordability edge, and now they're attracting fewer movers. In 2020, Phoenix had the most net inbound moves among all metro areas analyzed, while Austin had the fourth-most. But in 2021, Phoenix and Austin slid to the eight and ten spots on the list of highest net destinations, respectively. That might be due to the declining number of movers experiencing large price savings, at the local level, when moving there this year.

So far in 2021, people moving into the Austin metro area are moving *from* ZIP codes with an average home value of $632,779, and moving *into* ones in the Austin area where homes are worth an average of $608,163, less than $25,000 in potential price savings. In the comparable data covering the same time frame in 2020, people moving to Austin realized ZIP-level price savings averaging more than $140,000.

This year, people moving into the Phoenix metro area are moving from ZIP codes with an average home value of $528,712, and moving into ones in the Phoenix area where homes are worth roughly the same: $526,993, on average, or only about $1,700 less. In the comparable data for 2020, people moving to Phoenix realized ZIP-level price savings averaging over $48,000.[1]

The diminished home price savings for people moving to Austin and Phoenix in 2021 reflects the likely effects of 2020's demand surge, which drove up the cost of homes in those metro areas faster than many other major metropolitan areas, potentially shrinking the pool of movers in 2021.

## Methodology

Data was provided for all interstate moves that were loaded from January 1, 2016 to November 14, 2021. To maintain comparability with the time frame covered in 2021, only moves loaded by November 14 of each year were included. Home values were

computed using the Zillow Home Value Index for the ZIP codes of origin and destination in the loading month for each move.

[1] Note that the destination ZIP code-level home values above were higher than Austin's and Phoenix's overall typical home values, likely reflecting the generally higher overall price range sought by the particular users in this data source.

# Read Next

**AFFORDABILITY, BUYING/SELLING**

## Updates to conforming loan limits mean 2...

**BUYING/SELLING**

## Bah, Humbug! Holiday Streets Have Lower...

**BUYING/SELLING, NEWS**

## November 2022 Existing Home Sales: Sales Plummet in...

**FEATURED**

Updates to conforming loan limits mean 2 million U.S. homes no longer require a jumbo loan

Bah, Humbug! Holiday Streets Have Lower Zestimates

Mortgage Rates Increase Set Expectations For New Year

November 2022 Existing Home Sales: Sales Plummet in Stale Market

Prairie Village, KS was Zillow's Most Popular City in 2022

**RECENT**

Zillow Home Value and Sales Forecast: December 2022

November Housing Starts: Homebuilding Continues to Slow

Home Price Declines Resumed in November As Buyers Await Better Deals (November 2022 Market Report)

Rents Slide by Largest Amount in at Least 7 Years (November 2022 Rental Report)

10 Best Metros For First Time Home Buyers in 2023

About us

# EXHIBIT D

Case 1:23-cv-00611-DLC Document 125-43, Filed 01/12/23 Page 2 of 4

  northAmerican MOVING SERVICES

MENU

(800) 228-3092

 GET QUOTE

## Where did Americans Move in 2022?

In 2022, Americans were on the move, but where to? Most found themselves leaving high cost of living areas in favor of warmer climates and more reasonable housing conditions.

The chosen states for inbound moving migration predominantly reside in the south. Whether it's a coincidence or not, many of these states were among the first to lessen Covid-19 regulations. While it's a possibility that the surge in remote work leads people to areas with less restriction in the short term, it could also be that these locations offer a smaller tax burden in the long term as well.

## National Movers Study

2022

Choose A State



 High Inbound    High Outbound

| Top Inbound States in 2022 | |
| --- | --- |
| State | 2022 |
| South Carolina | 68% |
| North Carolina | 64% |
| Tennessee | 64% |
| Arizona | 57% |

| Top Outbound States in 2022 | |
| --- | --- |
| State | 2022 |
| Illinois | 65% |
| California | 63% |
| New Jersey | 62% |
| Pennsylvania | 60% |

JA090

| Florida | 55% | | Michigan | 59% |
|---------|-----|--|----------|-----|

## Takeaways From the 2022 Moving Migration Report

While some of the findings of the 2022 Moving Migration Report were expected, a number of others were surprising. Here are some of the top takeaways from the report:

- Move volume, or the number of individuals that moved in 2022 was down compared to previous years.
- Southern states remained primary draws for those moving, with top destinations South Carolina, North Carolina, Tennessee, Arizona, and Florida.
- For the fourth year in a row, Illinois has the largest percentage of individuals moving out of the state.
- Tennessee, North Carolina, and South Carolina have consistently been on the list of top inbound states since 2020.
- Many of the moves revolve around the flexibility of remote work and those choosing to take the route of early retirement.

## Illinois is Top Outbound State for 9 Years in a Row

Since 2014, Illinois has been the top state for outbound moves, according to the Moving Migration Report.

Other leading outbound states include New Jersey and Pennsylvania, both of which have remained on the list for more than a decade.

[Neighbor](#) released research stating that 78% of Americans are reducing their spending this holiday season. With the surge in inflation and the competitive housing market that is currently in play, many are cutting back on expenses to make ends meet. One of the biggest expenses Americans face are income and property taxes. Reducing those can have a significant impact on a family's budget.

California and New York sit towards the top of the highest cost of living lists in the United States. To find affordable housing and provide a higher quality of life for their families, people are branching out of expensive states and cities or urban areas.

While houses still sell for top dollar in many areas, the [competition has lessened](#)

What's more, many who are listing homes in top metro locations are finding that there are fewer showings than in previous years. The increase in cost is pushing prospective buyers into rural areas for homeownership. With affordability and quality of life top of mind, buyers are more likely to forgo convenience for lower taxes and home prices.

## Quality of Life Is the Top Concern for Movers in 2022

After experiencing several years of uncertainty, many are on the hunt for somewhere to settle that provides a higher quality of life than they previously had. For many, that means finding a home that is nestled in nature and allows for ample outdoor experiences. Others are relocating to be near family.

One of the driving forces behind this trend is the continuance of remote work. After numerous companies implemented this structure during the pandemic, workers realized they could successfully fulfill their work obligations away from the office. Given that, they are choosing to reside in locations where they can get more bang for their buck. Helping to continue the work from home trend is the fact that many companies downsized their corporate office space during the pandemic, resulting in

less office space for their employees to work from. Whether or not the work from home trend will be one the majority of companies ascribe to long term remains to be seen.

## Highest Income Tax States in 2022

Having your residence in certain states requires you to pay a higher income tax than what you are liable for in others. Something the two top outbound states have in common is that they have some of the highest tax rates in the country.

Those in California and New Jersey have long dealt with tax rates that are in the highest percentage in the United States. These levels take away from a person's overall income and leave fewer funds for discretionary spending and investments. Owning property, along with property taxes, is part of this equation as well and another top reason for people moving to lower tax liability states.

## Top Cities in 2022

Among the top inbound states in the Moving Migration Report, some cities saw a higher influx of new residents than others. The top cities in 2022 include:

- Raleigh, North Carolina
- Charleston, South Carolina
- Tampa, Florida
- Jacksonville, Florida
- Tucson, Arizona
- Nashville, Tennessee

There are more cities that were high on the list outside of the top states, including some in Minnesota, Ohio, and Texas. Among the similarities between them, the low cost of living and reasonable housing prices is at the top. In addition, all offer access to year-round outdoor recreational opportunities and activities, or in other words an enhanced quality of life.

## The Methodology

In the process of bringing this information to light, we compile data from many different angles. We look at population reports and speak to the top companies in the moving industry to get insider knowledge. Additionally, we look at the cities that have seen the most considerable growth and studies and statistics surrounding the topic.

We take this information and then set out to investigate the underlying causes. Many surveys are done on various demographics to understand the nature of someone's long distance move and what led to the decision. Getting this information from our own customers and others in the industry gives us a first-person look into the situation.

## Summary of Findings

Throughout the 2022 Moving Migration Report, you will see that the increasing cost of living is a consistent reason that people provide for their move. Many people are actively seeking affordable housing which they can't find while living in their current residence.

Additional driving factors for moving to another state include the desire to have a higher quality of life with access to nature and family. With the expanded opportunities for remote work, many are exploring lower-cost living options because they are no longer bound to one location.

The 2022 Moving Migration Report brings you the latest findings and the data that support the information. Where will 2023 take you? Will Illinois or Pennsylvania drop off the list for the first time in over a decade? Only time will tell, so check back in 2023 to find out!

# EXHIBIT E

1-844-759-7732    Buy ⌄    Rent ⌄    Sell ⌄    Mortgage ⌄    Real Estate Agents ⌄    Feed

Housing Market    Migration    Equality & Policy    Regional Trends    Data Center    Company News    Contact

**Mortgage**

Compare rates

Payment calculator

# Homebuyers Are Looking to Relocate to Affordable Areas–Especially in Florida–Amid High Rates, Prices

Published on November 29, 2022 by Dana Anderson

   

*The share of Redfin.com users looking to move to a different metro area is near its record high as high rates and prices up the appeal of affordable places. Coastal Florida is especially popular, even after getting pummeled by Hurricane Ian.*

Nearly one-quarter (24.1%) of U.S. homebuyers looked to move to a different metro area in the three months ending in October, on par with the record high of 24.2% set in the third quarter. That's up from roughly 18% in 2019, before the pandemic ushered in the remote-work era that gave many Americans more flexibility to relocate.



The U.S. housing market has cooled significantly during the second half of 2022 as high mortgage rates, inflation and a stumbling economy deter would-be homebuyers and sellers. But of the people who *are* still buying homes, an unprecedented portion are relocating to new metros. Many are seeking relative affordability as near-7% mortgage rates and persistently high home prices make expensive parts of the country even more expensive.

Join us on Twitter for more #housingmarket updates

Follow Us

## You Might Also Like

 Housing Market Update: Homes Linger on the Market as Buyers Take Their Time

 Housing Market Update: Typical Monthly Payment Is Nearly $300 Less Than October Peak, Bringing Some Homebuyers Back

 Share of Homes Bought With All Cash Hits Highest Level Since 2014

 Homebuyers Are Flocking to the Sun Belt, Attracted to Relatively Affordable Home Prices

The average 30-year-fixed mortgage rate was 6.9% in October, up 3.83 percentage points from 3.07% one year earlier—the largest year-over-year increase during any month since 1981. That has caused monthly mortgage payments for homebuyers to roughly double from a year earlier. And while rates have come down slightly in November, they're still significantly higher than they were last year.

## Homebuyers are looking to move to the Sun Belt, especially Florida

Sacramento, Las Vegas and Miami were the most popular destinations for Redfin.com users looking to relocate, followed by San Diego and Tampa. Popularity is determined by net inflow, which is the number of people looking to move into a metro minus the number of people looking to leave.

Half of the top 10 migration destinations are in Florida (Cape Coral, North Port-Sarasota and Orlando are all on the list, in addition to Miami and Tampa). That's despite the fact that the state was hit by Hurricane Ian, one of the deadliest, most destructive storms in U.S. history, in September.

Relatively affordable Sun Belt metros are typically most popular with relocating homebuyers, largely because buyers can get more home for less money. In Las Vegas, for instance, the typical home cost $410,000 in October, roughly half the price of the typical home in Los Angeles ($823,000)—the most common origin for people moving there.



**Housing Market Update: Early-Stage Demand Up Notably From October Trough**



**Just 3 in 100 Pandemic Homebuyers Would Fall Underwater With Next Year's Projected 4% Home-Value Decline**



**Housing Market Update: Supply Posts Record Increase As Homes Linger on the Market**

**Top 10 Metros Homebuyers Are Moving Into, by Net Inflow**

*Net inflow = Number of Redfin.com home searchers looking to move into a metro area, minus the number of searchers looking to leave*

| Rank | Metro* | Net Inflow | Top Origin | Top Out-of-State Origin |
|---|---|---|---|---|
| 1 | Sacramento, CA | 7,800 | San Francisco, CA | Chicago, IL |
| 2 | Las Vegas, NV | 7,100 | Los Angeles, CA | Los Angeles, CA |
| 3 | Miami, FL | 6,700 | New York, NY | New York, NY |
| 4 | San Diego, CA | 6,500 | Los Angeles, CA | Chicago, IL |
| 5 | Tampa, FL | 5,600 | New York, NY | New York, NY |
| 6 | Phoenix, AZ | 4,700 | Los Angeles, CA | Los Angeles, CA |
| 7 | Cape Coral, FL | 4,600 | Chicago, IL | Chicago, IL |
| 8 | North Port-Sarasota, | 4,300 | Chicago, IL | Chicago, IL |

| | | | | |
|---|---|---|---|---|
| | FL | | | |
| 9 | Dallas, TX | 3,800 | Los Angeles, CA | Los Angeles, CA |
| 10 | Orlando, FL | 3,700 | New York, NY | New York, NY |

*Combined statistical areas with at least 500 users searching to and from the region in August-October 2022

## Buyers are leaving expensive West Coast and East Coast cities

More homebuyers looked to leave San Francisco, Los Angeles, New York, Washington, D.C. and Boston than any other major metro. That's determined by net outflow, a measure of how many more Redfin.com users looked to leave an area than move in.

Homebuyers typically leave expensive coastal job centers more than they leave other places, a trend that started before the pandemic and picked up steam due to remote work and rising housing costs. They most commonly head to more affordable regions. Sacramento, where homes cost less than half what they do in the Bay Area, is the most common destination for people leave San Francisco, for instance.

**Top 10 Metros Homebuyers Are Leaving, by Net Outflow**

*Net outflow = Number of Redfin.com home searchers looking to leave a metro area, minus the number of searchers looking to move in*

| Rank | Metro* | Net Outflow | Portion of Local Users Searching Elsewhere | Top Destination | Top Out-of-State Destination |
|---|---|---|---|---|---|
| 1 | San Francisco, CA | 35,800 | 24% | Sacramento, CA | Seattle, WA |
| 2 | Los Angeles, CA | 34,100 | 20% | San Diego, CA | Las Vegas, NV |
| 3 | New York, NY | 22,400 | 27% | Miami, FL | Miami, FL |
| 4 | Washington, D.C. | 18,100 | 18% | Salisbury, MD | Salisbury, MD |
| 5 | Boston, MA | 7,800 | 19% | Portland, ME | Portland, ME |
| 6 | Chicago, IL | 7,300 | 17% | Milwaukee, WI | Milwaukee, WI |
| 7 | Detroit, MI | 4,200 | 32% | Cleveland, OH | Cleveland, OH |
| 8 | Denver, CO | 3,400 | 31% | Chicago, IL | Chicago, IL |

**JA096**

| 9 | Seattle, WA | 1,600 | 17% | Phoenix, AZ | Phoenix, AZ |
| 10 | Philadelphia, PA | 1,500 | 19% | Salisbury, MD | Salisbury, MD |

*Combined statistical areas with at least 500 users searching to and from the region in August-October 2022

## Methodology

Our migration analysis is based on about two million Redfin.com users who viewed for-sale homes online across more than 100 metro areas from August 2022 to October 2022. When we say "October" in this report, we're referring to the three months ending in October. To measure the share of homebuyers looking to relocate from one metro to another, we calculate the portion of overall home searchers that are migrants.

A Redfin.com user counts as a migrant if they viewed at least 10 for-sale homes in the third quarter and at least one of those homes was outside their home metro area. For instance, if a Redfin.com user based in Seattle views 10 homes in a three-month period and all of them are in Phoenix, that user counts as a full migrant to Phoenix. If a user based in Seattle views 10 homes in a three-month period and five are in Phoenix but five are in San Diego, that user counts as half of a migrant to Phoenix and half of a migrant to San Diego. If a user based in Seattle views 10 homes in a three-month period, nine in Seattle and one in Phoenix, that user counts as one-tenth of a migrant to Phoenix.

The analysis includes combined statistical areas with at least 500 Redfin.com users based in that region and at least 500 users searching for homes in that region. For instance, a user based in Seattle searching for a home in Phoenix counts toward the first condition, a user in Phoenix searching for a home in Seattle counts toward the second condition, and a user based in Seattle searching for a home in Seattle counts toward both. Redfin's migration data goes back to 2017.

   



### Dana Anderson

As a data journalist at Redfin, Dana Anderson writes about the numbers behind real estate trends. Redfin is a full-service real estate brokerage that uses modern technology to make clients smarter and faster. For more information about working with a Redfin real estate agent to buy or sell a home, visit our Why Redfin page.

✉ Email Dana

**JA097**

# EXHIBIT F



# scientific reports

Check for updates

**OPEN**

# Socioeconomic differences and persistent segregation of Italian territories during COVID-19 pandemic

Giovanni Bonaccorsi[1,5], Francesco Pierri[2,5], Francesco Scotti[1,5], Andrea Flori[1], Francesco Manaresi[3], Stefano Ceri[2] & Fabio Pammolli[1,4]

Lockdowns implemented to address the COVID-19 pandemic have disrupted human mobility flows around the globe to an unprecedented extent and with economic consequences which are unevenly distributed across territories, firms and individuals. Here we study socioeconomic determinants of mobility disruption during both the lockdown and the recovery phases in Italy. For this purpose, we analyze a massive data set on Italian mobility from February to October 2020 and we combine it with detailed data on pre-existing local socioeconomic features of Italian administrative units. Using a set of unsupervised and supervised learning techniques, we reliably show that the least and the most affected areas persistently belong to two different clusters. Notably, the former cluster features significantly higher income per capita and lower income inequality than the latter. This distinction persists once the lockdown is lifted. The least affected areas display a swift (V-shaped) recovery in mobility patterns, while poorer, most affected areas experience a much slower (U-shaped) recovery: as of October 2020, their mobility was still significantly lower than pre-lockdown levels. These results are then detailed and confirmed with a quantile regression analysis. Our findings show that economic segregation has, thus, strengthened during the pandemic.

Public health strategies extensively adopted by governments at the outbreak of the COVID-19 pandemic required the implementation of non-pharmaceutical interventions (NPIs) to reduce the transmission rate of the virus[1–6]. Among NPIs, mobility restrictions proved to play a central role in decreasing social contacts[7,8], effectively contributing to control the diffusion of several pathogens across social systems and motivating their wide adoption for the containment also of the COVID-19[9–13].

Specifically, full national lockdowns, i.e. periods of severe mobility restrictions and social distancing for almost all citizens, were widely adopted during the first wave of the COVID-19 pandemic[14–17], while restrictions targeted to specific geographic areas and for shorter periods constituted the preferred strategy during the second half of 2020[18–25].

The spread of the COVID-19 was unevenly distributed among geographic areas and clustered in specific zones during the first wave of contagion[14,19,26]. However, the adoption of generalized mobility restrictions across entire national territories severely affected the whole population, causing the disruption of national mobility networks[27–29] with relevant consequences for the socioeconomic context. The impact of the contraction of mobility flows on business activities and economic output thus sparked a vivid debate on the direct and indirect consequences of such policy measures[16,30–32], stimulating the investigation of the socioeconomic effects of NPIs adoption[26,33,34].

This work aims to assess the impact of NPIs by evaluating how mobility restrictions interacted with socioeconomic characteristics. In so doing, we focus on Italian territories and we rely on the assumption that a reduction in mobility flows represents a first-order proxy for the contraction of economic activities. This is plausible since a wide share of the population relies on mobility to reach workplaces, and a significant portion of productive

[1]Impact, Department of Management, Economics and Industrial Engineering, Politecnico di Milano, Milan, Italy. [2]Department of Electronics, Information and Bioengineering, Politecnico di Milano, Milan, Italy. [3]Science, Technology and Innovation Directorate, Productivity and Business Dynamism Division, OECD, Paris, France. [4]SIT, Schaffhausen Institute of Technology, Schaffhausen, Switzerland. [5]These authors contributed equally: Giovanni Bonaccorsi, Francesco Pierri and Francesco Scotti. ✉email: giovanni.bonaccorsi@polimi.it; fabio.pammolli@polimi.it

establishments depends on direct contact with consumers to carry on their activities. For example, mobility restrictions have been shown to be strongly correlated with consumption reduction[35,36] and loss of Gross Domestic Production (GDP)[37] during the pandemic.

Official measurements on the economic response of individuals and firms are typically available only several months after the events take place, and often with insufficient geographic detail. Digital traces of individuals, including mobility data, are instead widely diffused, readily available and contain information on the geographic position of users[38–40]. In this work, we take advantage of a large-scale social network dataset comprising near real-time observations for over 4 million individuals, provided by Facebook through its "Data For Good" program, to measure Italian mobility patterns and assess how restrictions disrupted the corresponding mobility network. Given the severity of the COVID-19 pandemic, we follow the literature on the management of natural disasters and other disruptive events[41–44] in which digital data have been exploited to evaluate the impact of shocks, even though these sources of information may not represent perfect survey instruments.

Extant literature on the negative impacts of NPIs on economic activities has focused mostly on the lockdown phase[26,34,45,46], although the speed and strength of recovery after restrictions lifting have relevant consequences on the overall impact of the crisis, with potentially long-lasting effects which could modify the socioeconomic structure of a country. On a macroeconomic perspective, the study of the effects of restrictions on economic output has resulted in competing recovery scenarios from the COVID-19 pandemic[47–52], distinguishing between a long and slow recovery (U-shaped or L-shaped), which signals the existence of long-run negative effects, and a short and fast dynamics (V-shaped), which indicates temporary disruptions.

Against this background, we investigate the existence of persistent effects from mobility restrictions in Italian territories by analyzing their recovery patterns and heterogeneous responses. In fact, some territories might limit the negative consequences of the lockdown, promptly reversing their mobility patterns once restrictions are lifted (a V-shaped recovery). Conversely, other territories might be persistently penalized by restrictions, suggesting long-lasting negative effects (a U-shaped recovery).

To investigate the existence and persistence of these heterogeneous patterns, we analyze the evolution of mobility in Italy from March to October 2020, i.e., covering both the lockdown and the recovery phases, and we construct an indicator measuring the level of mobility disruption. By ranking territories according to their mobility performance, we provide evidence on the existence of two distinct classes characterized by different behaviors. The most affected territories exhibit a slow U-shaped recovery, and at the end of our period of analysis their mobility levels are still nearly 20% lower than their pre-lockdown levels. The least affected territories have a quicker, V-shaped, recovery, with mobility reaching pre-lockdown levels around mid-July, hence only 2 months after mobility restrictions are lifted.

Then, to understand the extent to which pre-existing socioeconomic characteristics of Italian territories are informative to understand such mobility responses, we investigate the presence of commonalities among members of the two classes with both supervised and unsupervised machine learning techniques. We find significant evidence of persistent economic segregation induced by the lockdown, with most affected territories being characterized by lower income per capita and higher income inequality, in line with other recent studies[46,52–54]. Such findings are confirmed with a quantile regression analysis to assess the individual effect of different socioeconomic dimensions.

Our main variable of interest is income, but we also account for other relevant socioeconomic variables, such as the distribution of revenues per employee by productive sector, the share of employed individuals capable to work from remote, or the North-South geographic divide. Thus, we provide evidence that the effects of mobility restrictions have been unequally distributed across territories, with stronger and persistent effects where income per capita is lower.

These findings are relevant for the decision process of policymakers. The existence of two separate behaviours of recovery among territories signals the urgency of a differentiated policy response, targeting the most affected territories with intervention reducing the persistence of the effects of mobility restrictions. Moreover, our results show the relevance of pre-existing economic and social conditions for the resilience of territories during disrupting events and support governments and policymakers in tailoring effective economic relief schemes. In fact, our analysis does not simply reveal how recovery behaves differently among territories, but it pinpoints which socio-economic characteristics are reliable indicators to assess heterogeneous recovery performances.

## Results

### Evolution of the Italian mobility network.

We collect near real-time observations of individuals moving in the Italian peninsula in a period of 32 weeks, from February 24th to October 4th, 2020, based on data of the "Disease Prevention Movement Maps" provided by Facebook through their "Data for Good" program[56]. Measurements are recorded with an 8-h frequency by aggregating individual trips of Facebook users moving between Bing map tiles[57]. Mobility flows are constructed with proprietary mechanisms to ensure privacy and anonymization, e.g., adding random noise and discarding flows with less than 10 individuals[58]. Specifically, we collect observations of traffic flows within about 5,000 distinct tiles produced by an average daily number of almost 4 million individuals, representing Italian users who enabled Facebook geolocation on their mobile phones during the period of observation.

To study the impact of variations in mobility patterns with respect to the Italian economic structure, we perform a further aggregation step by mapping tiles into 562 Italian Local Labour Markets (LLMs), i.e., territorial divisions made by the Italian Institute of Statistics (Istat) to identify uniform sub-regional areas in which the labour force lives and works, and where local firms usually employ most of their workers[59,60] (see Fig. S5 in Supplementary Information for an illustrative example).

Using LLMs as units of analysis is particularly suitable for our study. In fact, LLMs are defined based on labor markets, i.e., areas with a homogeneous productive structure in which, therefore, we can assume internal consistency in the distribution of labor forces and commuting flows. For these reasons, we can exploit them to infer differences among comparable units. Using lower-level territorial units (such as municipalities) would have required, instead, a more complicated process of attribution of the economic productive structure since local labor markets overlap over administrative boundaries of municipalities. On the other hand, aggregating at the level of LLMs reduces our ability to capture short-range mobility flows, i.e., mobility flows *inside* LLMs. Our data, however, measure movements across fixed time windows of several hours and hence are more likely to represent long-range commuting patterns of individuals[45], i.e., *among* LLMs, rather than shorter ones.

We then build mobility networks using a weighted undirected graph formulation, where LLMs stand for nodes, while edges are weighted by the number of individuals traveling between two nodes in a given period of time. Given the large variability of daily measurements, for instance during the weekends, we study human mobility by aggregating observations using non-overlapping windows of 14 days over the interval from February 24th to October 4th. Figure 1 provides an outlook on Italian mobility as measured by our data. Top panels (A–B–C) highlight three specific snapshots *before*, (24/2-8/3), *during* (23/3-5/4) and *after* (15/6-29/6) the national lockdown of March 8th. Middle panels show the evolution of the total number of individuals flows, aggregating either over bi-weekly windows (D) or daily (E). Note how during the lockdown period there was a strong reduction in mobility flows, consistent with the hypothesis of the disruption of the Italian mobility network.

We investigate the process of disruption on the Italian mobility network due to lockdown restrictions, along with the analysis of simple topological statistics[61,62]. More specifically, we focus on the global efficiency (see Methods) along the literature on the resilience of networks against disruptive events[63–65]. We observe a pronounced variation of several network metrics (see Figs. 1D, E and S2, S3 in the Supplementary Information) following the national lockdown, which caused the disappearance of a large number of connections and induced a fragmentation of the mobility network which is well reflected by the pattern of global efficiency in Fig. 1F. Interestingly, we also note that the strongest effects of mobility restrictions are most evident a couple of weeks after the lockdown (cf. 23/3-5/4). Finally, at the end of the period of observation (21/9-4/10), these metrics are approximately at their pre-lockdown values, signaling a return to the "business as usual" mobility levels.

When focusing on mobility disruption at the level of single nodes, we adopt the same approach as above, analyzing both simple node centrality measures, namely degree and strength[61,62], and nodal efficiency[66,67], a more specific measure chosen to capture local mobility disruption. Nodal efficiency is defined as the average reciprocal distance of each node from the other nodes in the network, thus representing the contribution of each node to the global efficiency of the network. Hence, this measure combines the information deriving from network cohesiveness and the distance between nodes to measure how efficiently individuals travel throughout the network (see Methods for more details). The evolution over time of the distribution of node centralities mirrors the trend of the global network statistics: a sharp decreasing trend consequent to the application of lockdown and then a gradual recovery during the summer period (see Fig. 1F for nodal efficiency, and Fig. S4 in the Supplementary Information for strength and degree centrality).

The core of our analysis relies on the assumption that mobility disruption negatively affects economic activity. We proxy shocks to mobility with the nodal efficiency of each LLM compared to the pre-lockdown scenario, i.e., the network of mobility corresponding to the first 14-day window in our sample (24/2-8/3). We consider such proxy as particularly suitable in our setting, where a complex system undergoes external stress and then recovers, because it allows us to quantify the contribution of different territories to the configuration of the network. To model the shock in mobility at node level, a good candidate is also strength centrality, which simply sums the number of individuals moving from a location to all its immediate neighbors, and it is positively correlated with nodal efficiency. However, we employ nodal efficiency because it takes the overall topology of the graph into account, thus providing a system-wide evaluation of the mobility network, while strength centrality considers only direct connections.

Hence, let $i$ be an Italian LLM in our sample, we define the relative variation in nodal efficiency $\Delta e_i^t$ as $\frac{e_{i,t} - e_{i,t_0}}{e_{i,t_0}}$, where $e_i$ is the nodal efficiency of the LLM calculated in a specific window of time (see Methods), $t$ represents a 14-day window and $t_0$ the pre-lockdown window taken as reference (24/2-8/3). Figure 1G provides a Kernel Density Estimation of the variation in nodal efficiency over the entire period of observation. Note how the distribution of the variation in nodal efficiency is mainly negative during the lockdown phase, while after the release of restrictions it progressively shifts into more positive values in the upper tail of the distribution, thus capturing the effective dynamics of the human mobility network in Italy. More specifically, in the 2 weeks following the release of the national lockdown (cf. 4/5-18/5), roughly one-third of LLMs recovered at least half of their initial nodal efficiency, while at the end of our period of observation (cf. 21/9-4/10) there was still a non-negligible number of LLMs displaying negative values, thus not being able to reach the pre-pandemic levels of mobility. The distribution of variations in nodal efficiency indicates the emergence of heterogeneous responses in the recovery dynamics across LLMs, which we investigate from a micro-level territorial perspective in the following subsections.

### Identifying the most and the least affected LLMs.

We next examine whether the emergence of different mobility variations of Italian LLMs uncovers the presence of socioeconomic commonalities among those territories which instead share the same mobility performance in both the lockdown and recovery phases. Since socioeconomic variables do not cover the entire set of LLMs present in the mobility sample, at this stage the total number of observations in our analyses is reduced from 562 to 495 (cf. Fig. S5).

We attempt to answer the following question: do LLMs that exhibit different mobility performance, both during and after lockdown, also differ in their socioeconomic characteristics? To provide an answer, we rely on



**Figure 1.** (**A–C**) Snapshots of Italian mobility during three distinct windows of 14-day, 24/2-8/3, 23/3-5/4, and 15/6-29/6, chosen to capture the pre-lockdown, lockdown, and recovery periods, respectively. Nodes represent LLMs and edges represent mobility flows between two locations, with thickness proportional to their weight. Figures created with Python (version 3.7.4) using *networkx* package (version 2.6.2)[55]. (**D**) Temporal evolution of the total number of individuals moving between LLMs, aggregated over windows of 14 days. (**E**) Temporal evolution of the total number of individuals moving between LLMs daily, separating working days from weekends. (**F**) Temporal evolution of the global network efficiency (top) and the distribution of nodal efficiency (bottom). We also annotate the periods in which we computed the two performance indicators, respectively Lockdown and Recovery. (**G**) Kernel density estimation of the distribution of relative variation (%) in nodal efficiency for each window w.r.t. the baseline (24/2-8/3).

two measurements of mobility performance, one for the lockdown phase and one for the recovery phase, and we focus on those LLMS placed in the tails of the distribution of mobility performance, to identify the most and the least affected LLMs. By leveraging both unsupervised and supervised machine learning techniques, we test whether socioeconomic characteristics of LLMs are reliable predictors of their mobility performance.

We introduce two indicators that allow us to identify the most and the least affected LLMs during the lockdown and the recovery phases. We consider the nodal efficiency and denote *lockdown* as the mean percentage variation over the first two 14-day windows during the lockdown phase, and *recovery* as the mean percentage variation over the first two 14-day windows after lockdown lifting. Specifically, let $t_L$ refer to the 14-day window of lockdown (8/3-21/3), and $t_R$ to the 14-day window in which lockdown was lifted (4/5-17/5), then our two indicators of performance are computed as:

JA102



**Figure 2.** (**A**) Most (red) and least (blue) affected LLMs identified using the *lockdown* indicator and $K = 30\%$. White color indicates remaining 40% of LLMs in the data, whereas grey indicates LLMs not present in our data. Figure created with Python (version 3.7.4) using *networkx* package (version 2.6.2)[55]. (**B**) Temporal evolution of variation in nodal efficiency, w.r.t. baseline (24/2-8/3), for the most (red) and the least (blue) affected LLMs, identified using *lockdown* indicator and $K = 30\%$. Solid lines show mean values with 95% confidence interval (dashed area). We excluded from the plot the period corresponding to Assumption (10/8-23/8).

$$\Delta e_i^{lockdown} = \frac{\Delta e_i^{t_L} + \Delta e_i^{t_{L+1}}}{2}$$
$$\Delta e_i^{recovery} = \frac{\Delta e_i^{t_R} + \Delta e_i^{t_{R+1}}}{2} \tag{1}$$

Figure 1F reports the periods in which we measure the two performance indicators, while their distribution is shown in Fig. S7 of the Supplementary Information.

We then define the *most* and the *least* affected LLMs as those territories respectively in the *bottom* and in the *top K*% of the distribution of the aforementioned mobility performance indicators, where $K$ is a threshold chosen among the bottom/top percentiles of the distribution. As shown in the Supplementary Information (cf. Figs. S8 and S9), we find high correspondence between the most and the least affected territories for different values of $K$, indicating that, regardless of which indicator is used to define the most and the least affected LLMs, our findings are robust. Besides, we find that the distribution of the variation in nodal efficiency for the two classes are well separated in almost all different periods of observation (Kruskal–Wallis (KW) PVAL $\sim 0$ in all cases at significance level $\alpha = 0.01$), with only slight overlaps in farther periods (cf. Figs. S10 and S11 in the Supplementary Information).

Panel A of Fig. 2 shows the geographical distribution of the ($K = 30\%$) most and least affected LLMs identified using the *lockdown* indicator (cf. Fig. S6 in the Supplementary Information for the results obtained using the *recovery* indicator), whereas Panel B provides the temporal evolution of their mobility as expressed by the relative percentage variation in nodal efficiency. Note that the two classes experience different dynamics: the least affected LLMs exhibit a V-shaped recovery, with a steep drop followed by a fast upturn, while the most affected LLMs present a more smoothed and U-shaped pattern, with a long-lasting period of reduction in mobility and with a lag of 3 months in the recovery after the end of the lockdown. This shows the absence of a catch-up process for the most affected LLMs during recovery. Hence, not only mobility restrictions have unevenly impacted LLMs, but their effects are lasting longer in those LLMs where mobility disruption during the lockdown has been stronger. Interestingly, the dynamics of the relative percentage variation in nodal efficiency is able to capture the fact that at the end of the summer Italy experienced a strong rebound in mobility patterns, which attenuated during the early stages of Autumn showing again more penalized trajectories for the most affected territories.

**Unsupervised clustering of territories.** We employ unsupervised hierarchical clustering (see Methods) to investigate whether the *most* and *least* affected LLMs manifest distinct peculiarities in terms of socioeconomic variables.

Specifically, since the disruption of mobility is associated with the exacerbation of socioeconomic disparities[26,45,46], we consider income per capita, inequality in the distribution of income and population density as potential drivers of variations in mobility. Furthermore, the market structure and the sectoral composition of the local economy are considered as relevant factors that might affect the impact of restrictions, given the different requirements of each sector in terms of mobility and direct contact with customers[13,33,36,68–70]. We control for overall market structure by introducing an aggregated measure representing the concentration of revenues among sectors (Revenue Concentration) in each LLM. We account for sectoral distribution of activities by including the

Case 1:23-cv-00612-DLC Document 25-63, Filed 01/10/23 Page 7 of 16

number of employees by sector. Moreover, we control for the sectoral distribution of revenues by including the revenues per employee in each sector, i.e., a proxy of the local productivity of each sector in every LLM. Finally, we account for features affecting the response of LLMs to government interventions. Indeed, on the one hand, the Italian Government distinguished among industries having the possibility to maintain their activities open even during the lockdown (the so-called *essential* sectors) and others whose reopening was postponed. On the other hand, differences among firms in their capacity to implement work from remote influence the effect of restrictions. Hence, we account for the presence of employees in essential sectors and in sectors with higher attitudes to remote work using two aggregated variables, Essential Workers and Remote Workers, which measure the share of employees in these categories for each LLM. We use 16 aggregated NACE Rev. 2 categories to define sectors (see Table S6 for details). Overall, we consider 38 features (3 socioeconomic variables, 2 variables associated with governmental intervention and 33 variables for the sectoral composition of the economy: the number of employees and the revenues per employee for each of the 16 sectors and the overall concentration of revenues among them) measured before the lockdown and explained in detail in the Methods section (cf. Fig. S1).

Panels A and B of Fig. 3 provide results of the clustering analysis, carried out considering all aforementioned variables, to extract the two classes of territories in an unsupervised fashion (for $K = 30$%). Note how observations from the same class cluster together, as they exhibit smaller inter-distances with respect to members of the opposite class. We quantify this result through the *purity* score of each cluster. This is computed by (1) assigning each observation to the class which is most frequent in the cluster, and (2) counting the number of correctly assigned observations within each cluster and dividing by the total number of observations. We note high values of purity score in the clustering (about 90%) when extracting more than 50 clusters, with values around 70–80% when extracting as few as 2 clusters (see Panel C in Fig. 3). This suggests that the two classes exhibit a remarkable discrepancy in their socioeconomic structure. Similar results hold for $K = 20$% (cf. Fig. S12 in the Supplementary Information).

**Binary classification of the most and the least affected territories.** We corroborate these findings by using a simple supervised machine learning framework. We aim to test whether we can accurately distinguish LLMs, belonging either to the *most* or *least* affected territories, based on their socioeconomic variables. We thus train and test several off-the-shelf classifiers, from Logistic Regression to Random Forest and K-Nearest Neighbors[71] (see Methods). We use a stratified shuffle split cross-validation (with 10 folds and 20% of observations as test sample) to evaluate the performance of different models. We show in Panel D of Fig. 3 the Area under the Receiving Operator characteristic curve (AUROC) of a Random Forest classifier (computed as the macro average of both classes), using both *lockdown* and *recovery* indicators to extract the two classes, and different values for $K$. We note a great performance in the classification task, with AUROC values in the range 82–97%, with *lockdown* indicator performing slightly worse than *recovery*, and lower performance for both when considering larger samples (cf. $K \in [40\%, 50\%]$). Other classifiers yield similar performance (see Tables S2 and S3 in Supplementary Information), indicating that indeed mobility patterns uncover two classes which exhibit very different socioeconomic characteristics before the lockdown. We also obtain similar results when considering a period of four 14-day windows to compute the two indicators (see Fig. S13 in the Supplementary Information).

**Multiple comparison tests.** We finally check the robustness of these findings by performing pairwise multiple comparison tests, for each of these socioeconomic dimensions, among the three classes of LLMs, namely the $K = 30$% most and least affected LLMs and the remaining 40% ones (see Tables S4 and S5 in the Supplementary Information). Specifically, we perform a Kruskal–Wallis (KW) test with Conover procedure and Bonferroni correction for $p$-values[72] (see Methods). We observe that several variables exhibit statistically significant different distributions (KW PVAL $\sim 0$ at significance level $\alpha = 0.01$). In particular, we find that, using both *lockdown* and *recovery* indicators to extract classes, the most affected LLMs exhibit median values of Income per Capita and Density which are significantly smaller compared to the least affected ones, whereas median values of Inequality are higher for the most affected areas compared to the others (KW PVAL $\sim 0$ at significance level $\alpha = 0.01$, cf. Figs. 4A, B and S14, S15 in Supplementary Information). For what concerns variables describing the labour market and the industrial composition of different territories, we observe that sectors of the most affected LLMs exhibit lower levels of revenues per employee, whereas the number of essential workers does not seem to show statistically significant differences among the different classes (cf. Figs. 4C, D and S14, S15 in Supplementary Information). We remark that our analysis focuses on the differences between the most and the least affected classes (and not with respect to the rest of the territories). Hence, these tests show that although not all variables of interest exhibit a statistically significant difference between the two classes, in general territories belonging to the most or the least affected classes differ along several relevant socioeconomic dimensions.

## The relationship between socioeconomic characteristics of territories and mobility dynamics.
We finally explore the determinants of changes in human mobility of LLMs altogether, both during the lockdown and after the relaxation of restrictive measures, by using all 495 LLMs for which we have data for mobility and socioeconomic variables.

The classification analysis tells us that socioeconomic variables can predict which LLMs belong to the most or the least affected classes (i.e., a binary outcome), but it does not indicate how these factors affect variation in nodal efficiency. In this section, we propose a framework to evaluate the magnitude and, more importantly, the direction of the interplay between local mobility performances and the socioeconomic characteristics of LLMs.

The unexplored hypothesis we want to test here is the emergence *within* the two classes of peculiar relationships between the variation of mobility and the corresponding socioeconomic characteristics. For instance, among LLMs in one class the response of mobility performance to a certain variable might be negative, while among LLMs in the other class the relation might be reversed or with a reduced magnitude. Alternatively, it may happen that the correlation remains the same within the two classes, thus signaling a socioeconomic trait

JA104

www.nature.com/scientificreports



**Figure 3.** (**A**, **B**) Results of hierarchical clustering using features of the most and the least affected LLMs identified with *lockdown* (**A**) and *recovery* (**B**) indicators, with $K = 30\%$. Red and blue labels of rows and columns identify respectively the most and the least affected areas. (**C**) Plot of purity score vs number of clusters for lockdown (green) and recovery (orange) dendrograms, shown respectively in panels (**A**) and (**B**). In the recovery phase, the two classes are more homogeneous and better separated, as indicated by purity scores higher compared to the lockdown period. This might signal that the effects of lockdown were more uniformly applied among LLMs, whereas recovery dynamics present more heterogeneity which allows us to better identify the most and the least affected territories. (**D**) Area under the Receiving Operator characteristic Curve (AUROC) for a Random Forest classifier evaluated on features of the most and the least affected LLMs, using lockdown (green) and recovery (orange) indicators and different values of $K$ to obtain the binary label. Note the best performance for K = 20%, with AUROC values around 95% for both indicators. Similar to panel (**C**), we observe in general better results when identifying the most and the least affected LLMs during the recovery phase.

which strongly characterizes the mobility response of all LLMs, regardless of classes. Furthermore, by analyzing both lockdown and recovery performance of LLMs, we are interested in understanding the extent to which the impact of socioeconomic characteristics on mobility performance is stable over time, thus affecting LLMs both before and after the implementation of mobility restrictions.

To do so, we perform a quantile regression[73] in which the dependent variable corresponds, in turn, to the *lockdown* and *recovery* indicators defined in the previous section. The quantile regression method allows us to estimate specific coefficients for the explanatory variables in each quantile of the distribution of variation in mobility, investigating the existence of different effects involving the tails of the distribution. In contrast, a traditional Ordinary Least Squares (OLS) regression, assumes a uniform relationship between the distributions of the predictors and the one of the dependent variable, providing only a single coefficient.

Our purpose is to analyze the role of socioeconomic variables on the resilience of territories. We focus, in particular, on the relationship between income per capita and mobility variation. To account for the role of other socioeconomic dimensions, we include the economic structure of territories in the econometric model and we employ a proxy of sectoral productivity (revenues per employee of each sector) to control for the influence of

JA105

Case 1:23-cv-00611-DLC Document 25-63 Filed 01/20/23 Page 9 of 16



**Figure 4.** (**A–D**) Distributions of socioeconomic features for the most (red) and the least (blue) affected LLMs, and remaining ones (white), identified using *lockdown* variable and $K = 30\%$. For variables in panels (**A–C**), the Kruskal–Wallis test to assess statistical differences between the distributions of the classes of LLMs is significant at a level $\alpha = 0.001$. For the variable in panel (**D**), it is not significant. According to the pairwise multiple comparison tests with Conover procedure and Bonferroni correction for *p*-values, distributions are statistically different at a level $\alpha = 0.01$ in all cases for variables in panels (**A–C**), with the following exceptions: in panel (**B**), there is no significant difference between Rest and Least; in panel (**C**) the difference between Rest and Least is significant at a level $\alpha = 0.05$.

local productivity on the mobility performance of territories. Finally, territorial controls at the level of macroarea account for remaining unobserved local effects.

As we obtain a clear separation between the most and the least affected classes in correspondence of a threshold $K$ equal to 10%, 20% and 30%, we focus on the corresponding quantiles of the distribution of the two indicators as illustrative cases. Hence, for each quantile $\tau$ of the dependent variables $\Delta e^k$, we estimate the following equation:

$$
\begin{aligned}
\Delta e_\tau^k &= \alpha + \boldsymbol{\beta} \cdot \mathbf{X} + \boldsymbol{\gamma} \cdot \mathbf{Z} \\
k &\in \{\text{lockdown, recovery}\} \\
\tau &\in [0.1, 0.2, 0.3, 0.7, 0.8, 0.9]
\end{aligned}
\tag{2}
$$

where $\mathbf{X} = [\boldsymbol{x}, \boldsymbol{l}, \boldsymbol{r}]$ is a matrix containing the socioeconomic variables explained in the classification section. Inside $\mathbf{X}$, we distinguish $\boldsymbol{x}$, a matrix of socioeconomic indicators measured at the LLM level (Income per Capita, Income Inequality, Population Density, Revenue Concentration, Essential and Remote Workers), and $\boldsymbol{l}$ and $\boldsymbol{r}$, two matrices with, respectively, the number of employees and revenues per employee in each sector for every LLM. Furthermore, to the first set of variables we add a matrix of territorial descriptors: $\mathbf{Z} = [\boldsymbol{z}, \boldsymbol{z} \cdot \boldsymbol{r}']$ with $\boldsymbol{r}' \subset \boldsymbol{r}$. Inside $\mathbf{Z}$, to measure the interplay between territorial and sector variables we employ territorial controls at the level of Italian macroareas (i.e., a subdivision of the country among North-West, North-East, Center, South and Insular Italy), $\boldsymbol{z}$, and we introduce a matrix of interaction terms, $\boldsymbol{z} \cdot \boldsymbol{r}'$, between territorial controls and the revenue per employee of a specific subset of sectors.

For the most relevant variables, Table 1 reports coefficients and standard errors estimated with Eq. 2, while Tables S8 and S9 in the Supplementary Information report full results. Moreover, in Tables S10 and S11 in the Supplementary Information we report results obtained with heteroskedastic-robust standard errors, obtained via wild bootstrap (1000 replications). In general, our results remain unaffected with few exceptional cases which we comment in the Supplementary Information. Next subsections are devoted to discuss separately the relations reported in Table 1, distinguishing the separate relations among the performance of territories and each group of variables: first, the main socioeconomic variables of interest; secondly, variables related to the productive structure of LLMs; and, finally, the relation captured by territorial controls.

**Main socioeconomic variables.** We observe that the coefficient of Income per Capita is positive and statistically significant for both the lower ($q_{0.10,lockdown} = 0.303$, SE = 0.077, $q_{0.10,recovery} = 0.226$, SE = 0.074) and upper part of the distribution of both indicators of mobility performance ($q_{0.90,lockdown} = 0.169$, SE = 0.074, $q_{0.90,recovery} = 0.281$, SE = 0.058). This shows that LLMs with lower Income per Capita are associated with worse mobility performance, while LLMs with higher income have better mobility performance.

The relation with Income per Capita remains almost constant between classes (i.e., for all quantiles), and both during the *lockdown* and *recovery* periods. Moreover, it is robust, since we accounted for a wide range of controls at the level of territories and sectors. This identifies Income per Capita as the main driver of our analysis and supports the hypothesis of persistence of a segregation effect by income both across territories and over time. We can safely conclude that, regardless of their class, poorer territories are always the most affected by restrictions and the slowest to recover.

Moreover, we find evidence that during the recovery phase, in the upper quantiles of the distribution of mobility the coefficient for Inequality is negative and statistically significant ($q_{0.70,recovery} = -0.107$, SE = 0.029, $q_{0.90,recovery} = -0.090$, SE = 0.030). This pattern suggests that, among LLMs in the upper quantiles of the mobility distribution, territories with higher Inequality experience a slower recovery. This result highlights the relevance of the quantile methodology: in the previous sections we have shown that inequality among the most affected LLMs is greater than the one of the least affected LLMs (cf. Fig. 4B). However, by considering all variables together

JA106

Case 1:21-cv-06113-DLC Document 256-63 Filed 01/20/23 Page 100 of 16

|  | $q_{0.10}$ | $q_{0.20}$ | $q_{0.30}$ | $q_{0.70}$ | $q_{0.80}$ | $q_{0.90}$ | OLS |
|---|---|---|---|---|---|---|---|
| **Dependent variable: lockdown indicator** | | | | | | | |
| Income Per Capita | 0.303*** | 0.234*** | 0.167** | 0.243** | 0.243*** | 0.169** | 0.208** |
|  | (0.077) | (0.069) | (0.097) | (0.064) | (0.074) | (0.074) | (0.090) |
| Income Inequality | 0.019 | − 0.054 | − 0.046 | − 0.071 | − 0.005 | 0.055 | − 0.059 |
|  | (0.041) | (0.036) | (0.041) | (0.051) | (0.033) | (0.039) | (0.047) |
| Population Density | 0.155*** | 0.136*** | 0.147*** | 0.226*** | 0.146*** | 0.109** | 0.179*** |
|  | (0.045) | (0.040) | (0.046) | (0.057) | (0.037) | (0.043) | (0.053) |
| Revenue Concentration | 0.022 | 0.064 | 0.095** | 0.043 | − 0.007 | 0.033 | 0.051 |
|  | (0.045) | (0.040) | (0.046) | (0.057) | (0.037) | (0.043) | (0.053) |
| Essential Workers | − 0.011 | − 0.016 | 0.025 | − 0.003 | − 0.069 | − 0.018 | − 0.076 |
|  | (0.061) | (0.054) | (0.061) | (0.076) | (0.050) | (0.058) | (0.071) |
| Remote Workers | 0.134** | 0.096 | 0.106 | 0.036 | 0.092* | 0.004 | 0.069 |
|  | (0.068) | (0.060) | (0.068) | (0.085) | (0.056) | (0.064) | (0.079) |
| North-Eastearn Italy | 0.872*** | 0.421 | 0.771*** | 0.723** | 0.486** | 0.349 | 0.550 |
|  | (0.289) | (0.257) | (0.291) | (0.362) | (0.239) | (0.275) | (0.337) |
| Central Italy | − 0.047 | − 0.095 | − 0.139 | − 0.264 | − 0.351** | − 0.030 | − 0.227 |
|  | (0.199) | (0.177) | (0.200) | (0.249) | (0.164) | (0.189) | (0.232) |
| Southern Italy | 0.455 | 0.215 | − 0.099 | 0.220 | 0.386 | 0.921*** | 0.154 |
|  | (0.285) | (0.253) | (0.286) | (0.356) | (0.235) | (0.271) | (0.332) |
| Insular Italy | 0.237 | 0.147 | 0.071 | − 0.191 | − 0.247* | − 1.025*** | − 0.253 |
|  | (0.166) | (0.148) | (0.167) | (0.208) | (0.137) | (0.158) | (0.194) |
| Constant | − 0.868*** | − 0.628*** | − 0.428*** | 0.039 | 0.223* | 0.073 | − 0.269 |
|  | (0.160) | (0.142) | (0.161) | (0.200) | (0.132) | (0.152) | (0.186) |
| AIC | 1077.58 | 1072.87 | 1108.63 | 1261.38 | 1373.51 | 1453.74 | 1256.68 |
| BIC | 1325.65 | 1320.94 | 1356.7 | 1509.45 | 1621.58 | 1701.81 | 1136.68 |
| **Dependent variable: recovery indicator** | | | | | | | |
| Income Per Capita | 0.226*** | 0.182*** | 0.162** | 0.217*** | 0.223*** | 0.281*** | 0.217*** |
|  | (0.074) | (0.065) | (0.068) | (0.055) | (0.062) | (0.058) | (0.087) |
| Income Inequality | 0.004 | − 0.040 | − 0.086** | − 0.107*** | − 0.110*** | − 0.090*** | − 0.079* |
|  | (0.039) | (0.034) | (0.036) | (0.029) | (0.033) | (0.030) | (0.046) |
| Population Density | 0.119*** | 0.101*** | 0.082** | 0.103*** | 0.118*** | 0.080** | 0.125*** |
|  | (0.043) | (0.038) | (0.040) | (0.032) | (0.037) | (0.034) | (0.051) |
| Revenue Concentration | 0.075* | 0.056 | 0.065 | 0.029 | 0.031 | − 0.031 | 0.041 |
|  | (0.043) | (0.038) | (0.040) | (0.032) | (0.037) | (0.034) | (0.051) |
| Essential Workers | − 0.077 | − 0.107** | − 0.026 | − 0.129*** | − 0.125** | − 0.178*** | − 0.193*** |
|  | (0.058) | (0.051) | (0.053) | (0.043) | (0.049) | (0.045) | (0.068) |
| Remote Workers | 0.148** | 0.145** | 0.090 | 0.078 | 0.051 | − 0.012 | 0.082 |
|  | (0.064) | (0.057) | (0.059) | (0.048) | (0.054) | (0.051) | (0.076) |
| North-Eastearn Italy | − 0.052 | − 0.199 | − 0.183 | − 0.038 | 0.092 | 0.244 | − 0.095 |
|  | (0.275) | (0.244) | (0.254) | (0.204) | (0.233) | (0.216) | (0.325) |
| Central Italy | − 0.711*** | − 0.793*** | − 0.709*** | − 0.706*** | − 0.732*** | − 0.690*** | − 0.639*** |
|  | (0.189) | (0.168) | (0.175) | (0.140) | (0.160) | (0.149) | (0.223) |
| Southern Italy | − 0.737*** | − 0.845*** | − 0.484* | − 0.376* | − 0.497** | − 0.634*** | − 0.436 |
|  | (0.271) | (0.240) | (0.250) | (0.201) | (0.229) | (0.212) | (0.319) |
| Insular Italy | − 0.385** | − 0.381*** | − 0.394*** | − 0.869*** | − 1.282*** | − 1.938*** | − 1.152*** |
|  | (0.158) | (0.140) | (0.146) | (0.117) | (0.134) | (0.124) | (0.187) |
| Constant | − 0.308** | − 0.072 | − 0.040 | 0.114 | 0.116 | − 0.021 | − 0.279 |
|  | (0.152) | (0.135) | (0.140) | (0.113) | (0.129) | (0.119) | (0.179) |
| AIC | 1039.41 | 965.67 | 927.63 | 1067.09 | 1219.97 | 1348.98 | 1218.72 |
| BIC | 1287.47 | 1213.74 | 1175.7 | 1315.15 | 1468.04 | 1597.05 | 1098.72 |

**Table 1.** Results for quantile regression of the lockdown (top) and recovery (bottom) indicators with respect to economic, sectorial and geographic explanatory variables, including interaction of macroareas with sectorial variables. Regression obtained with the Iterative Weighted Least Squares method on standardized variables. Last column shows OLS regression as a reference. Number of observations: 495. Coefficients shown for a subset of variables, full regression table reported in Tables S8 and S9 in the SI. Results with heteroskedastic-robust standard errors, obtained via wild bootstrap (1000 replications) reported in Tables S10 and S11 in the SI. * $p < 0.1$; ** $p < 0.05$; *** $p < 0.01$.

nature portfolio

9

**JA107**

and analyzing separately the two classes of LLMs, we find that inequality is more important for the recovery of the least affected LLMs.

Finally, regarding Population Density we observe a pattern similar to Income per Capita, signaling that both during and after lockdown, the mobility contraction is higher for less densely populated territories.

**Productive structure of LLMs.** We find that the aggregated share of remote workers available in each LLM has a positive and significant coefficient during both the lockdown ($q_{0.10,lockdown}$ = 0.134, SE = 0.068) and recovery phases ($q_{0.10,recovery}$ = 0.148 , SE = 0.064) for the most affected territories, meaning that among them the effect of restrictions was stronger and the recovery was slower where the pre-existing potential availability of remote workers was lower.

We also observe that the number of workers employed in essential sectors is not a key driver for mobility during the lockdown. This evidence is consistent with the results of our previous tests, where we showed that the Essential Workers variable was not statistically different between the most and the least affected LLMs (See Fig. 4D). Interestingly, we find also a negative and statistically significant coefficient across (almost) all quantiles of the distribution during the recovery. These results, rather than signaling the absence of an effect on mobility from workers in essential sectors, are instead explainable by the level of detail of our data. Our measurements of mobility, in fact, are not suited to capture brief short-range movements, occurring for instance within neighborhoods of the same city. Urban movements of this kind are those more related to essential sectors of the economy, which were allowed to operate in order to provide necessary services to citizens (as shown in other studies[13,35,36]). Since we are not able to capture the higher mobility induced by essential sectors, we do not see a significant relation during lockdown. The same phenomenon yields a negative coefficient during recovery because it causes LLMs where the share of Essential Workers is higher to show lower levels of mobility in comparison to other LLMs.

Regarding the last aggregated measure, Revenue Concentration, we find a positive and significant coefficient during recovery ($q_{0.10,recovery}$ = 0.075, SE = 0.043) among the most affected LLMs, signaling that for these territories a faster rebound in mobility is denoted by a more concentrated economy.

In addition to aggregated variables, we introduce sector-specific effects to reinforce our main results, i.e., matrices **l** and **p** which report Employees and Revenues per Employees for 16 NACE Rev. 2 aggregated sectors. The role of these variables is to control for the relation between mobility performance and mobility-intensive sectors and separate it from the one between mobility and income. We find coefficients in line with our expectations, i.e., we observe a positive coefficient from mobility-intensive sectors and a negative coefficient from sectors where remote work is more available. This confirms that controlling for these variables is indeed necessary. For full details, we refer the reader to Tables S8 and S9 in the Supporting Information.

**Territorial controls.** The last type of controls we introduce address the presence of territorial biases. These may affect the estimates either directly, signaling the existence of persistent differences among territories, or indirectly via an interaction with specific sectors. In the latter case, we are testing whether some industries have a different impact on the LLMs in which they are located.

With matrix **z**, we introduce dummy variables related to the five Italian geographical macroareas using North-West of Italy as reference area, given its role during the current epidemics and relevance for the whole Italian economic system (North-West is both the richest Italian macroarea and the one most affected by COVID-19 contagion). Moreover, we use matrix **z · r'** to test interaction effects among such macroareas and four sectors which we deem relevant regarding mobility restrictions: Manufacturing, Constructions, Arts and Entertainment and the Health sector. We report in Table 1 the main macroarea effects and in the Supplementary Information the macroarea interaction effects (Tables S8 and S9).

Territorial controls capture unobserved effects affecting all LLMs belonging to the same macroarea. This allows us to test also the hypothesis of the role of contagion on the reduction of mobility, since the impact of the COVID-19 was unevenly distributed across Italy affecting North-Eastern and North-Western Italy more than the rest of the country, especially during the first wave of the epidemic[19,20]. While there is mounting evidence that the nexus of causality runs in the other direction, i.e., it is mobility restriction which reduces the spread of contagion[8–12], we still perform a robustness check and look for a relation between contagion and mobility reduction. First, Figs. S16–S19 in the Supplementary Information show that the difference among the most affected and the least affected LLMs in the number of infections and deaths due to the COVID-19 is not statistically significant. Second, we find a better mobility performance in macroareas where contagion was more intense.

During the lockdown, in fact, we observe a positive coefficient only for territories in North-Eastern Italy, both among the most affected ($q_{0.10,lockdown}$ = 0.872, SE = 0.289) and the least affected LLMs ($q_{0.80,lockdown}$ = 0.486, SE = 0.239), even though with a lower coefficient. This means that LLMs in this macroarea, especially among the most affected class, had a better mobility performance with respect to the North-Western macroarea, even though the intensity of contagion among the two macroareas was comparable. On the contrary, the other Italian macroareas, where the intensity of contagion was lower, did not have a performance significantly different from North-Western. During the recovery phase, instead, we find a negative and significant coefficient of the Center, South and Insular macroareas showing a slower rebound with respect to the North-Western macroarea. This is consistent with the geographic representation of the most and the least affected LLMs reported in Fig. 2A and highlights the presence of territorial effects which, however, are not related to the spread of the virus.

Finally, regarding interaction effects between sectors and macroareas, i.e., **z · r'** in Eq. 2, we find that they are usually not significant (cf. Tables S8 and S9 in the Supplementary information). Among the few exceptions, it is worth focusing on the Health sector, due to its strategic role during the pandemic. In fact, we notice a positive coefficient during lockdown among least affected LLMs and across all macroareas (and especially in the insular area), signaling that those macroareas with higher concentration of revenues per employee from firms in the Health sector, experienced lower variation in mobility with respect to the reference macroarea. In the recovery phase, these effects are no longer significant.

JA108

## Discussion

In this paper, we investigate the interplay between human mobility and the socioeconomic composition of Italian territories, with a specific focus on persistent effects which characterized public mobility during and after the national lockdown put in place by Italian authorities in March 2020 to prevent the spread of the COVID-19. To this aim, we leverage a massive dataset of near real-time observations of movements for approximately 4 million daily individuals in a period of 32 weeks, from March to October 2020, and we rely on detailed information on the composition of the Italian productive system by sector, using official census statistics on the number of employees and revenues, and on the socioeconomic characteristics of Italian administrations.

We show that pre-existing economic disparities among Italian territories can explain their reaction to lockdown restrictions and that two specific classes of territories emerge: the most affected and the least affected territories by interventions. The two classes show persistent behaviours, with income disparities driving their reaction both in the lockdown and recovery periods, and with income inequality playing a relevant role during the latter. Moreover, we observe that our estimates are robust once controlling for several relevant confounding factors, such as the composition of productive sectors of the economy, the share of remote workers and the share of workers from sectors exempted from restrictions by the government, and, finally, common features among territories belonging to the same geographic macroarea.

We reveal at a microeconomic level that a stable separation exists between the most affected and the least affected territories of Italy. These findings are of utmost importance for policy decisions aimed to balance the need to limit the spread of the contagion and the negative effects of restrictions on socioeconomic conditions. In particular, lockdown effects, combining with preexisting disparities, are more intense for the most disadvantaged territories, which yield a slower recovery, leading to further segregation of already deprived areas. To compensate economic losses deriving from the COVID-19 epidemic and avoid a longer path of recovery for the most penalized territories, our analysis supports the urgency of a differentiated policy response, targeting the most affected territories with intervention reducing the persistence of the effects of mobility restrictions.

## Methods

### Network efficiency.

Network efficiency[63,64] is a measure traditionally employed to study man-made and other communication networks. It combines the information deriving from network cohesiveness and the distance between nodes to assess how efficiently information/individuals travel over the network[63,64,66].

Given a weighted undirected network $G(V, E)$ with $n = |V|$ nodes and $m = |E|$ edges, the connections of $G$ are represented by the weighted adjacency matrix $W$ with elements $\{w_{ij}\}$, where $w_{ij} \geq 0 \; \forall \; i, j$. In our analysis, we use the reciprocal of the number of individuals traveling between two locations to specify weights only when computing the efficiency measure of the network (and the nodes). Given that our network resembles a commuting network, we assume that two locations are closer if many individuals travel between them. The global network efficiency is thus computed as:

$$E_{glob}(G) = \frac{1}{n(n-1)} \sum_{i \neq j \in G} \frac{1}{d_{ij}}$$

where $d_{ij}$ is the shortest path distance between two generic nodes $i$ and $j$. When nodes $i$ and $j$ cannot be connected by any path, then $d_{ij} = +\infty$.

Following the methodology of Latora et al.[63], $E_{glob}(G)$ is normalized in order to assume the maximum value in the case of perfect efficiency, i.e., in a fully connected graph where all nodes are connected to each other via the shortest possible path. In our framework, this corresponds to the shortest distance between two nodes in the network, namely we assume that $\min(d_{ij}) = \min(w_{ij}) = w_{\min} \; \forall i, j$. The normalized global efficiency can be thus computed as:

$$E_{norm}(G) = \frac{E_{glob}(G)}{E_{ideal}(G)} = E_{glob}(G) \cdot w_{min}$$

where $E_{ideal}(G) = \frac{1}{n(n-1)} \sum_{i \neq j \in G} \frac{1}{w_{min}} = \frac{1}{w_{min}}$. The shortest distance between two nodes, namely $w_{\min}$, varies depending on the time window of 14 days in which the network is built.

In addition, we define the nodal efficiency as the contribution of each node $i$ to $E_{glob}(G)$:

$$e_i = \frac{1}{n-1} \sum_{i \neq j \in G} \frac{1}{d_{ij}},$$

and, accordingly, the normalized nodal efficiency of node $i$ as $e_i^{norm} = e_i \cdot w_{\min}$.

### ASIA database.

The Italian National Registry of Active Firms (ASIA) is managed by Istat and reports information on all economic units on the national territory exercising industrial, commercial and services activities. It collects and updates annually identification information (name and address) and structure (economic activity, dependent and independent employees, legal form, date start and end activities, turnover) of firms within the register. Even though the data is collected at a granular level, for privacy reasons it has been provided to us by Istat at the province level and for each NACE Rev. 2 business sector which we aggregate in 21 macrocategories (see Table S6 in the Supporting Information for details).

JA109

**Matching procedure for economic variables.** Our analyses integrate data measured at the municipal level with information regarding the productive structure of the Italian economy at the level of provinces, i.e. at a more aggregate level. In order to ensure a reliable number of observations we bridge the two datasets towards the intermediate level of analysis of Local Labour Market (LLMs) which are comparable sub-regional geographical areas defined by the Italian National Institute of Statistics (Istat). As a result, our economic data cover different dimensions of the local socioeconomic context of each Italian LLM, in total 495 areas. Our three main variables of interest are Income per Capita, Inequality in the distributions of incomes and Population Density. These variables have been collected at the municipal level and then aggregated at the level of LLMs mapping each Italian municipality to a unique LLM. We then integrate these variables with sector related ones (employees and revenues per employee) obtained from the ASIA database at the province level. Using publicly available data from Istat on the number of employee at municipal level, we were able to redistribute province level data to the LLM level of aggregation using the share of province employees for each municipality as partition coefficient and the municipality-to-LLM mapping to aggregate the municipality data.

**Description of economic variables.** **Declared income**. This variable is the tax base of the personal income tax declared by tax payers in the 2018 tax return to the Revenue Agency for the 2017 financial year. The distribution at the municipal level is provided by the Ministry of Economic and Finances (MEF) and can be recovered from Istat. We calculate Income per Capita as the ratio of total declared taxable income in a municipality divided by number of declarants with taxable income.

**Income inequality**. We measure income inequality at the municipal level as the ratio between average and median values of the distribution of the declared income, without taking into account cadastral incomes. If the distribution of income is skewed, as is the case for 98% of Italian municipalities, the average municipal income will be consistently greater than the median municipal income. Hence municipalities with greater mean to median ratio will have a more unequal distribution than municipalities with lower ratio.

**Density of population**. We use population density to account for concentration individuals in a certain territory. It is calculated as the ratio of total population calculated at the first of January divided by the extension of the territory in squared kilometers.

**Concentration of revenues by sector**. We calculate this variable as the Herfindahl–Hirschman concentration index of the revenues of sectors in each LLMs. Let us define the revenue of LLM $i$ in sector $j$ as $r_{ij}$ and all its revenues $R_i$ then the HHI of each LLM is defined as $HHI_i = \sum_j \left[ \frac{r_{ij}}{R_i} \right]^2$.

**Percentage of workers who are able to work from remote**. We use estimates of remote workers by sector from[74] and adapt them to Italian firms. We obtain the LLMs share of potential remote worker as the weighted sum of each sector employees number multiplied by each sector-specific remote share estimate. The obtained estimates are also in line with those of[75].

**Percentage of workers in sectors declared essential by the government** . Essential sectors are obtained from official Government decrees. We obtain the LLMs share of essential sector workers as the percentage of employee from essential sectors over all employees from all sectors.

**Territorial controls**. Our regression sample provides a good representation of the entire set of Italian municipalities, both in terms of population size and geographical location, including 2,387 observations corresponding to 30% of Italian municipalities. Nevertheless, to exclude spatial spillovers effect we control for territorial confounding factors using macroarea controls corresponding to NUTS1 areas, which represent the most aggregated geographical classification of national administrative units provide by Eurostat (see Table S7 in the Supporting Information for details). We use macroarea controls to make the estimation of interaction effects in our regression easier and avoid inflating the regression with too many covariates.

**Clustering, classification, multiple test analysis and quantile regression.** We rely on several open-source packages to perform our analysis of the most and the least affected territories. We encode each LLM with a vector of socioeconomic covariates (see previous section) and we assign them a binary label, based on the *lockdown* and *recovery* indicators defined in the main text.

We employ *scipy*[76] to carry out a hierarchical clustering of LLMs based on their standardized socioeconomic variables, using a cosine distance and average linkage to obtain clusters. We report similar results when using euclidean distance or other linkage approaches, e.g., complete or Ward linkage.

We use *scikit-learn*[77] to train several binary classifiers, namely Logistic Regression, Support Vector Machine, Random Forest and K-Nearest Neighbors, in the task of classifying most vs least affected LLMs based on their socioeconomic variables. We apply standardization of features and use default hyperparameters as specified in the package, and we use stratified shuffle-split cross-validation to evaluate their performance.

We employ *scikit-posthocs*[78] to perform multiple test comparisons and assess statistical differences in the distribution of features of the most and the least affected LLMs (and remaining ones). In particular, we apply Kruskal–Wallis test with Conover procedure and Bonferroni correction for $p$-values.

Finally, all quantile regression results have been performed with the *quantreg* R package[73] on standardized variables with default options. Results in the Supplementary Information are obtained with heteroskedastic robust standard errors obtained via wild bootstrap with 1000 iterations.

## Data availability

Data describing movements of individuals in Italy during the period of observation were provided under an academic license agreement with Facebook through its "Data for Good" program (available at: https://dataforgood.fb.com/tools/disease-prevention-maps/). All observations are released in an aggregated and de-identified

manner to ensure privacy and anonymization of single users. Origin-destination matrices which describe traffic between tiles in non-overlapping windows of 14-day can be provided upon request to the corresponding author. With the only exception of the median income used to calculate the inequality index, all economic variables have been provided by the Italian National Institute of Statistics (I.stat). Municipal data on income, population and employee by sector are all available from the Istat website (http://dati.istat.it/). Data at the province level regarding revenues by sector have been obtained from the National Registry of Active Firms (ASIA database) and are available to researchers upon request. Finally, median income has been provided by the Italian Ministry of Economy and Finances (MEF). For further details we refer the reader to Table S1 in the Supporting Information.

Received: 15 July 2021; Accepted: 24 September 2021

Published online: 27 October 2021

## References

1. Davies, N. G. *et al.* Effects of non-pharmaceutical interventions on COVID-19 cases, deaths, and demand for hospital services in the UK: A modelling study. *Lancet Public Health* https://doi.org/10.1016/S2468-2667(20)30133-X (2020).
2. Flaxman, S. *et al.* Estimating the effects of non-pharmaceutical interventions against COVID-19 in Europe. *Nature* https://doi.org/10.1038/s41586-020-2405-7 (2020).
3. Li, Y. *et al.* The temporal association of introducing and lifting non-pharmaceutical interventions with the time-varying reproduction number (R) of SARS-CoV-2: A modelling study across 131 countries. *Lancet Infect. Dis.* https://doi.org/10.1016/S1473-3099(20)30785-4 (2020).
4. Maier, B. F. & Brockmann, D. Effective containment explains subexponential growth in recent confirmed COVID-19 cases in China. *Science* 368, 742–746 (2020).
5. Dehning, J. *et al.* Inferring change points in the spread of COVID-19 reveals the effectiveness of interventions. *Science* https://doi.org/10.1126/science.abb9789 (2020).
6. Brauner, J. M. *et al.* Inferring the effectiveness of government interventions against COVID-19. *Science* 371, eabd9338. https://doi.org/10.1126/science.abd9338 (2020).
7. Aleta, A. *et al.* Modelling the impact of testing, contact tracing and household quarantine on second waves of COVID-19. *Nat. Hum. Behav.* 4, 964–971. https://doi.org/10.1038/s41562-020-0931-9 (2020).
8. Kraemer, M. U. G. *et al.* The effect of human mobility and control measures on the COVID-19 epidemic in China. *Science* https://doi.org/10.1126/science.abb4218 (2020).
9. Xiong, C., Hu, S., Yang, M., Luo, W. & Zhang, L. Mobile device data reveal the dynamics in a positive relationship between human mobility and COVID-19 infections. *Proc. Natl. Acad. Sci.* 117, 27087–27089. https://doi.org/10.1073/pnas.2010836117 (2020).
10. Kissler, S. M. *et al.* Reductions in commuting mobility correlate with geographic differences in SARS-CoV-2 prevalence in New York City. *Nat. Commun.* 11, 4674. https://doi.org/10.1038/s41467-020-18271-5 (2020).
11. Jia, J. S. *et al.* Population flow drives spatio-temporal distribution of COVID-19 in China. *Nature* 582, 389–394. https://doi.org/10.1038/s41586-020-2284-y (2020).
12. Nouvellet, P. *et al.* Reduction in mobility and COVID-19 transmission. *Nat. Commun.* 12, 1090. https://doi.org/10.1038/s41467-021-21358-2 (2021).
13. Glaeser, E. L., Gorback, C. & Redding, S. J. JUE insight: How much does COVID-19 increase with mobility? Evidence from New York and four other U.S. cities. *J. Urban Econ.* https://doi.org/10.1016/j.jue.2020.103292 (2020).
14. Chinazzi, M. *et al.* The effect of travel restrictions on the spread of the 2019 novel coronavirus (COVID-19) outbreak. *Science* https://doi.org/10.1126/science.aba9757 (2020).
15. Hsiang, S. *et al.* The effect of large-scale anti-contagion policies on the COVID-19 pandemic. *Nature* https://doi.org/10.1038/s41586-020-2404-8 (2020).
16. Haug, N. *et al.* Ranking the effectiveness of worldwide COVID-19 government interventions. *Nat. Hum. Behav.* https://doi.org/10.1038/s41562-020-01009-0 (2020).
17. Galeazzi, A. *et al.* Human mobility in response to covid-19 in France, Italy and UK. *Sci. Rep.* 11, 1–10 (2021).
18. Friedman, J., Friedman, J., Johnson, S. & Landsberg, A. Transitioning out of the coronavirus lockdown: A framework for evaluating zone-based social distancing. *Front. Public Health* https://doi.org/10.3389/fpubh.2020.00266 (2020).
19. Bertuzzo, E. *et al.* The geography of COVID-19 spread in Italy and implications for the relaxation of confinement measures. *Nat. Commun.* 11, 4264. https://doi.org/10.1038/s41467-020-18050-2 (2020).
20. Scala, A. *et al.* Time, space and social interactions: Exit mechanisms for the COVID-19 epidemics. *Sci. Rep.* 10, 13764. https://doi.org/10.1038/s41598-020-70631-9 (2020).
21. Della Rossa, F. *et al.* A network model of Italy shows that intermittent regional strategies can alleviate the COVID-19 epidemic. *Nat. Commun.* 11, 5106. https://doi.org/10.1038/s41467-020-18827-5 (2020).
22. Davies, N. G. *et al.* Association of tiered restrictions and a second lockdown with COVID-19 deaths and hospital admissions in England: A modelling study. *Lancet Infect. Dis.* https://doi.org/10.1016/S1473-3099(20)30984-1 (2020).
23. Ge, J., He, D., Lin, Z., Zhu, H. & Zhuang, Z. Four-tier response system and spatial propagation of COVID-19 in China by a network model. *Math. Biosci.* 330, 108484. https://doi.org/10.1016/j.mbs.2020.108484 (2020).
24. Kaufman, B. G., Whitaker, R., Mahendraratnam, N., Smith, V. A. & McClellan, M. B. Comparing associations of state reopening strategies with COVID-19 Burden. *J. Gen. Intern. Med.* 35, 3627–3634. https://doi.org/10.1007/s11606-020-06277-0 (2020).
25. Warren, G. W., Lofstedt, R. & Wardman, J. K. COVID-19: The winter lockdown strategy in five European nations. *J. Risk Res.* https://doi.org/10.1080/13669877.2021.1891802 (2021).
26. Polyakova, M., Kocks, G., Udalova, V. & Finkelstein, A. Initial economic damage from the COVID-19 pandemic in the United States is more widespread across ages and geographies than initial mortality impacts. *Proc. Natl. Acad. Sci.* 117, 27934–27939. https://doi.org/10.1073/pnas.2014279117 (2020).
27. Zhang, J. *et al.* Changes in contact patterns shape the dynamics of the COVID-19 outbreak in China. *Science* 368, 1481–1486. https://doi.org/10.1126/science.abb8001 (2020).
28. Pullano, G., Valdano, E., Scarpa, N., Rubrichi, S. & Colizza, V. Evaluating the effect of demographic factors, socioeconomic factors, and risk aversion on mobility during the COVID-19 epidemic in France under lockdown: A population-based study. *Lancet Digit. Health* https://doi.org/10.1016/S2589-7500(20)30243-0 (2020).
29. Schlosser, F. *et al.* COVID-19 lockdown induces disease-mitigating structural changes in mobility networks. *Proc. Natl. Acad. Sci.* https://doi.org/10.1073/pnas.2012326117 (2020).
30. Alwan, N. A. *et al.* Scientific consensus on the COVID-19 pandemic: We need to act now. *Lancet* 396, e71–e72. https://doi.org/10.1016/S0140-6736(20)32153-X (2020).
31. Mitjà, O. *et al.* Experts' request to the Spanish Government: Move Spain towards complete lockdown. *Lancet* 395, 1193–1194. https://doi.org/10.1016/S0140-6736(20)30753-4 (2020).

JA111

32. Saltelli, A. *et al.* Five ways to ensure that models serve society: A manifesto. *Nature* **582**, 482–484. https://doi.org/10.1038/d41586-020-01812-9 (2020).
33. Guan, D. *et al.* Global supply-chain effects of COVID-19 control measures. *Nat. Hum. Behav.* **4**, 577–587. https://doi.org/10.1038/s41562-020-0896-8 (2020).
34. Jay, J. *et al.* Neighbourhood income and physical distancing during the COVID-19 pandemic in the United States. *Nat. Hum. Behav.* https://doi.org/10.1038/s41562-020-00998-2 (2020).
35. Carvalho, V. M. *et al.* Tracking the COVID-19 crisis with high-resolution transaction data. *R. Soc. open sci.* **8**, 210218. https://doi.org/10.1098/rsos.210218 (2021).
36. Chetty, R., Friedman, J. N., Hendren, N. & Stepner, M. *The Economic Impacts of COVID-19: Evidence from a New Public Database Built Using Private Sector Data*. Tech. Rep, National Bureau of Economic Research (2020).
37. Fernández-Villaverde, J & Jones, C. I. Macroeconomic outcomes and covid-19: A progress report. Working Paper number 28004, National Bureau of Economic Research. https://doi.org/10.3386/w28004 (2020).
38. Buckee, C. O. *et al.* Aggregated mobility data could help fight COVID-19. *Science* https://doi.org/10.1126/science.abb8021 (2020).
39. Grantz, K. H. *et al.* The use of mobile phone data to inform analysis of COVID-19 pandemic epidemiology. *Nat. Commun.* **11**, 4961. https://doi.org/10.1038/s41467-020-18190-5 (2020).
40. Kogan, N. E. *et al.* An early warning approach to monitor COVID-19 activity with multiple digital traces in near real time. *Sci. Adv.* **7**, eabd6989. https://doi.org/10.1126/sciadv.abd6989 (2021).
41. Acosta, R. J., Kishore, N., Irizarry, R. A. & Buckee, C. O. Quantifying the dynamics of migration after Hurricane Maria in Puerto Rico. *Proc. Natl. Acad. Sci.* **117**, 32772–32778. https://doi.org/10.1073/pnas.2001671117 (2020).
42. Eyre, R., De Luca, F. & Simini, F. Social media usage reveals recovery of small businesses after natural hazard events. *Nat. Commun.* **11**, 1629. https://doi.org/10.1038/s41467-020-15405-7 (2020).
43. Kryvasheyeu, Y. *et al.* Rapid assessment of disaster damage using social media activity. *Sci. Adv.* **2**, e1500779. https://doi.org/10.1126/sciadv.1500779 (2016).
44. Preis, T., Moat, H. S., Bishop, S. R., Treleaven, P. & Stanley, H. E. Quantifying the digital traces of Hurricane Sandy on Flickr. *Sci. Rep.* **3**, 3141. https://doi.org/10.1038/srep03141 (2013).
45. Bonaccorsi, G. *et al.* Economic and social consequences of human mobility restrictions under COVID-19. *Proc. Natl. Acad. Sci.* **117**, 15530–15535. https://doi.org/10.1073/pnas.2007658117 (2020).
46. Chang, S. *et al.* Mobility network models of COVID-19 explain inequities and inform reopening. *Nature* https://doi.org/10.1038/s41586-020-2923-3 (2020).
47. Gregory, V., Menzio, G. & Wiczer, D. G. *Pandemic Recession: L or V-Shaped?* Tech. Rep., National Bureau of Economic Research (2020).
48. Guerrieri, V., Lorenzoni, G., Straub, L. & Werning, I. *Macroeconomic Implications of COVID-19: Can Negative Supply Shocks Cause Demand Shortages?* Tech. Rep., National Bureau of Economic Research (2020).
49. Kaplan, G., Moll, B. & Violante, G. L. The great lockdown and the big stimulus: Tracing the pandemic possibility frontier for the U.S. Working Paper 27794, National Bureau of Economic Research. https://doi.org/10.3386/w27794 (2020).
50. Eichenbaum, M. S., Rebelo, S. & Trabandt, M. Epidemics in the neoclassical and new keynesian models. Working Paper 27430, National Bureau of Economic Research. https://doi.org/10.3386/w27430 (2020).
51. Deb, P., Furceri, D., Ostry, J. D. & Tawk, N. *The Economic Effects of COVID-19 Containment Measures*. Tech. Rep., CEPR Discussion Paper No. DP15087 (2020).
52. Martin, A., Markhvida, M., Hallegatte, S. & Walsh, B. Socio-economic impacts of covid-19 on household consumption and poverty. *Econ. Disasters Clim. Change* **4**, 453–479 (2020).
53. Blundell, R., Dias, M. C., Joyce, R. & Xu, X. COVID-19 and inequalities. *Fisc. Stud.* **41**, 291–319 (2020).
54. Adams-Prassl, A., Boneva, T., Golin, M. & Rauh, C. Inequality in the impact of the coronavirus shock: Evidence from real time surveys. *J. Public Econ.* **189**, 104245. https://doi.org/10.1016/j.jpubeco.2020.104245 (2020).
55. Hagberg, A., Swart, P. & Chult, D. S. *Exploring Network Structure, Dynamics, and Function Using Networkx*. Tech. Rep., Los Alamos National Lab. (LANL) (2008).
56. Facebook Data for Good. Accessed 03 February 2021 https://dataforgood.fb.com.
57. Bing Maps. Accessed 03 February 2021 https://www.bing.com/maps.
58. Maas, P. *et al.* Facebook disaster maps: Aggregate insights for crisis response and recovery. In *Proceedings of the 16th International Conference on Information Systems for Crisis Response and Management (ISCRAM), Valencia, Spain 2019* (2019).
59. Sistemi locali del lavoro, Istat. Accessed 03 February 2021 https://www.istat.it/it/informazioni-territoriali-e-cartografiche/sistemi-locali-del-lavoro.
60. Franconi, L., Ichim, D. & D'Aló, M. Labour market areas for territorial policies: Tools for a European approach. *Stat. J. IAOS* **33**, 585–591. https://doi.org/10.3233/SJI-160343 (2017).
61. Barabási, A.-L. *et al. Network Science* (Cambridge University Press, 2016).
62. Newman, M. *Networks* (Oxford University Press, 2018).
63. Latora, V. & Marchiori, M. Efficient behavior of small-world networks. *Phys. Rev. Lett.* **87**, 198701 (2001).
64. Latora, V. & Marchiori, M. A measure of centrality based on network efficiency. *New J. Phys.* **9**, 188 (2007).
65. Crucitti, P., Latora, V. & Marchiori, M. Model for cascading failures in complex networks. *Phys. Rev. E* **69**, 045104. https://doi.org/10.1103/PhysRevE.69.045104 (2004).
66. Crucitti, P., Latora, V. & Porta, S. Centrality measures in spatial networks of urban streets. *Phys. Rev. E* **73**, 036125 (2006).
67. Achard, S. & Bullmore, E. Efficiency and cost of economical brain functional networks. *PLoS Comput. Biol.* **3**, e17. https://doi.org/10.1371/journal.pcbi.0030017 (2007).
68. Pedauga, L., Sáez, F. & Delgado-Márquez, B. L. Macroeconomic lockdown and smes: The impact of the covid-19 pandemic in Spain. *Small Bus. Econ.* https://doi.org/10.1007/s11187-021-00476-7 (2021).
69. Barrot, J.-N., Grassi, B. & Sauvagnat, J. Sectoral effects of social distancing. Available at SSRN (2020).
70. Spelta, A., Flori, A., Pierri, F., Bonaccorsi, G. & Pammolli, F. After the lockdown: Simulating mobility, public health and economic recovery scenarios. *Sci. Rep.* **10**, 16950. https://doi.org/10.1038/s41598-020-73949-6 (2020).
71. Friedman, J. *et al. The Elements of Statistical Learning* Vol. 1 (Springer Series in Statistics, 2001).
72. Kruskal, W. H. & Wallis, W. A. Use of ranks in one-criterion variance analysis. *J. Am. Stat. Assoc.* **47**, 583–621 (1952).
73. Koenker, R. & Hallock, K. F. Quantile regression. *J. Econ. Perspect.* **15**, 143–156. https://doi.org/10.1257/jep.15.4.143 (2001).
74. Espinoza, R. & Reznikova, L. Who can log in? The importance of skills for the feasibility of teleworking arrangements across OECD countries. *OECD Soc., Employ. Migr. Work. Pap.* https://doi.org/10.1787/3f115a10-en (2020).
75. Dingel, J. I. & Neiman, B. *How Many Jobs Can be Done at Home?* Tech. Rep., National Bureau of Economic Research (2020).
76. Virtanen, P. *et al.* SciPy 1.0: Fundamental algorithms for scientific computing in Python. *Nat. Methods* **17**, 261–272. https://doi.org/10.1038/s41592-019-0686-2 (2020).
77. Buitinck, L. *et al.* API design for machine learning software: Experiences from the scikit-learn project. In *ECML PKDD Workshop: Languages for Data Mining and Machine Learning* 108–122 (2013).
78. Terpilowski, M. Scikit-posthocs: Pairwise multiple comparison tests in python. *J. Open Sour. Softw.* **4**, 1169. https://doi.org/10.21105/joss.01169 (2019).

JA112

## Author contributions

G.B., F.Pi, F.S., A.F., F.Pa. designed the research. G.B., F.Pi. and F.S. collected data. G.B., F.Pi. and F.S. analyzed data and performed research. All authors discussed research results, wrote and reviewed the manuscript.

## Competing interests

The authors declare no competing interests.

## Additional information

**Supplementary Information** The online version contains supplementary material available at https://doi.org/10.1038/s41598-021-99548-7.

**Correspondence** and requests for materials should be addressed to G.B. or F.P.

**Reprints and permissions information** is available at www.nature.com/reprints.

**Publisher's note** Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.

**Open Access** This article is licensed under a Creative Commons Attribution 4.0 International License, which permits use, sharing, adaptation, distribution and reproduction in any medium or format, as long as you give appropriate credit to the original author(s) and the source, provide a link to the Creative Commons licence, and indicate if changes were made. The images or other third party material in this article are included in the article's Creative Commons licence, unless indicated otherwise in a credit line to the material. If material is not included in the article's Creative Commons licence and your intended use is not permitted by statutory regulation or exceeds the permitted use, you will need to obtain permission directly from the copyright holder. To view a copy of this licence, visit http://creativecommons.org/licenses/by/4.0/.

© The Author(s) 2021

JA113

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

BLOOMBERG L.P.

and

DOW JONES & COMPANY, INC.,

          Plaintiffs,

    v.

UNITED STATES
POSTAL SERVICE,

       Defendant.

Civil Action No. 22-cv-6112 (DLC)

---

## DECLARATION OF MARIE PATINO

I, Marie Patino, declare as follows:

    1.    I am a journalist and have been a reporter for Bloomberg since April 2019 and was a journalist specifically for Bloomberg CityLab ("CityLab") from January 2020 through December 2022. I am now a journalist on the Bloomberg data visualization team. CityLab is published by Bloomberg L.P., plaintiff in the above-captioned case. I submit this Declaration in support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment and Cross-Motion for Summary Judgment. I have personal knowledge of the matters described herein.

    2.    On March 30, 2021, in my role as a reporter for CityLab, I submitted a Freedom of Information Act ("FOIA") request to the United States Postal Service ("USPS"). A true and correct copy of my request is attached hereto as **Exhibit 1** (the "Bloomberg FOIA Request").

    3.    By letter dated April 19, 2021, USPS denied the Bloomberg FOIA Request. A true and correct copy of USPS's denial is attached hereto as **Exhibit 2.**

4.    I previously submitted two FOIA requests to USPS for change-of-address ("COA") data on or around December 30, 2020 and February 2, 2021, respectively, which were fulfilled on or around January 5, 2021 and February 11, 2021, respectively. In response to those FOIA requests, I received (1) COA data from between January 1, 2019 and November 30, 2020, including origin and destination ZIP codes and move types, broken down by month and year, and (2) weekly temporary and permanent COA data from between January 2019 and December 2020, aggregated at the ZIP code level, for residential and business moves, as reflected in ECF No. 1-7, ECF page no. 2 ("[T]he withheld records are virtually identical to the records that [Bloomberg] had sought and received from USPS earlier this year."), and ECF page nos. 15–16; 24–25 (USPS determination letters).

5.    Attached hereto as **Exhibit 3** are true and correct excerpts of responsive records I received from USPS in response to my December 30, 2020 request for COA data mentioned in paragraph 4.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 20 day of January 2023 in London, U.K.

Marie Patino

# EXHIBIT 1

**Request - 2021-FPRO-014 69**   ✉ **Inbox (0)**   ✈ **Compose Message**   🔔 **Sent Messages**   **Withdraw Request**
← **Back (RequestStatus.aspx)**

## Requester Details

To modify request details please update your requester profile or contact the our office for assistance.

**Ms. Marie P Patino**
Journalist
Bloomberg LP
1101 New York Avenue NW
Floor 9A - Bloomberg LP
Washington, D.C., DC  20005
Phone 202-807-2344
mpatino14@bloomberg.net

Requester Default Category: News Media

## Request Details

| | |
|---|---|
| Date Requested | 03/30/2021 |
| Status | Closed |

## General Information

| | |
|---|---|
| Requester Service Center | [ HQ Records Office ▾ ] |
| Action Office Instructions | for Postal Service Headquarters controlled records including contracts, building leases, and other real estate transactions or employee listings |

JA117

**Requester Category Descriptions**

- **Commercial Organization**:  A requester who asks for information for a use or purpose that furthers a commercial, trade, or profit interest, which can include furthering those interests through litigation.
- **Educational or Scientific**:  A requester who asks for information under the auspices of an educational institution for the purpose of furthering scholarly research or a requester that asks for information for an institution that is not operated on a commercial basis, but solely for the purpose of conducting scientific research the results of which are not intended to promoted any particular product or industry.
- **News media:**  A requester that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience.  "News" means information that is about current events or that would be of current interest to the public.
- **All others:**  You are a requester who does not fall within any of the preceding categories.



| Requester Category | News Media ▼ |
| Send Response Via | E-mail ▼ |
| Payment Mode | --------------Select--- ▼ |

**Shipping Address**

| Address | 1101 New York Ave | Apartment/Suite Number | Floor 9A - Bloombe |
| City | Washington, D.C. | State | District of Columbia ▼ |
| Country | United States ▼ | Zip Code | 20005 |

**Request Information**

JA118

**Requesting Records About Another Person** - you may receive greater access by including the record subject's written consent and verification of identify, or in the case the subject is deceased, evidence of proof of their death. A death certificate, a newspaper obituary, or comparable proof of death can be used to meet this requirement.  Otherwise, records relating to another person and disclosure of the records could invade that person's privacy ordinarily will not be disclosed to you. You may add the authorization and verification of identity in the **Privacy Waiver and Authorization** attachment option below.  To download an authorization form click here (http://about.usps.com/who-we-are/foia/privacy-waiver_07-25-2017.pdf).

**Requesting Records About Yourself** - you must verify your identity and provide a signed request.  Appropriate identification may include such information as your mailing address, employee identification number, or other personal identifier.  You may also provide one of the following 1) a signed request that includes your identifying information and witnessed by a notary, or 2) a certification of identity statement immediately above the signature on your request letter: "I declare under penalty of perjury that the foregoing is true and correct. Executed on [date]."  You may add your written, signed request and verification of identity in the **Proof of Identity** option below.  To download a proof of identify form click here (http://about.usps.com/who-we-are/foia/identity-certification_07-25-2017.pdf).

| | |
|---|---|
| Description of Request | Hello,<br>Sorry for yet another request of this dataset -- change of addresses data, per zip, but only for the month of December 2020. I |

You may attach a pdf version of your written request in the **Description Document** attachment option below however you will be required to enter a brief description of the records requested.

| | | | |
|---|---|---|---|
| Date Range for Record Search: From(mm/dd/yyyy) | 01/12/2020 | To (mm/dd/yyyy) | 01/01/2021 |

Description Document     📎 Add Attachment

Privacy Waiver & Authorization     📎 Add Attachment

Proof of Identity     📎 Add Attachment

**Fee Information**

| | |
|---|---|
| Willing Amount ($) | 25.00 |

JA119

To request a fee waiver you must be able to demonstrate:

- disclosure of the requested information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the Postal Service, and
- disclosure of the information is not primarily in your commercial interest.

For additional information about fee waiver requests, see 39 CFR 265.9(j).

| | |
|---|---|
| Fee Waiver Requested | ☑ 🖉 Add Attachment |
| Fee Waiver Granted | TBD |
| Fee Waiver Request Reason | News media -- this is to inform the public of migration patterns during the pandemic. |

**Cost Details :**

| | |
|---|---|
| Total Cost | $0.00 |
| Cost Incurred | $0.00 |
| Amount Paid | $0.00 |
| Balance Amount | $0.00 |
| Payment Status | No Charges |
| Willing to Pay All Fees | ☐ |

**Expedite Information**

| | |
|---|---|
| Expedited Processing Requested | ☐ 🖉 Add Attachment |

Explain in detail the basis for making the request for expedited processing. By completing this section, you certify that the statement provided to be true and correct. For additional information about completing this section, see 39 CFR 265.5(c).

Need for Expedited Processing

**JA120**

Case 1:22-cv-06112-DLC Document 26-3, Filed 01/20/23 Page 6 of 6

Copyright © 2017 USPS. All Rights Reserved.

JA121

# EXHIBIT 2


**UNITED STATES
POSTAL SERVICE**

April 19, 2021

Ms. Marie P. Patino
Journalist
Bloomberg LP
1101 New York Avenue Northwest Floor 9A
Washington, DC 2005-4269
VIA Email:  mpatino14@bloomberg.net

RE:  FOIA Case No. 2021-FPRO-01469

Dear Ms. Patino:

Your Freedom of Information Act (FOIA) requests for information from the United States Postal
Service® has been forwarded to my office for response. Your request sought the following:

> Change-of-address (COA) data of December 2020, aggregated by ZIP Code. Data to
> include origin/destination information.

Information is maintained in the United States Postal Service change-of-address system for a
maximum of four (4) years from the date a customer indicates on their change-of-address order to
begin mail forwarding.  After the four-year retention period, the change-of-address information is
permanently deleted from the change-of-address system and no longer available for inquiry.

Based on your description of records sought, it has been determined that the records you seek are
exempt from disclosure under FOIA Exemption 3, 39 U.S.C. §410(c)(2).

Exemption 3 allows an agency to withhold information that is "specifically exempted from disclosure by
statute."  5 U.S.C. § 552(b)(3).  Section 410(c)(2) of the Postal Reorganization Act qualifies as an
Exemption 3 statute.  39 U.S.C. § 410(c)(2).  Section 410(c)(2) permits the Postal Service to withhold
"information of a commercial nature, including trade secrets, whether or not obtained from a person
outside the Postal Service, which under good business practice would not be publicly disclosed."  39
U.S.C. § 410(c)(2).  Information of a commercial nature under Section 410(c)(2) is broadly defined to
include all information that "relates to commerce, trade, profit, or the Postal Service's ability to conduct
itself in a businesslike manner."  39 C.F.R. § 265.14(b)(3).  In determining whether information is
commercial in nature, the Postal Service considers six (6) factors relating to whether the information is
more akin to its role as a business entity, a competitor in the market or a provider of basic public
services.  *See* 39 C.F.R. § 265.14(b)(3)(i).  In addition, the Postal Service has identified an extensive,
though not exhaustive, list of information that is commercial in nature and thus, exempt from disclosure
under Section 410(c)(2).  *See* 39 C.F.R. § 265.14(b)(3)(ii).

Here, we find that the records you requested qualifies as "information of a commercial nature" under
Section 410(c)(2) because the information is related to change-of-address counts which provides
information that is under development for a commercial product. Accordingly, this information is
exempt from disclosure under Exemption 3 of the FOIA and Section 410(c)(2).

As information, we do have change-of-address data for the last four years on our FOIA website, which
can be found at https://about.usps.com/who/legal/foia/welcome.htm.

If you are not satisfied with the response to this request, you may file an administrative appeal within 90 days of the date of this response letter by writing to the General Counsel, U.S. Postal Service, 475 L'Enfant Plaza SW, Washington, DC 20260 or *via* email at FOIAAppeal@usps.gov. Your appeal must be postmarked or electronically transmitted within 90 days of the date of the response to your request. The letter of appeal should include, as applicable:

(1) A copy of the request, of any notification of denial or other action, and of any other related correspondence;
(2) The FOIA tracking number assigned to the request;
(3) A statement of the action, or failure to act, from which the appeal is taken;
(4) A statement identifying the specific redactions to responsive records that the requester is challenging;
(5) A statement of the relief sought; and
(6) A statement of the reasons why the requester believes the action or failure to act is erroneous.

For further assistance and to discuss any aspect of your request, you may contact any of the following:

Michelle Evans
Addressing & Geospatial Technology
United States Postal Service
225 North Humphreys Boulevard Suite 501
Memphis, TN 38188-1001
Phone: 901-681-4474

Privacy & Records Office
United States Postal Service
475 L'Enfant Plaza Southwest Room 1P830
Washington, DC 20260-1101
Phone: 202-268-2608
Fax: 202-268-5353
FOIA Public Liaison: Nancy Chavannes-Battle

Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer. The contact information for OGIS is as follows:

Office of Government Information Services
National Archives and Records Administration
8601 Adelphi Road-OGIS
College Park, MD 20740-6001
Email: ogis@nara.gov
Telephone: 202-741-5770
Toll free: 1-877-684-6448
Facsimile: 202-741-5769

Sincerely,

James D. Wilson
Director, Addressing and Geospatial Technology

cc: Records Office

# EXHIBIT 3

| YYYYMM | Old Zip | New Zip | Perm Total | Temp Total |
|---|---|---|---|---|
| 201901 | 00602 | 00602 | 18 | 0 |
| 201901 | 00612 | 00612 | 17 | 1 |
| 201901 | 00617 | 00617 | 13 | 0 |
| 201901 | 00637 | 00637 | 11 | 0 |
| 201901 | 00646 | 00646 | 20 | 0 |
| 201901 | 00650 | 00650 | 13 | 0 |
| 201901 | 00662 | 00662 | 16 | 0 |
| 201901 | 00698 | 00698 | 11 | 0 |
| 201901 | 00723 | 00723 | 22 | 0 |
| 201901 | 00757 | 00757 | 11 | 0 |
| 201901 | 00769 | 00769 | 14 | 0 |
| 201901 | 00782 | 00782 | 11 | 0 |
| 201901 | 00924 | 00924 | 12 | 0 |
| 201901 | 00926 | 00926 | 24 | 1 |
| 201901 | 01001 | 01001 | 16 | 4 |
| 201901 | 01002 | 01002 | 35 | 3 |
| 201901 | 01007 | 01007 | 14 | 2 |
| 201901 | 01013 | 01013 | 55 | 4 |
| 201901 | 01013 | 01020 | 23 | 0 |
| 201901 | 01013 | 01040 | 24 | 1 |
| 201901 | 01013 | 01089 | 15 | 2 |

**JA126**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLOOMBERG L.P. | |
| and | |
| DOW JONES & COMPANY, INC., | |
| Plaintiffs, | Civil Action No. 22-cv-6112 (DLC) |
| v. | |
| UNITED STATES POSTAL SERVICE, | |
| Defendant. | |

## DECLARATION OF PAUL OVERBERG

I, Paul Overberg, declare as follows:

1.      I am a journalist and have been a reporter for The Wall Street Journal ("WSJ") since September 2015.  The WSJ is owned by Dow Jones & Company, Inc., plaintiff in the above-captioned case.  I submit this Declaration in support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment and Cross-Motion for Summary Judgment.  I have personal knowledge of the matters described herein.

2.      On September 15, 2021, in my role as a reporter for WSJ, I submitted a Freedom of Information Act ("FOIA") request to the United States Postal Service ("USPS").  A true and correct copy of my request is attached hereto as **Exhibit 1** (the "Dow Jones FOIA Request").

3.      By letter dated September 17, 2021, USPS denied the Dow Jones FOIA Request.  A true and correct copy of USPS's denial is attached hereto as **Exhibit 2**.

4.      I previously submitted two FOIA requests to USPS for change-of-address ("COA") data on or around February 8, 2021, and March 15, 2021, which were fulfilled on or around February 12, 2021, and March 17, 2021, respectively.   In response to those FOIA requests, I received monthly data showing the number of residential USPS customers who filed a change-of-address request form in 2017 and between 2018 and 2020, aggregated for each pair of counties representing the "to" and "from" locations of the request, as reflected in ECF No. 1-3, ECF page no. 5 ("[T]he Postal Service has previously, repeatedly released COA records, including origin/destination data, in response to FOIA requests."), and ECF page nos. 7–10 (USPS determination letters).

5.      Attached hereto as **Exhibit 3** are true and correct excerpts of responsive records I received from USPS in response to my February 8, 2021 request for COA data mentioned in paragraph 4.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _18th_ day of _January_ 2023 in _Vienna, Virginia_.

_Paul Overberg_

Paul Overberg

# EXHIBIT 1





**Request Information**

Describe the records sought in sufficient detail to enable USPS personnel to locate them with a reasonable amount of effort. Whenever possible, include specific information about each record sought such as the type of record; the title or case number of a specific document or report; the topic or subject matter, the name of the office, facility, functional unit or employees most likely to possess the record, the geographical location, such as a city and state, where the records are thought to exist; the date or general timeframe of the record's creation; and any details related to the purpose of the record. For additional information about how to submit a FOIA request, see 39 CFR 265.3(c). A request that does not reasonably describe the records sought, or does not comply with the published rules regarding the procedures to be followed for submitting a request, will be deemed to be an improper FOIA request. A request for any and all records about a broad subject matter is generally not a reasonable description.

**Requesting Records About Another Person** - you may receive greater access by including the record subject's written consent and verification of identify, or in the case the subject is deceased, evidence of proof of their death. A death certificate, a newspaper obituary, or comparable proof of death can be used to meet this requirement. Otherwise, records relating to another person and disclosure of the records could invade that person's privacy ordinarily will not be disclosed to you. You may add the authorization and verification of identity in the **Privacy Waiver and Authorization** attachment option below. To download an authorization form click here.

**Requesting Records About Yourself** - you must verify your identity and provide a signed request. Appropriate identification may include such information as your mailing address, employee identification number, or other personal identifier. You may also provide one of the following 1) a signed request that includes your identifying information and witnessed by a notary, or 2) a certification of identity statement immediately above the signature on your request letter: "I declare under penalty of perjury that the foregoing is true and correct. Executed on [date]." You may add your written, signed request and verification of identity in the **Proof of Identity** option below. To download a proof of identify form click here.

| Description of Request | |
|---|---|
| | Thank you for quick fulfillment of two earlier requests, No. 2021-FPRO-00980 and No. 2021-FPRO-01334. They included monthly summary data showing the number of residential postal customers who filed change-of-address requests in 2017-2020. They contained separate tallies for temporary and permanent requests. They were |

You may attach a pdf version of your written request in the **Description Document** attachment option below however you will be required to enter a brief description of the records requested.

| Date Range for Record Search: From(mm/dd/yyyy) | | To (mm/dd/yyyy) | |
|---|---|---|---|
| Description Document | 📎 Add Attachment | | |
| Privacy Waiver & Authorization | 📎 Add Attachment | | |

| Proof of Identity | 📎 Add Attachment |
|---|---|

**Fee Information**

You may state the maximum amount of fees for which you are willing to accept liability without prior notice. If no amount is stated, you will be deemed willing to accept liability for fees not to exceed $25.00.

Records will be furnished without charge or at a reduced rate if you are able to demonstrate that 1) disclosure of the requested information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the Postal Service, and 2) disclosure of the information is not primarily in your commercial interest. For additional information about fee waiver requests, see 39 CFR 265.9(j).

| Willing Amount ($) | 100.00 |
|---|---|

To request a fee waiver you must be able to demonstrate:
- disclosure of the requested information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the Postal Service, and
- disclosure of the information is not primarily in your commercial interest.

For additional information about fee waiver requests, see 39 CFR 265.9(j).

| Fee Waiver Requested | ☑ 📎 Add Attachment |
|---|---|
| Fee Waiver Granted | TBD |
| Fee Waiver Request Reason | As a reporter for The Wall Street Journal, a news media organization, I request a waiver of fees. Release of this information is likely to contribute significantly to public understanding of pandemic effects, including on postal operations. |

**Cost Details :**

| | |
|---|---|
| Total Cost | $0.00 |
| Cost Incurred | $0.00 |
| Amount Paid | $0.00 |
| Balance Amount | $0.00 |
| Payment Status | No Charges |
| Willing to Pay All Fees | ☐ |

**Expedite Information**

Requests will be processed on an expedited basis whenever it is determined that they involve circumstances in which the lack of expedited processing could reasonably be expected to pose an imminent threat to the life or physical safety of an individual or there is an urgency to inform the public about an actual or alleged Federal Government activity, if made by a person who is primarily engaged in disseminating information.

Expedited Processing Requested        ☐ 🖇 Add Attachment

Explain in detail the basis for making the request for expedited processing. By completing this section, you certify that the statement provided to be true and correct. For additional information about completing this section, see 39 CFR 265.5(c).

Need for Expedited Processing

Copyright © 2017 USPS. All Rights Reserved.

# EXHIBIT 2


**UNITED STATES**
**POSTAL SERVICE**

September 17, 2021


Via Email: paul.overberg@wsj.com


Paul Overberg
Wall Street Journal
1025 Connecticut Ave NW, Suite 800
Washington, DC 20036


RE:  FOIA Case No. 2021-FPRO-03224

Dear Mr. Overberg:

This responds to your Freedom of Information Act (FOIA) requests dated September 15, 2021 in which you seek access to Postal Service county-level change-of-address (COA) records between January and June 2021, including origin/destination data.

There is a longstanding practice of limiting the data reported for COA orders. During Hurricane Katrina, a policy was established that prohibits disclosure of COA volume where the count is less than ten (10). The purpose of this policy was to minimize the ability of a data recipient to identify where any specific individual(s) may have moved from or to, which would be a violation of our responsibility to safeguard the privacy interests of customers submitting COA orders.

Please note that some of the records you have requested are records that the Postal Service has recently decided to make available for public inspection in accordance with the FOIA, 5 U.S.C. § 552(a)(2). The records you have requested consist of:

- Records that have been released to previous FOIA requesters and that the Postal Service has determined have become or are likely to become the subject of subsequent requests for substantially the same records; and

- Records that have been released to previous FOIA requesters and that have been requested three (3) or more times

Because the Postal Service has made these records publicly available in its public and/or electronic reading rooms, we will not process these records in response to your FOIA request made under 5 U.S.C. § 552(a)(3).  Instead, please note that the records that you seek are available on our website under the *FOIA Library – Change of Address Stats*.  Given the highly sought data of COA records, requests will no longer be processed under the FOIA as the information is available to the general public. It is available as an Excel spreadsheet which allows ease of customization by each individual data seeker after download. Any and all COA data to be released is available at the below-referenced FOIA Library website, which will be updated on a monthly basis:

   https://about.usps.com/who/legal/foia/welcome.htm.

You may now obtain county level information by purchasing the Postal Service's *City State Product* or from another source. For more information regarding our *City State Product*, please contact the National Customer Support Center at 1-800-238-3150 as this information is no longer being processed under the FOIA.


475 L'Enfant Plaza SW, Rm. 1P830
Washington DC  20260-1101
(202) 268-2608
FAX: (202) 268-5353

**JA134**

- 2 -

In regard to the remaining portion of your request pertaining to origin/destination data, based on your description of records sought, it has been determined that this portion of the records you seek are now exempt from disclosure under FOIA Exemption 3, 39 U.S.C. §410(c)(2).

Exemption 3 allows an agency to withhold information that is "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3). Section 410(c)(2) of the Postal Reorganization Act qualifies as an Exemption 3 statute. 39 U.S.C. § 410(c)(2). Section 410(c)(2) permits the Postal Service to withhold "information of a commercial nature, including trade secrets, whether or not obtained from a person outside the Postal Service, which under good business practice would not be publicly disclosed." 39 U.S.C. §410(c)(2). Information of a commercial nature under Section 410(c)(2) is broadly defined to include all information that "relates to commerce, trade, profit, or the Postal Service's ability to conduct itself in a businesslike manner." 39 C.F.R. § 265.14(b)(3). In determining whether particular information is commercial in nature, the Postal Service considers six (6) factors relating to whether the information is more akin to its role as a business entity, a competitor in the market or a provider of basic public services. *See* 39 C.F.R. § 265.14(b)(3)(i).

Here, we find that the records you requested qualify as "information of a commercial nature" under Section 410(c)(2) because it is related to COA counts by origin and destination which is information that is now, at the moment, currently under development for a commercial product. Requests for COA data that seek the originating and destination location, at any level, is no longer releasable under the FOIA. Accordingly, this information is exempt from disclosure under Exemption 3 of the FOIA and Section 410(c)(2).

If you are not satisfied with the response to this request, you may file an administrative appeal within ninety (90) days of the date of this response letter by writing to the General Counsel U.S. Postal Service 475 L'Enfant Plaza SW Washington, DC 20260 or via email at FOIAAppeal@usps.gov. Your appeal must be postmarked or electronically transmitted within ninety (90) days of the date of the response to your request. The letter of appeal should include, as applicable:

    (1) A copy of the request, of any notification of denial or other action, and of any other
        related correspondence;
    (2) The FOIA tracking number assigned to the request;
    (3) A statement of the action, or failure to act, from which the appeal is taken;
    (4) A statement identifying the specific redactions to responsive records that the requester
        is challenging;
    (5) A statement of the relief sought; and
    (6) A statement of the reasons why the requester believes the action or failure to act is
        erroneous.

For further assistance and to discuss any aspect of your request, you may contact any of the following:

       PRIVACY & RECORDS OFFICE
       US POSTAL SERVICE
       475 L'ENFANT PLAZA SW RM 1P830
       WASHINGTON DC 20260-1101
       Phone: (202) 268-2608
       Fax: (202) 268-5353
       FOIA Public Liaison: Nancy Chavannes-Battle

Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

Sincerely,

*Tai Thompson*

Tai Thompson
Government Information Specialist

# EXHIBIT 3

| YYYYMM | Old County | Old State | New County | New State | Total Perm | Total Temp |
|---|---|---|---|---|---|---|
| 202005 | DISTRICT OF COLUMBIA | DC | PHILADELPHIA | PA | 36 | 0 |
| 202005 | PHILADELPHIA | PA | DISTRICT OF COLUMBIA | DC | 48 | 0 |

| YYYYMM | Old County | Old State | New County | New State | Total Perm | Total Temp |
|---|---|---|---|---|---|---|
| 201801 | ABBEVILLE | SC | ABBEVILLE | SC | 65 | 0 |
| 201801 | ABBEVILLE | SC | ANDERSON | SC | 12 | 0 |
| 201801 | ACADIA | LA | ACADIA | LA | 202 | 11 |
| 201801 | ACADIA | LA | LAFAYETTE | LA | 46 | 0 |
| 201801 | ACADIA | LA | SAINT LANDRY | LA | 22 | 0 |
| 201801 | ACCOMACK | VA | ACCOMACK | VA | 93 | 0 |
| 201801 | ADA | ID | ADA | ID | 2606 | 107 |
| 201801 | ADA | ID | BONNEVILLE | ID | 14 | 0 |
| 201801 | ADA | ID | CANYON | ID | 296 | 0 |
| 201801 | ADA | ID | CLARK | NV | 0 | 12 |
| 201801 | ADA | ID | ELMORE | ID | 25 | 0 |
| 201801 | ADA | ID | GEM | ID | 18 | 0 |
| 201801 | ADA | ID | KING | WA | 30 | 17 |
| 201801 | ADA | ID | LOS ANGELES | CA | 12 | 0 |
| 201801 | ADA | ID | MARICOPA | AZ | 32 | 51 |
| 201801 | ADA | ID | MOHAVE | AZ | 0 | 12 |
| 201801 | ADA | ID | ORANGE | CA | 11 | 0 |
| 201801 | ADA | ID | PAYETTE | ID | 12 | 0 |
| 201801 | ADA | ID | PIMA | AZ | 0 | 26 |
| 201801 | ADA | ID | RIVERSIDE | CA | 0 | 34 |
| 201801 | ADA | ID | SALT LAKE | UT | 14 | 0 |
| 201801 | ADA | ID | SAN DIEGO | CA | 18 | 11 |
| 201801 | ADA | ID | TWIN FALLS | ID | 18 | 0 |
| 201801 | ADA | ID | VALLEY | ID | 16 | 0 |
| 201801 | ADA | ID | YUMA | AZ | 0 | 13 |
| 201801 | ADAIR | KY | ADAIR | KY | 92 | 0 |
| 201801 | ADAIR | KY | TAYLOR | KY | 20 | 0 |
| 201801 | ADAIR | MO | ADAIR | MO | 114 | 0 |
| 201801 | ADAIR | OK | ADAIR | OK | 75 | 0 |

**JA137**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BLOOMBERG L.P. and DOW JONES & COMPANY, INC.,

                       Plaintiffs,

                -v-

UNITED STATES POSTAL SERVICE,

                      Defendant.

22 Civ. 6112 (DLC)

---

## **SUPPLEMENTAL DECLARATION OF JEFFREY TACKES**

I, Jeffrey Tackes, make the following Supplemental Declaration in lieu of an affidavit in accordance with the provisions of 28 U.S.C. § 1746. I understand that my declaration may be introduced into the record of the above captioned action.

1.      I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.      The purpose of this declaration is to provide additional information with respect to the Population Mobility Trends product that was described in my Declaration dated December 9, 2022 ("December 2022 Declaration"), in order to address certain assertions made in Plaintiffs' Combined Memorandum of Law In Opposition to Defendant's Motion for Summary Judgment and In Support of Plaintiffs' Cross Motion for Summary Judgment, dated January 20, 2023 ("Combined Memorandum of Law").

3.      As set forth in Paragraph 30 of my December 2022 Declaration, and as of the date of this Supplemental Declaration, USPS anticipates that the Population Mobility Trends

product will be released in April or May of 2023.  The product is currently in the final stages of development.

4.      As I explained in Paragraph 36 of my December 2022 Declaration, the Population Mobility Trends product will include restrictions on use, access, distribution, and retention that are included in all of USPS's data licenses.  Although USPS cannot publicly release at this time the specific terms of the restrictions of the Population Mobility Trend product's use, access, distribution, and retention in advance of launching the product, it can represent that the restrictions will prohibit the wholesale public release of an *entire* data file provided to a paying Population Mobility Trends licensee.  By contrast, the use, access, distribution, and retention restrictions will not "prevent Plaintiffs from incorporating COA data into a helpful visualization or chart," or prohibit Plaintiffs from "publi[shing] . . . any analysis of COA data," as Plaintiffs suggest on page 24 of their Combined Memorandum of Law.

5.      As set forth in Exhibit A of the December 2022 Declaration, plaintiff Dow Jones & Company's FOIA Request ("Dow Jones FOIA Request") submitted on or about September 15, 2021, sought "monthly summary data showing the number of residential postal customers who filed change-of-address requests" from January 2021 to June 2021, and sought "separate tallies for temporary and permanent requests."  The Dow Jones FOIA Request asked USPS to send its response as an Excel file with columns named: (a) YYYYMM; (b) Old County; (c) Old State; (d) New County; (e) New State; (f) Total Perm[anent]; and (g) Total Temp[orary].

6.      As set forth in Exhibit E of the December 2022 Declaration, plaintiff Bloomberg L.P.'s FOIA Request ("Bloomberg FOIA Request") submitted on or about March 30, 2021 requested "[c]hange of addresses data, per zip [code], but only for the month of December 2020."

**JA139**

7.     The change-of-address data to be incorporated in Population Mobility Trends will include the data sought in both FOIA Requests because the quantity of change-of-address requests for each 5-digit ZIP code will include monthly counts for business, family, individual, permanent and temporary counts <u>originating from</u> each ZIP code, as well as aggregated counts for the number of change-of-address requests that <u>moved to</u> within the county, or within the state, and out of the state.  In addition, for every ZIP code, the quantity of change-of-address requests for each 5-digit ZIP Code will include monthly counts for business, family, individual, permanent and temporary counts <u>destinating to</u> each ZIP code, as well as aggregated counts for the number of change-of-address requests that <u>moved from</u> within the county, or within the state, and outside of the state.  This data will encompass the January 2021 to June 2021 timeframe in the Dow Jones FOIA Request, and the December 2020 timeframe in the Bloomberg LP FOIA Request, and will be available in monthly refreshed files, as well as monthly historical files up to the maximum of 48 months.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing declaration is true and correct.

Executed in Washington, D.C., on February 17, 2023.

E-SIGNED by Jeffrey.J Tackes
on 2023-02-17 16:26:52 CST

_____
JEFFREY TACKES

**JA140**



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*86 Chambers Street*
*New York, New York 10007*

May 16, 2023

**VIA ECF**
Honorable Denise L. Cote
United States District Judge
United States District Court
500 Pearl Street, Room 1910
New York, New York 10007

Re:     *Bloomberg L.P. v. United States Postal Service*,
         22 Civ. 6112 (DLC)

Dear Judge Cote:

      This Office represents defendant United States Postal Service ("USPS" or the "Government") in the above-referenced matter commenced by plaintiffs Bloomberg L.P. and Dow Jones & Company (jointly, "Plaintiffs") under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"). This case concerns two FOIA requests submitted by Plaintiffs to USPS seeking records regarding change-of-address ("COA") data from December 2020, and from January 2021 to June 2021, respectively. The parties have cross-moved for summary judgment on whether the COA data sought by Plaintiffs is exempt from disclosure under FOIA Exemption 3, 5 U.S.C. § 552(b)(3), because it is "information of a commercial nature" within the meaning of the Postal Reorganization Act of 1970, 39 U.S.C. § 410(c)(2). As set forth in the Government's briefs and supporting declarations, the COA data is "information of a commercial nature" because it will be sold commercially as a part of an anticipated USPS data-licensing product called "Population Mobility Trends." *See, e.g.,* Decl. of Jeffrey Tackes, dated Dec. 9, 2022 [ECF No. 18].

      We write respectfully to inform the Court that on May 12, 2023, USPS launched the Population Mobility Trends product as a "tabular dataset built upon aggregated USPS National Change of Address data and 2020 Census demographics," and is accepting paid subscription orders for the product. The data offerings include historical COA data for the previous 48-month period, to be refreshed monthly.[1] *See* USPS® Population Mobility Trends, https://postalpro.usps.com/pmt. Because USPS is selling the COA data sought by Plaintiffs as a commercial product, the data is squarely "information of a commercial nature" and exempt from disclosure under FOIA Exemption 3. Accordingly, and for the reasons set forth in USPS's motion papers, this Court should grant USPS's motion for summary judgment in this case.

      We thank the Court for its consideration of this letter.

---

[1] For example, if a 48-month file is released to a subscriber in June 2023, the file will contain historical COA data from the prior 48 months, from June 2019, to May 2023.

Hon. Denise L. Cote                                                                     Page 2 of 2
May 16, 2023

                                                        Respectfully submitted,

                                                        DAMIAN WILLIAMS
                                                        United States Attorney
                                                        *Counsel for Defendant*

                                        By:     /s/ Tomoko Onozawa
                                                        TOMOKO ONOZAWA
                                                        Assistant United States Attorney
                                                        Tel: (212) 637-2721
                                                        Fax:  (212) 637-2717
                                                        Email:  tomoko.onozawa@usdoj.gov


cc:       All Counsel of Record (via ECF)

**JA142**

# REPORTERS COMMITTEE

**FOR FREEDOM OF THE PRESS**

1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300 • www.rcfp.org

Bruce D. Brown, Executive Director
bruce.brown@rcfp.org • (202) 795-9301

**STEERING COMMITTEE CHAIR**
STEPHEN J. ADLER

**STEERING COMMITTEE MEMBERS**
WOLF BLITZER
*CNN*
DAVID BOARDMAN
*Temple University*
THEODORE J. BOUTROUS, JR.
*Gibson, Dunn & Crutcher LLP*
MASSIMO CALABRESI
*Time Magazine*
LYNETTE CLEMETSON
*University of Michigan*
NIKHIL DEOGUN
*Brunswick Group*
MANNY GARCIA
*Austin American-Statesman*
EMILIO GARCIA-RUIZ
*San Francisco Chronicle*
JOSH GERSTEIN
*POLITICO*
ALEX GIBNEY
*Jigsaw Productions*
SUSAN GOLDBERG
*GBH*
GAIL GOVE
*NBCUniversal*
JAMES GRIMALDI
*The Wall Street Journal*
LAURA HANDMAN
*Davis Wright Tremaine*
DIEGO IBARGÜEN
*Hearst*
JEREMY JOJOLA
*9NEWS Colorado*
KAREN KAISER
*Associated Press*
KIMBRIELL KELLY
*The Los Angeles Times*
DAVID LAUTER
*The Los Angeles Times*
MARGARET LOW
*WBUR*
COLLEEN MCCAIN NELSON
*The McClatchy Company*
MAGGIE MULVIHILL
*Boston University*
JAMES NEFF
*The Philadelphia Inquirer*
NORMAN PEARLSTINE
THOMAS C. RUBIN
*Stanford Law School*
BRUCE W. SANFORD
*BakerHostetler, retired*
CHARLIE SAVAGE
*The New York Times*
JENNIFER SONDAG
*Bloomberg News*
NABIHA SYED
*The Markup*
ADAM SYMSON
*The E.W. Scripps Company*
PIERRE THOMAS
*ABC News*
MATT THOMPSON
*The New York Times*
VICKIE WALTON-JAMES
*NPR*
SUSAN ZIRINSKY
*CBS News*

**HONORARY LEADERSHIP COUNCIL**
J. SCOTT APPLEWHITE, *Associated Press*
CHIP BOK, *Creators Syndicate*
DAHLIA LITHWICK, *Slate*
TONY MAURO, *American Lawyer Media, retired*
JANE MAYER, *The New Yorker*
ANDREA MITCHELL, *NBC News*
CAROL ROSENBERG, *The New York Times*
PAUL STEIGER, *ProPublica*
SAUNDRA TORRY, *Freelance*
JUDY WOODRUFF, *The PBS NewsHour*

*Affiliations appear only for purposes of identification.*

May 22, 2023

Honorable Judge Denise Cote
United States District Judge
U.S. District Court for the Southern District of New York
40 Foley Square
New York, NY 10007

**VIA ECF**

Re:   *Bloomberg L.P. and Dow Jones & Company, Inc. v. United States Postal Service* (22-cv-6112 (DLC))

Dear Judge Cote,

Plaintiffs write to respond to Defendant's supplemental filing, ECF No. 33.  As detailed in Plaintiffs' Memorandum in Support of their Cross-Motion for Summary Judgment, ECF No. 24 ("Cross-Mot."), Dow Jones & Company, Inc. and Bloomberg L.P. submitted requests under the Freedom of Information Act ("FOIA" or the "Act"), 5 U.S.C. § 552, to the United States Postal Service ("USPS") for change-of-address ("COA") data reflecting aggregate net-flows of persons and businesses to and from different jurisdictions across the nation.  USPS has withheld that data, citing FOIA Exemption 3 and the Postal Reorganization Act, 39 U.S.C. § 410(c)(2).

USPS's recent letter informs the Court of the launch of its Population Mobility Trends product and argues that "[b]ecause USPS is selling the COA data sought by Plaintiffs as a commercial product, the data is squarely 'information of a commercial nature' and exempt from disclosure under FOIA Exemption 3." ECF No. 33.  But the mere fact that government data has value, or could be sold, does not make it "commercial" for the purposes of 39 U.S.C. § 410(c)(2).  *See* Cross-Mot. at 6–8; *cf. Carlson v. USPS*, 504 F.3d 1123, 1129 (9th Cir. 2007) ("While the Postal Service argues the requested information concerning post offices is commercial because it has value, this is too broad a definition of commercial.").

The launch of Population Mobility Trends <u>supports</u> Plaintiffs' arguments in this matter.  First, it confirms, as previously argued by Plaintiffs, that the data Defendant is selling and the data Plaintiffs seek are <u>not</u> one in the same.  *See* Ex. A[1] at 2 (Population Mobility Trends' Technical Guide, stating that "[f]or each old ZIP Code, the product returns the three ZIP Codes with the highest COA volume customers are moving to per County, In State/Outside County, and Outside State, for a total of nine possible returns").

---

[1]     Plaintiffs respectfully request that the Court take judicial notice of the referenced exhibits, which are from Defendant's website; such notice is proper pursuant to Fed. R. Evid. 201.  *See, e.g.*, *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015).

As Plaintiffs have explained, what Population Mobility Trends provides is not what Plaintiffs requested.  *See* Decl. of Paul Overberg, ECF No. 27, Ex. 1; Decl. of Marie Patino, ECF No. 26, Ex. 1; *see also* Cross-Mot. at 19–20 (explaining that Dow Jones requested county data by state, not ZIP-code data, and that Plaintiffs' requests are not limited to the top three ZIP codes where populations are moving).

Further, the newly-published pricing and sample "Data License Agreement" for Population Mobility Trends confirms that if USPS is allowed to withhold COA data under FOIA, journalists' ability to use this important information in their reporting will be stymied—if not completely eviscerated.  With respect to pricing, USPS seeks to charge up to **$277,000** for four years of data.  *See* Ex. B (Population Mobility Trends Order Form).  Such pricing would effectively eliminate access for members of the press and public, ensuring that the only beneficiaries of this government data are commercial enterprises that can afford to pay hundreds of thousands of dollars.  That is contrary to FOIA.  As then-Judge Jackson explained in 2018, "the information and records that an agency possesses rightfully belong to the public[.]"  *Yanofsky v. Dep't of Commerce*, 306 F. Supp. 3d 292, 293 (D.D.C. 2018) (emphasis added) (holding Department of Commerce could not charge $173,775 for data files requested by journalist).

Moreover, as anticipated by Plaintiffs, *see* Cross-Mot. at 23–24, Population Mobility Trends' sample "Data License Agreement" contains onerous restrictions on licensees' use of USPS's data that would inhibit reporting by the news media.  *See* Ex. C.  According to the sample agreement, licensees must agree to restrictions on their ability to "use, copy, modify, and distribute" the data; further, licensees "shall not disclose, release, [or] distribute . . . any portion of the [d]ata . . . to any third party without [Defendant's] prior written consent"; and, *inter alia*, shall not "publish . . . or otherwise make available the [d]ata or . . . . or display any compilation or directory of the [d]ata."  *Id*.  Especially troubling for journalists is the provision stating that licensees must agree that USPS has the right "to examine such books and records in [the l]icensee's possession or under its control with respect to the subject matter and terms of th[e license a]greement."  *Id*.  A government audit of journalists' work is an affront to and incompatible with an independent press.

For these reasons and those set forth in their briefing, Plaintiffs respectfully request that the Court deny Defendant's motion for summary judgment and enter summary judgment in Plaintiffs' favor.  We thank the Court for its consideration of this letter.

Respectfully submitted,

*/s/ Katie Townsend*
ktownsend@rcfp.org
REPORTERS COMMITTEE FOR FREEDOM
OF THE PRESS
1156 15 Street NW, Suite 1020
Washington, D.C. 20005
202.795.9303

*Counsel for Plaintiffs*

2

**JA144**

# EXHIBIT A

# Population Mobility Trends
## Technical Guide

**May 2023**



USPS® Office of
**Addressing Technology**

Memphis, TN



**JA146**

# Table of Contents

**Overview** ................................................................................................................ 1

**Demographic Categories** ...................................................................................... 1

    *Requirements for Low Volume Demographics* ........................................................ 1

**ZIP Code Data** ....................................................................................................... 2

**Report File Layout – Copyright Record** ............................................................... 3

**Report File Layout – Detail Record** ..................................................................... 4

**Code Definitions** ................................................................................................. 10

**PMT Summary File Layout – Copyright Record** ................................................ 11

**PMT Summary File Layout – Detail Record** ...................................................... 12

# Overview

The Population Mobility Trends product utilizes USPS Change-of-Address information to provide statistical information about customer moving trends.  The product includes the most common moving trends based on the following factors:

- Old address ZIP Code to New address ZIP Codes migration information:
    - o   Top 3 movements within same county
    - o   Top 3 movements outside county but within same state
    - o   Top 3 movements outside state
- Top 3 demographic patterns related to (refer to Demographics Categories):
    - o   Median Age
    - o   Median Income
    - o   Average Household Size
- Multi-dwelling address information from the USPS Address Management System

No personally identifiable COA information is provided by the Population Mobility Trends product.

# Demographic Categories

Demographic categories of Median Age, Medium Incomes, and Average Household Size are assigned to each COA based on carrier route information. Each category is grouped as follows:

| Median Age | Median Income | Average Household Size |
|------------|---------------|------------------------|
| 20-24 | <  $15,000 | 1 |
| 25-34 | $15,000  –  $24,999 | 2 |
| 35-44 | $25,000  –  $34,999 | 3 |
| 45-54 | $35,000  –  $49,999 | 4 |
| 55-64 | $50,000  –  $74,999 | 5 |
| 64-74 | $75,000  –  $99,999 | 6 or more |
| 75-84 | $100,000 – $149,999 | |
| > 85 | $150,000 – $199,999 | |
| | > $200,000 | |

## *Requirements for Low Volume Demographics*

In cases where the demographics information is not available or extremely low, no information is provided.   Listed below is the criteria used to determine when to provide zero counts in the demographic data.

1. **Age** – Less than 20
2. **Income** – Less than 0
3. **Household Size** – Less than 1

**JA148**

## ZIP Code Data

For each Old and New ZIP Code, the Population Mobility Trends product returns the following data:

**Percentage of Residential Multi-Family Addresses (Residential Highrise Addresses)**
**Percentage of Business Multi-Tenant Addresses (Business Highrise Addresses)**

For each old ZIP Code, the product returns the three ZIP Codes with the highest COA volume customers are moving to per County, In State/Outside County, and Outside State, for a total of nine possible returns (limitations may exist based on volume restrictions):

**Top 3 New ZIP Codes within County**
**Top 3 New ZIP Codes within State outside County**
**Top 3 New ZIP Codes outside State**

In addition, the top 3 **Median Age**, **Median Income**, and **Average Household Size** is provided for each Old/New ZIP Code combination.

If the any ZIP Code has fewer than 11 COAs, **no data** is returned for that ZIP Code.

**JA149**

# Report File Layout – Copyright Record

Data is provided in comma-delimited (.csv) file format.

**Filename = pmtmonthly.csv and pmt48.csv**

| Field Name | Length | Description |
|---|---|---|
| Copyright Code | 1 | C = Copyright |
| Filler | 11 | |
| Copyright Statement | 8 | COPYRIGHT © |
| Filler | 1 | |
| File Version Year | 5 | 2023. |
| Filler | 5 | |
| Copyright Notice | 20 | ALL RIGHTS RESERVED. |
| Filler | 1 | |
| Census Notice | 53 | DEMOGRAPHIC DATA SOURCED FROM THE U.S. CENSUS BUREAU. |

**JA150**

# Report File Layout – Detail Record

Data is provided in comma-delimited (.csv) file format.

**Filenames = pmtmonthly.csv and pmt48.csv**

| Field Name | Length | Description |
|---|---|---|
| COA Date | 8 | Year and Month of Move Effective Date |
| OLD ZIP | 5 | Old Address ZIP Code derived from Change-of-Address |
| OLD City | 28 | Old Address City derived from Change-of-Address |
| OLD State | 2 | Old Address State derived from Change-of-Address |
| OLD County | 20 | Old Address County derived from Change-of-Address |
| NEW Distance | 1 | C - Moved inside county<br>S - Moved outside county but in same State<br>O - Moved outside of state |
| NEW ZIP | 5 | New Address ZIP Code derived from Change-of-Address |
| NEW City | 28 | New Address City derived from Change-of-Address |
| NEW State | 2 | New Address State derived from Change-of-Address |
| NEW County | 20 | New Address County derived from Change-of-Address |
| Total COA Volume | 8 | Total COA volume for COA Date, OLD ZIP and NEW ZIP |
| Old Addr Age Demographic Code 1 | 2 | Age demographic with the highest volume COAs<br>(Refer to Code Descriptions below) |
| Old Addr Bus Perm Age 1 | 8 | Total Permanent business COAs |
| Old Addr Bus Temp Age 1 | 8 | Total Temporary business COAs |
| Old Addr Bus Highrise Age 1 | 3 | Percentage of Business COAs that moved from a multi-tenant address |
| Old Addr Fam Perm Age 1 | 8 | Total Permanent family COAs |
| Old Addr Fam Temp Age 1 | 8 | Total Temporary family COAs |
| Old Addr Ind Perm Age 1 | 8 | Total Permanent individual COAs |
| Old Addr Ind Temp Age 1 | 8 | Total Temporary individual COAs |
| Old Addr Fam Highrise Age 1 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| Old Addr Ind Highrise Age 1 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| Old Addr Age 2 | 2 | Age demographic with the second highest volume COAs<br>(Refer to Code Descriptions below) |
| Old Addr Bus Perm Age 2 | 8 | Total Permanent business COAs |
| Old Addr Bus Temp Age 2 | 8 | Total Temporary business COAs |
| Old Addr Bus Highrise Age 2 | 3 | Percentage of Business COAs that moved from a multi-tenant address |
| Old Addr Fam Perm Age 2 | 8 | Total Permanent family COAs |
| Old Addr Fam Temp Age 2 | 8 | Total Temporary family COAs |

| Old Addr Ind Perm Age 2 | 8 | Total Permanent individual COAs |
| Old Addr Ind Temp Age 2 | 8 | Total Temporary individual COAs |
| Old Addr Fam Highrise Age 2 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| Old Addr Ind Highrise Age 2 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| Old Addr Age 3 | 2 | Age demographic with the third highest volume COAs<br>(Refer to Code Descriptions below) |
| Old Addr Bus Perm Age 3 | 8 | Total Permanent business COAs |
| Old Addr Bus Temp Age 3 | 8 | Total Temporary business COAs |
| Old Addr Bus Highrise Age 3 | 3 | Percentage of Business COAs that moved from a multi-tenant address |
| Old Addr Fam Perm Age 3 | 8 | Total Permanent family COAs |
| Old Addr Fam Temp Age 3 | 8 | Total Temporary family COAs |
| Old Addr Ind Perm Age 3 | 8 | Total Permanent individual COAs |
| Old Addr Ind Temp Age 3 | 8 | Total Temporary individual COAs |
| Old Addr Fam Highrise Age 3 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| Old Addr Ind Highrise Age 3 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| Old Addr Income 1 | 2 | Income demographic with the highest volume COAs<br>(Refer to Code Descriptions below) |
| Old Addr Bus Perm Income 1 | 8 | Total Permanent business COAs |
| Old Addr Bus Temp Income 1 | 8 | Total Temporary business COAs |
| Old Addr Bus Highrise Income 1 | 3 | Percentage of Business COAs that moved from a multi-tenant address |
| Old Addr Fam Perm Income 1 | 8 | Total Permanent family COAs |
| Old Addr Fam Temp Income 1 | 8 | Total Temporary family COAs |
| Old Addr Ind Perm Income 1 | 8 | Total Permanent individual COAs |
| Old Addr Ind Temp Income 1 | 8 | Total Temporary individual COAs |
| Old Addr Fam Highrise Income 1 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| Old Addr Ind Highrise Income 1 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| Old Addr Income 2 | 2 | Income demographic with the second highest volume COAs<br>(Refer to Code Descriptions below) |
| Old Addr Bus Perm Income 2 | 8 | Total Permanent business COAs |
| Old Addr Bus Temp Income 2 | 8 | Total Temporary business COAs |
| Old Addr Bus Highrise Income 2 | 3 | Percentage of Business COAs that moved from a multi-tenant address |
| Old Addr Fam Perm Income 2 | 8 | Total Permanent family COAs |
| Old Addr Fam Temp Income 2 | 8 | Total Temporary family COAs |
| Old Addr Ind Perm Income 2 | 8 | Total Permanent individual COAs |
| Old Addr Ind Temp Income 2 | 8 | Total Temporary individual COAs |
| Old Addr Fam Highrise Income 2 | 3 | Percentage of Residential COAs that moved from a multi-family address |

**JA152**

| | | |
|---|---|---|
| Old Addr Ind Highrise Income 2 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| Old Addr Income 3 | 2 | Income demographic with the third highest volume COAs (Refer to Code Descriptions below) |
| Old Addr Bus Perm Income 3 | 8 | Total Permanent business COAs |
| Old Addr Bus Temp Income 3 | 8 | Total Temporary business COAs |
| Old Addr Bus Highrise Income 3 | 3 | Percentage of Business COAs that moved from a multi-tenant address |
| Old Addr Fam Perm Income 3 | 8 | Total Permanent family COAs |
| Old Addr Fam Temp Income 3 | 8 | Total Temporary family COAs |
| Old Addr Ind Perm Income 3 | 8 | Total Permanent individual COAs |
| Old Addr Ind Temp Income 3 | 8 | Total Temporary individual COAs |
| Old Addr Fam Highrise Income 3 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| Old Addr Ind Highrise Income 3 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| Old Addr Household 1 | 2 | Household size demographic with the highest volume COAs (Refer to Code Descriptions below) |
| Old Addr Bus Perm Household 1 | 8 | Total Permanent business COAs |
| Old Addr Bus Temp Household 1 | 8 | Total Temporary business COAs |
| Old Addr Bus Highrise Household 1 | 3 | Percentage of Business COAs that moved from a multi-tenant address |
| Old Addr Fam Perm Household 1 | 8 | Total Permanent family COAs |
| Old Addr Fam Temp Household 1 | 8 | Total Temporary family COAs |
| Old Addr Ind Perm Household 1 | 8 | Total Permanent individual COAs |
| Old Addr Ind Temp Household 1 | 8 | Total Temporary individual COAs |
| Old Addr Fam Highrise Household 1 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| Old Addr Ind Highrise Household 1 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| Old Addr Household 2 | 2 | Household size demographic with the second highest volume COAs (Refer to Code Descriptions below) |
| Old Addr Bus Perm Household 2 | 8 | Total Permanent business COAs |
| Old Addr Bus Temp Household 2 | 8 | Total Temporary business COAs |
| Old Addr Bus Highrise Household 2 | 3 | Percentage of Business COAs that moved from a multi-tenant address |
| Old Addr Fam Perm Household 2 | 8 | Total Permanent family COAs |
| Old Addr Fam Temp Household 2 | 8 | Total Temporary family COAs |
| Old Addr Ind Perm Household 2 | 8 | Total Permanent individual COAs |
| Old Addr Ind Temp Household 2 | 8 | Total Temporary individual COAs |
| Old Addr Fam Highrise Household 2 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| Old Addr Ind Highrise Household 2 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| Old Addr Household 3 | 2 | Household size demographic with the third highest volume COAs (Refer to Code Descriptions below) |

**JA153**

| Old Addr Bus Perm Household 3 | 8 | Total Permanent business COAs |
|---|---|---|
| Old Addr Bus Temp Household 3 | 8 | Total Temporary business COAs |
| Old Addr Bus Highrise Household 3 | 3 | Percentage of Business COAs that moved from a multi-tenant address |
| Old Addr Fam Perm Household 3 | 8 | Total Permanent family COAs |
| Old Addr Fam Temp Household 3 | 8 | Total Temporary family COAs |
| Old Addr Ind Perm Household 3 | 8 | Total Permanent individual COAs |
| Old Addr Ind Temp Household 3 | 8 | Total Temporary individual COAs |
| Old Addr Fam Highrise Household 3 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| Old Addr Ind Highrise Household 3 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| New Addr Age 1 | 2 | Age demographic with the highest volume COAs (Refer to Code Descriptions below) |
| New Addr Bus Perm Age 1 | 8 | Total Permanent business COAs |
| New Addr Bus Temp Age 1 | 8 | Total Temporary business COAs |
| New Addr Bus Highrise Age 1 | 3 | Percentage of Business COAs that moved from a multi-tenant address |
| New Addr Fam Perm Age 1 | 8 | Total Permanent family COAs |
| New Addr Fam Temp Age 1 | 8 | Total Temporary family COAs |
| New Addr Ind Perm Age 1 | 8 | Total Permanent individual COAs |
| New Addr Ind Temp Age 1 | 8 | Total Temporary individual COAs |
| New Addr Fam Highrise Age 1 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| New Addr Ind Highrise Age 1 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| New Addr Age 2 | 2 | Age demographic with the second highest volume COAs (Refer to Code Descriptions below) |
| New Addr Bus Perm Age 2 | 8 | Total Permanent business COAs |
| New Addr Bus Temp Age 2 | 8 | Total Temporary business COAs |
| New Addr Bus Highrise Age 2 | 3 | Percentage of Business COAs that moved from a multi-tenant address |
| New Addr Fam Perm Age 2 | 8 | Total Permanent family COAs |
| New Addr Fam Temp Age 2 | 8 | Total Temporary family COAs |
| New Addr Ind Perm Age 2 | 8 | Total Permanent individual COAs |
| New Addr Ind Temp Age 2 | 8 | Total Temporary individual COAs |
| New Addr Fam Highrise Age 2 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| New Addr Ind Highrise Age 2 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| New Addr Age 3 | 2 | Age demographic with the third highest volume COAs (Refer to Code Descriptions below) |
| New Addr Bus Perm Age 3 | 8 | Total Permanent business COAs |
| New Addr Bus Temp Age 3 | 8 | Total Temporary business COAs |
| New Addr Bus Highrise Age 3 | 3 | Percentage of Business COAs that moved from a multi-tenant address |

JA154

| New Addr Fam Perm Age 3 | 8 | Total Permanent family COAs |
|---|---|---|
| New Addr Fam Temp Age 3 | 8 | Total Temporary family COAs |
| New Addr Ind Perm Age 3 | 8 | Total Permanent individual COAs |
| New Addr Ind Temp Age 3 | 8 | Total Temporary individual COAs |
| New Addr Fam Highrise Age 3 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| New Addr Ind Highrise Age 3 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| New Addr Income 1 | 2 | Income demographic with the highest volume COAs (Refer to Code Descriptions below) |
| New Addr Bus Perm Income 1 | 8 | Total Permanent business COAs |
| New Addr Bus Temp Income 1 | 8 | Total Temporary business COAs |
| New Addr Bus Highrise Income 1 | 3 | Percentage of Business COAs that moved from a multi-tenant address |
| New Addr Fam Perm Income 1 | 8 | Total Permanent family COAs |
| New Addr Fam Temp Income 1 | 8 | Total Temporary family COAs |
| New Addr Ind Perm Income 1 | 8 | Total Permanent individual COAs |
| New Addr Ind Temp Income 1 | 8 | Total Temporary individual COAs |
| New Addr Fam Highrise Income 1 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| New Addr Ind Highrise Income 1 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| New Addr Income 2 | 2 | Income demographic with the second highest volume COAs (Refer to Code Descriptions below) |
| New Addr Bus Perm Income 2 | 8 | Total Permanent business COAs |
| New Addr Bus Temp Income 2 | 8 | Total Temporary business COAs |
| New Addr Bus Highrise Income 2 | 3 | Percentage of Business COAs that moved from a multi-tenant address |
| New Addr Fam Perm Income 2 | 8 | Total Permanent family COAs |
| New Addr Fam Temp Income 2 | 8 | Total Temporary family COAs |
| New Addr Ind Perm Income 2 | 8 | Total Permanent individual COAs |
| New Addr Ind Temp Income 2 | 8 | Total Temporary individual COAs |
| New Addr Fam Highrise Income 2 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| New Addr Ind Highrise Income 2 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| New Address: Income 3 | 2 | Income demographic with the third highest volume COAs (Refer to Code Descriptions below) |
| New Addr Bus Perm Income 3 | 8 | Total Permanent business COAs |
| New Addr Bus Temp Income 3 | 8 | Total Temporary business COAs |
| New Addr Bus Highrise Income 3 | 3 | Percentage of Business COAs that moved from a multi-tenant address |
| New Addr Fam Perm Income 3 | 8 | Total Permanent family COAs |
| New Addr Fam Temp Income 3 | 8 | Total Temporary family COAs |
| New Addr Ind Perm Income 3 | 8 | Total Permanent individual COAs |

**JA155**

| New Addr Ind Temp Income 3 | 8 | Total Temporary individual COAs |
|---|---|---|
| New Addr Fam Highrise Income 3 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| New Addr Ind Highrise Income 3 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| New Address: Household 1 | 2 | Household size demographic with the highest volume COAs (Refer to Code Descriptions below) |
| New Addr Bus Perm Household 1 | 8 | Total Permanent business COAs |
| New Addr Bus Temp Household 1 | 8 | Total Temporary business COAs |
| New Addr Bus Highrise Household 1 | 3 | Percentage of Business COAs that moved from a multi-tenant address |
| New Addr Fam Perm Household 1 | 8 | Total Permanent family COAs |
| New Addr Fam Temp Household 1 | 8 | Total Temporary family COAs |
| New Addr Ind Perm Household 1 | 8 | Total Permanent individual COAs |
| New Addr Ind Temp Household 1 | 8 | Total Temporary individual COAs |
| New Addr Fam Highrise Household 1 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| New Addr Ind Highrise Household 1 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| New Address: Household 2 | 2 | Household size demographic with the second highest volume COAs (Refer to Code Descriptions below) |
| New Addr Bus Perm Household 2 | 8 | Total Permanent business COAs |
| New Addr Bus Temp Household 2 | 8 | Total Temporary business COAs |
| New Addr Bus Highrise Household 2 | 3 | Percentage of Business COAs that moved from a multi-tenant address |
| New Addr Fam Perm Household 2 | 8 | Total Permanent family COAs |
| New Addr Fam Temp Household 2 | 8 | Total Temporary family COAs |
| New Addr Ind Perm Household 2 | 8 | Total Permanent individual COAs |
| New Addr Ind Temp Household 2 | 8 | Total Temporary individual COAs |
| New Addr Fam Highrise Household 2 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| New Addr Ind Highrise Household 2 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| New Addr Household 3 | 2 | Household size demographic with the third highest volume COAs (Refer to Code Descriptions below) |
| New Addr Bus Perm Household 3 | 8 | Total Permanent business COAs |
| New Addr Bus Temp Household 3 | 8 | Total Temporary business COAs |
| New Addr Bus Highrise Household 3 | 3 | Percentage of Business COAs that moved from a multi-tenant address |
| New Addr Fam Perm Household 3 | 8 | Total Permanent family COAs |
| New Addr Fam Temp Household 3 | 8 | Total Temporary family COAs |
| New Addr Ind Perm Household 3 | 8 | Total Permanent individual COAs |
| New Addr Ind Temp Household 3 | 8 | Total Temporary individual COAs |
| New Addr Fam Highrise Household 3 | 3 | Percentage of Residential COAs that moved from a multi-family address |
| New Addr Ind Highrise Household 3 | 3 | Percentage of Residential COAs that moved from a multi-family address |

**JA156**

# Code Definitions

**Age Code**

| | |
|---|---|
| **A0** | Age < 20 |
| **A1** | Age 20 - 24 |
| **A2** | Age 25 - 34 |
| **A3** | Age 35 - 44 |
| **A4** | Age 45 - 54 |
| **A5** | Age 55 - 64 |
| **A6** | Age 65 - 74 |
| **A7** | Age 75 - 44 |
| **A8** | Age > 85 |

**Household Code**

| | |
|---|---|
| **H0** | 0 members |
| **H1** | 1 member |
| **H2** | 2 members |
| **H3** | 3 members |
| **H4** | 4 members |
| **H5** | 5 members |
| **H6** | 6 or more members |

**Income Code**

| | |
|---|---|
| **I0** | No Income |
| **I1** | < $15,000 |
| **I2** | $15,000 - $24,999 |
| **I3** | $25,000 - $34,999 |
| **I4** | $35,000 - $49,999 |
| **I5** | $50,000 - $74,999 |
| **I6** | $100,000 - $149,999 |
| **I7** | $150,000 - $199,999 |
| **I8** | > $200,000 |

**JA157**

# PMT Summary File Layout – Copyright Record

Data is provided in comma-delimited (.csv) file format.

**Filename = pmt_summary.csv**

| Field Name | Length | Description |
|---|---|---|
| Copyright Detail Code | 1 | C = Copyright |
| Filler | 11 | |
| Copyright Statement | 13 | COPYRIGHT © |
| Filler | 1 | |
| File Version Year | 5 | 2023. |
| Filler | 2 | |
| Copyright Notice | 19 | ALL RIGHTS RESERVED |

**JA158**

# PMT Summary File Layout – Detail Record

Data is provided in comma-delimited (.csv) file format.

**Filename = pmt_summary.csv**

Total COA requests to and from a 5-digit ZIP Code by month for the last four years.
- Totals are broken down by move type:
- Family – Everyone with the last name submitted on the COA request is moving
- Individual – The individual named on the COA request is moving
- Business – The business named on the COA request is moving

In order to protect the privacy of our moving customers, COA volumes where the count is less than 11 will not be disclosed. Since we only report when the volume is greater than 10, the columns for Business, Family and Individual may not add up to the amount in the total.

| Field Name | Length | Description |
| --- | --- | --- |
| YYYYMM | 6 | Year and month to which the data pertains. |
| ZIP Code | 8 | 5-digit ZIP Code where the COA request originates or destinates. |
| City | 28 | City name associated with the ZIP Code |
| State | 2 | State associated with the ZIP Code |
| Total From ZIP | 8 | Total COA requests that originated from the ZIP Code |
| Total Business | 8 | Total Business COAs that originated from the ZIP Code |
| Total Family | 8 | Total Family COAs that originated from the ZIP Code |
| Total Individual | 8 | Total Individual COAs that originated from the ZIP Code |
| Total Perm | 8 | Total permanent COAs that originated from the ZIP Code |
| Total Temp | 8 | Total temporary COAs that originated from the ZIP Code |
| To In County | 8 | Total COA requests within the same County as the ZIP Code |
| To In State | 8 | Total COA requests within the same State as the ZIP Code |
| To Out of State | 8 | Total COA requests that destinate to a different State than the ZIP Code |
| Total To ZIP | 8 | Total COA request that Destinate to the ZIP Code |
| Total Business | 8 | Total Business COA's that destinate to the ZIP Code |
| Total Family | 8 | Total Family COA's that destinate to the ZIP Code |
| Total Individual | 8 | Total Individual COA's that destinate to the ZIP Code |
| Total Perm | 8 | Total Permanent COA's that destinate to the ZIP Code |
| Total Temp | 8 | Total Temporary COA's that destinate to the ZIP Code |
| From In County | 8 | Total Business COA's that destinate to the ZIP Code |
| From In State | 8 | Total COA requests that destinate to the same State as the ZIP Code |
| From Out Of State | 8 | Total COA requests that come from a different State than the ZIP Code |

**JA159**

# EXHIBIT B



## *Population Mobility Trends Order Form*

### Billing Information *(Please PRINT clearly.)*

| Contact Name | | Customer/Company Name | |

| Address *(Number, street, suite, apt., etc.)* | Urbanization | Country Name (if other than USA) |

| City | State | ZIP + 4® Code |

| Phone Number *(Include area code)* | Fax Number *(Include area code)* | Email Address |

### Product Information *(Monthly products are provided on an annual subscription basis.)*

Choose the products you wish to order below, then indicate product format, product subtotal, and order total.

| Product ID | Product Name | Unit Price | Subtotal |
|---|---|---|---|
| 170000 | Population Mobility Trends 12 - Month Historical - Internal | $91,000 | |
| 170001 | Population Mobility Trends 12 - Month Historical - Limited | $120,000 | |
| 170002 | Population Mobility Trends 48 - Month Historical - Internal | $137,000 | |
| 170003 | Population Mobility Trends 48 - Month Historical - Limited | $181,000 | |
| 170004 | Population Mobility Trends 48 - Month Historical - Enterprise | $277,000 | |
| 170005 | Propulaton Mobility Trends 48 - Month Historical - Enterprise R | $184,000 | |
| | | **Total** | |

### Other Required Forms *(Please submit all applicable forms at the same time to avoid delay in product fulfillment.)*

**EPF (Electronic Product Fulfillment)**
All products, renewals, and receipts of payment are fulfilled via the EPF web site. To obtain access to the EPF web site, please complete PS Form 5116, *Electronic Product Fulfillment Web Access Request Form* located on PostalPro at https://postalpro.usps.com/EPF001. Instructions for form submission, log-in to the EPF web site, etc., are found on PS Form 5116.

**Signed Data License Agreement**
This order form must be accompanied by a signed United States Postal Service Data License Agreement (Agreement) acknowledging and agreeing to the terms and obligations of the Agreement. To obtain the Agreement, please visit PostalPro at https://postalpro.usps.com/pmt

If you have questions about this order form, call **800-238-3150** or email AISproducts.NCSC@usps.gov for assistance.

### Payment Method *(Please select one.)*

☐ Visa ☐ American Express ☐ MasterCard ☐ Check # _____ ☐ ACH Credit ☐ USPS® Money Order

Credit Card Number

| | | | | | | | | | | | | | | | |

Card expiration date: _____ / _____
                       *(MM)*   *(YYYY)*

If paying by credit card or ACH Credit, fax completed form(s) to: **901-681-4409.**
***Do not send credit card information via email.***

Make check or USPS money order payable to "United States Postal Service."
**There is a $35 fee for all Returned Checks.**
**Mail payment and order form(s) to:**

ACCOUNTS RECEIVABLE
ADDRESSING TECHNOLOGY
UNITED STATES POSTAL SERVICE
225 N HUMPHREYS BLVD STE 501
MEMPHIS TN  38188-1099

### NO REFUNDS will be issued once the order has been processed and the file(s) downloaded.

| Credit Card Address (if different than business address) | Urbanization Name |

| City | State | ZIP + 4 Code |

Print Name

Authorized Signature

*The person signing this order form accepts total responsibility governing the use of this card/account and agrees to comply with the terms of the issuer and the USPS.*

**PMT001**   April 2023            **Privacy Notice:**  For information regarding our Privacy Policy, visit *www.usps.com*.

**JA161**

# EXHIBIT C

# United States Postal Service
# Population Mobility Trends
# Data License Agreement

This License Agreement ("**Agreement**") is between YOU, the LICENSEE as designated on the signature page of this agreement and on your USPS Population Mobility Trends ("PMT") Order Form submission ("**LICENSEE**", "**Licensee**", or "**YOU**") and the United States Postal Service, an independent establishment of the executive branch of the Government of the United States, with its headquarters located at 475 L'Enfant Plaza, S.W., Washington, DC 20260 ("**LICENSOR**", "**Licensor**", or "**USPS**"). LICENSOR and LICENSEE may be referred to herein collectively as the "**Parties**" or individually as a "**Party**."

THIS AGREEMENT, TOGETHER WITH ALL EXHIBITS, APPENDICES, SCHEDULES, AND ANY OTHER ATTACHMENTS IDENTIFIED HEREIN, THE PMT ORDER FORM, AND THE ELECTRONIC PRODUCT FULFILLMENT (EPF) WEB ACCESS REQUEST FORM, CONSTITUTES THE COMPLETE AGREEMENT BETWEEN YOU AND USPS. BY SIGNING AND RETURNING THIS DATA LICENSE AGREEMENT AND THE PMT ORDER FORM, YOU INDICATE YOUR AGREEMENT TO THE TERMS OF THIS AGREEMENT. IF YOU DO NOT AGREE TO THE TERMS OF THIS AGREEMENT, DO NOT SIGN AND RETURN THIS AGREEMENT OR THE PMT ORDER FORM.

WHEREAS, Licensor in the ordinary course of its business obtains and produces **data, all of which is confidential and proprietary, on a monthly basis related to Population Mobility Trends ("PMT")** collected in the prior month, including any updates thereto, the descriptions of, specifications for, samples of, and operative web-based links for, such data being provided in **Exhibit A, Population Mobility Trends (PMT) Database Descriptions and Samples,** and such data is the **"Data"** in this Agreement; and

WHEREAS, Licensor desires to license the Data and Database to Licensee, and Licensee desires to license the Data and Database from Licensor, subject to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  Grant of License. Subject to and conditioned on LICENSEE's payment of the Fee and compliance with all terms and conditions of this Agreement, LICENSOR hereby grants to LICENSEE a non-exclusive, non-sublicensable, and non-transferable license during the Term to use the Data and USPS database (the **"Database"** or **"USPS PMT Database"**, defined as the file downloaded by YOU from the LICENSOR'S Electronic Product Fulfillment ("EPF") portal which contains a dataset or compilation of the Data) and any other data relating to PMT, as identified in the PMT Order Form ("**Order**

**Form**", a copy of which is attached hereto as **Exhibit B, Population Mobility Trends (PMT) Order Form**, and defined and described in Exhibit A ("**USPS PMT Database**"), all such data within the database and datasets generically deemed "**Data**" for purposes of this Agreement, for use and incorporation into Licensee's technology, software, service, platform, and/or product described in **Exhibit D, Population Mobility Trends Tiers of Access and Usage** (the "**Permitted Use**" or "**Use**"). "**Permitted Use**" or "**Use**" means that the Licensee may use, copy, modify and distribute the Database and may use, copy, modify, and distribute the Data in connection with the Permitted Use. The license to the Database and Data is **not** sub-licensable; provided however, that if YOU purchase the Enterprise version of the license, YOU may share the Database and Data with subsidiaries that are at least majority-owned and listed by YOU on **Exhibit C, List Of Subsidiaries and Parent Companies**. No derivative works of the Database or Data are allowed. Licensee may add products as a Permitted Use upon mutual agreement during the Agreement Term and based upon a mutually agreed price. The Data and Database are licensed to YOU, not sold. The Data and Database contain information and data which is proprietary and confidential to the Licensor or others. YOU understand and acknowledge that the Datbase is copyrighted, and YOU will not delete or obscure any copyright notices contained therein or attached thereto.

2. <u>Data Tiers of Access and Usage</u>. LICENSEE shall have access to the Data and Database as described in Exhibit D, Population Mobility Trends Tiers of Access and Usage, and in the PMT Order Form. LICENSEE shall indicate on the PMT Order Form which product ("PMT Version") from Exhibit D it is purchasing.

3. <u>Data Use Restrictions</u>. LICENSEE shall use the Database and Data for the Permitted Use only and shall not disclose, release, distribute, or deliver the Database or Data, any portion of the Data or Database, or any other information derived from the Data or Database to any third party without LICENSOR's prior written consent. For the avoidance of doubt, LICENSEE may incorporate the Data into the products or services listed in Exhibit B (PMT Order Form), as allowed by Exhibit D (Population Mobility Trends Tiers of Access and Usage), but no Data either in whole or in part may be transferred or sold by LICENSEE. Any purpose or use not specifically authorized herein is prohibited, unless otherwise agreed to in writing by LICENSOR. Without limiting the foregoing and except as otherwise expressly set forth in Section 1, LICENSEE shall not at any time, directly or indirectly: (i) permit non-parties to this Agreement to copy, modify, distribute, or display the Data or Database, any portion of the Data or Database, or any other information derived from the Data or Database; (ii) rent, lease, lend, sell, sublicense, assign, distribute, publish, transfer, or otherwise make available the Data or Database; (iii) reverse engineer, disassemble, decompile, decode, adapt, or otherwise attempt to derive or gain access to the source of the Data or methods used to compile the Data, in whole or in part; (iv) remove any proprietary notices included within the Database or Data; (v) publish, distribute, or display any compilation

**USPS Population Mobility Trends**       2
**Data License v. 5/12/23**

or directory of the Data or, based upon information derived from the Data, create a new database; (vi) use LICENSOR's trademarks, trade names, service marks, logos, or other distinctive brand features; (vii) use the Data in a manner that disparages or negatively affects the USPS; or (viii) use the Data in any manner or for any purpose that infringes, misappropriates, or otherwise violates any intellectual property right or other right of any person, or that violates any applicable law.

4. <u>Reservation of Rights in Data</u>. LICENSOR reserves all rights not expressly granted to LICENSEE in this Agreement. Except for the limited rights and licenses expressly granted under this Agreement, nothing in this Agreement grants, by implication, waiver, estoppel, or otherwise, to LICENSEE or any third party any intellectual property rights or other right, title, or interest in or to the Data and Database. The Data and Database is licensed not sold.

5. <u>Promotion Restrictions.</u> Neither Party will make any public announcement regarding this Agreement, without the written consent of the other Party. Licensee will not promote or publicize the fact that it utilizes data derived from Licensor for the Permitted Use and will not use any of Licensor's trademarks, copyrights, logos, or other intellectual property in connection with the Permitted Use without the written consent of Licensor.

6. <u>Intellectual Property Ownership</u>. LICENSEE acknowledges that, as between LICENSEE and LICENSOR, LICENSOR owns all right, title, and interest, including all intellectual property rights, in and to the Data and Database. Licensor owns all right, title, and interest to the intellectual property rights, including all copyrights and trade secrets, in the Data and Database and any other proprietary material or interest provided to Licensee. Providing to Licensee the compilation of data referred to herein as the Database does not transfer any right, title, or interest to Licensee other than the license to use the Data and Database strictly according to the terms specified in this Agreement. Manipulation, repackaging, recompilation, or the like of the data comprising the Data may create derivative compilations and Licensee agrees Licensor owns and will own all right, title, and interest, including all copyrights, in any and all derivative compilations created by Licensee, its users and sublicensees, or any other entity who accesses the Data or Database directly or indirectly through Licensee or any user or sublicensee, whether permitted under this Agreement or not. Licensee hereby assigns all right, title, and interest, including all copyrights, that it might have, if any, in such derivative compilations, whether they originate at Licensee, a user, a sublicensee, or another entity, to Licensor and agrees to sign such further documentation as is necessary, if any, to effect the assignment and agrees to obtain any other documentation needed to effect the assignment, including that from other entities. Licensor retains all right, title, and interest to compilations of the Data. Licensor may elect to license any such derivative compilations to Licensee, but such license does not convey any right, other than the limited use rights, to Licensee.

**USPS Population Mobility Trends**         3

**Data License v. 5/12/23**

7. <u>Modification of This Agreement</u>. LICENSOR reserves the right to change the terms, conditions, and notices under which the Data and Database are licensed. Once YOU agree to the use of data licensed under this Agreement, the terms of such use in place at the time of acceptance shall apply throughout the term of this Agreement; however, USPS may apply any such modifications adopted if YOU pay to continue the use of data in subsequent terms. YOU may review the most current terms and conditions of use at https://postalpro.usps.com/pmt. If YOU do not agree to, or cannot comply with, the Agreement as amended, YOU must stop using the Data and Database. YOU will be deemed to have accepted the Agreement as amended if You continue to use the Data or Database. YOU acknowledge and agree that continued use of the Data or Database, in each instance, is subject to any such changes and that use of the Data or Database constitutes acceptance of such changed terms. YOU agree to review this Agreement from time to time to ensure compliance with these terms and conditions.

8. Delivery.

(a) All deliveries, renewals, and receipts of payment are fulfilled via the USPS Electronic Product Fulfillment ("**EPF**") portal or another portal which may be provided by the USPS. To obtain access to EPF, YOU must complete PS Form 5116, Electronic Product Fulfillment Web Access Request Form located on PostalPro at https://postalpro.usps.com/EPF001. Instructions for form submission, log-in to EPF, etc., are found in PS Form 5116.

(b) YOU are responsible for Logon/Logoff, all actions pertaining to the use of YOUR assigned logon ID, and YOU will not provide YOUR logon ID to another person or entity. YOU agree that access to computer data or files not authorized for YOU is prohibited. YOU understand YOUR logon ID, and access to the Data and Database, may be suspended indefinitely if YOU violate security procedures or fail to provide updated information for the information listed above whenever a material change occurs. YOU agree that misuse of a USPS computer system may result in disciplinary action and/or criminal prosecution as well as being a breach of this Agreement.

(c) YOU further agree that any logon ID will be used solely within the scope authorized from USPS. YOU will ensure that no one in YOUR organization will access EPF or YOUR logon ID except those accessing the Database in accordance with this Agreement (or another applicable agreement with USPS). YOU will periodically review use of the assigned logon ID and computer files and/or data for compliance.

(d) USPS reserves the right to change the terms, conditions, and notices under which EPF is offered. YOU will receive a notice in EPF of any change to the terms, conditions, and notices and YOU may review the most current terms and conditions at the website for EPF or the PostalPro website. If YOU do not agree to, or cannot comply with, the EPF terms, conditions, and notices as amended, YOU must stop using EPF. YOU will be deemed to have accepted the terms, conditions, and notices as amended if YOU continue to use EPF.

**USPS Population Mobility Trends**     4

**Data License v. 5/12/23**

      (e)    EPF provides YOU with the opportunity to implement various USPS services and products, which may be modified or expanded in EPF from time to time. YOU acknowledge and agree that YOUR use of EPF, in each instance, is subject to any such changes. YOU agree to review this Agreement and the EPF site from time to time to ensure compliance with these terms and conditions and any changes thereto.

      (f)    The delivery and availability of the Database is specified in Exhibit D. The delivery and availability of monthly updates is specified in Exhibit D.

    9.    <u>Competitors of USPS</u>. Licensee may not specifically market or promote the Data or the existence of such Data to entities in the mailing and shipping business, including, but not limited to, FedEx, UPS, Amazon, and DHL, (all such entities, "**Competitors of USPS**"), or otherwise solicit Competitors of USPS to make any use of the Data or Database. Notwithstanding any provision in this Agreement to the contrary, no Competitors of USPS may obtain any rights in the Data or Database, and any purported transfer, sale, assignment, grant, or use by any means or method whatsoever shall not grant any rights to Competitors of USPS and shall be null and void ab initio.

10.  <u>Fee and Payment</u>. LICENSEE shall pay LICENSOR the annual fee for each Term ("**Fee**") set forth in the Order Form at the time the Order Form is returned to USPS.

11.  <u>Data Security</u>. LICENSEE shall use all reasonable legal, organizational, physical, administrative, and technical measures, and security procedures to safeguard and ensure the security of the Database and Data and to protect the Database and Data from unauthorized access, disclosure, duplication, use, modification, or loss. LICENSEE will notify LICENSOR within twenty-four (24) hours of any incident involving unauthorized access, disclosure, duplication, use, modification, or loss of the Database or Data to the following email address: jeffrey.j.tackes@usps.gov

12.  <u>DISCLAIMER OF WARRANTIES</u>. THE DATA AND DATABASE IS PROVIDED "AS IS" AND LICENSOR HEREBY DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE. LICENSOR SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT, AND ALL WARRANTIES ARISING FROM COURSE OF DEALING, USAGE, OR TRADE PRACTICE. LICENSOR MAKES NO WARRANTY OF ANY KIND THAT THE DATA OR ANY PRODUCTS OR RESULTS OF ITS USE WILL MEET LICENSEE'S REQUIREMENTS, OPERATE WITHOUT INTERRUPTION, ACHIEVE ANY INTENDED RESULT, BE COMPATIBLE OR WORK WITH ANY SOFTWARE, SYSTEM, OR OTHER SERVICES, OR BE SECURE, ACCURATE, COMPLETE, FREE OF HARMFUL CODE, OR ERROR-FREE.

13. <u>Indemnification</u>. LICENSEE shall indemnify, hold harmless, and, at LICENSOR's option, defend LICENSOR from and against any Losses resulting from any third-party claim based on LICENSEE's: (i) negligence or willful misconduct in using the Data or Database for the Permitted Use; and (ii) use of the Data or Database in a manner not authorized by this Agreement; provided that LICENSEE may not settle any third-party claim against LICENSOR unless such settlement completely and forever releases LICENSOR from all liability with respect to such third-party claim or unless LICENSOR consents to such settlement, and further provided that LICENSOR shall have the right, at its option, to defend itself against any such third-party claim or to participate in the defense thereof by counsel of its own choice. Nothing in this paragraph shall impact the discretion of the United States Department of Justice to take any appropriate action concerning this Agreement.

14. <u>LIMITATIONS OF LIABILITY</u>. IN NO EVENT WILL LICENSOR BE LIABLE UNDER OR IN CONNECTION WITH THIS AGREEMENT UNDER ANY LEGAL OR EQUITABLE THEORY, INCLUDING BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, AND OTHERWISE, FOR ANY (A) CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, ENHANCED, OR PUNITIVE DAMAGES, (B) INCREASED COSTS, DIMINUTION IN VALUE, OR LOST BUSINESS, PRODUCTION, REVENUES, OR PROFITS, (C) LOSS OF GOODWILL OR REPUTATION, (D) USE, INABILITY TO USE, LOSS, INTERRUPTION, DELAY, OR RECOVERY OF ANY DATA OR BREACH OF DATA OR SYSTEM SECURITY, OR (E) COST OF REPLACEMENT GOODS OR SERVICES, IN EACH CASE REGARDLESS OF WHETHER LICENSOR WAS ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES OR SUCH LOSSES OR DAMAGES WERE OTHERWISE FORESEEABLE. IN NO EVENT WILL LICENSOR'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, UNDER ANY LEGAL OR EQUITABLE THEORY, INCLUDING BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, AND OTHERWISE, EXCEED THE FEE PAID TO LICENSOR UNDER THIS AGREEMENT.

15. <u>Term and Termination</u>.

    (a) <u>Term</u>. This Agreement is granted for a term of one year from the date of granting. Approximately sixty days before the end of any term, LICENSOR may, in its sole discretion, offer to renew the Agreement for a one year term, by way of a renewal notice from the USPS EPF portal to LICENSEE. If LICENSEE pays the new Fee, this Agreement will be renewed for an additional one-year term. Without such offer to renew and full payment, no new term will be granted. Each term is also subject to termination and discontinuance as provided in this Agreement.

    (b) <u>Termination</u>.

(i)  LICENSOR may terminate this Agreement, effective on written notice to LICENSEE, if LICENSEE fails to pay any amount when due hereunder or breaches any of its obligations under this Agreement.

(ii)  Either Party may terminate this Agreement, effective on written notice to the other Party, if the other Party materially breaches this Agreement, and such breach: (A) is incapable of cure; or (B) being capable of cure, remains uncured ten days after the non-breaching Party provides the breaching Party with written notice of such breach.

(c)  <u>Additional Termination Rights by Licensor.</u> In the event LICENSOR elects to discontinue licensing the Data and/or Database, USPS shall provide written notice to LICENSEE at least 90 days before the discontinuation date ("**Discontinuation Date**").  In the event the Discontinuation Date occurs after the end of the current Term, LICENSEE may, at LICENSOR's discretion, renew the license for a partial renewal term that ends on the Discontinuation Date ("**Partial Renewal Term**"), provided that LICENSEE pays LICENSOR the pro-rated Fees for the Partial Renewal Term in accordance with this Agreement.  In the event of termination by LICENSOR, LICENSEE may be refunded its Fee on a pro-rata basis unless termination is due to a breach of this Agreement.

(d) <u>Effect of Expiration or Termination</u>. Upon expiration or earlier termination of this Agreement, the license granted hereunder will also terminate.  Upon termination, LICENSEE's obligations under Section 10. (Data Security) will continue.  LICENSEE may continue using Data and Databases in its possession, that LICENSEE has paid for, for the Permitted Use only, but LICENSOR will not deliver any updates to the Data or Database as may be specified elsewhere in this Agreement.  No expiration or termination will affect LICENSEE's obligation to pay all Fees that may have become due before such expiration or termination.

16. <u>Miscellaneous.</u>

(a)  <u>Force Majeure</u>. In no event shall LICENSOR be liable to LICENSEE or be deemed to have breached this Agreement, for any failure or delay in performing its obligations under this Agreement, if and to the extent such failure or delay is caused by any circumstances beyond LICENSOR's reasonable control, including but not limited to acts of God, flood, fire, earthquake, explosion, epidemics, pandemics, war, terrorism, invasion, riot or other civil unrest, strikes, labor stoppages or slowdowns or other industrial disturbances, or passage of law or any action taken by a governmental or public authority, including imposing an embargo.

(b)  <u>Amendment and Modification; Waiver</u>. With the exception of any URLs/internet weblinks, or other terms listed in the Agreement as being subject to change, no amendment to or modification of this Agreement is effective unless it is in writing

**USPS Population Mobility Trends**          7

**Data License v. 5/12/23**

and signed by an authorized representative of each Party. No waiver by any Party of any of the provisions hereof will be effective unless explicitly set forth in writing and signed by the Party so waiving. Except as otherwise set forth in this Agreement, (i) no failure to exercise, or delay in exercising, any rights, remedy, power, or privilege arising from this Agreement will operate or be construed as a waiver thereof and (ii) no single or partial exercise of any right, remedy, power, or privilege hereunder will preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

(c) <u>Severability</u>. If any provision of this Agreement is held to be invalid, illegal, or unenforceable by any court having appropriate jurisdiction, such invalidity, illegality, or unenforceability will not affect any other term or provision of this Agreement. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

(d) <u>Survival</u>. Any rights, obligations, or required performance of the parties in this Agreement which, by their express terms or nature and context are intended to survive termination or expiration of this Agreement, will survive any such termination or expiration, including but not limited to the rights and obligations set forth in Section 3 (Data Use Restrictions), Section 6 (Intellectual Property Ownership), and Section 10 (Data Security).

(e) <u>Governing Law; Venue; Submission to Jurisdiction</u>. This Agreement is governed by and construed in accordance with United States federal law. Venue for any dispute under this Agreement lies in the federal courts for the District of Columbia. Both parties consent and submit to the jurisdiction of the United States District Court for the District of Columbia.

(f) <u>Assignment</u>. LICENSEE may not assign or transfer any of its rights or delegate any of its obligations hereunder, in each case whether voluntarily, involuntarily, by operation of law, or otherwise, without the prior written consent of LICENSOR. Any purported assignment, transfer, or delegation in violation of this Section is null and void. No assignment, transfer, or delegation will relieve the assigning or delegating Party of any of its obligations hereunder. This Agreement is binding upon and inures to the benefit of the Parties hereto and their respective permitted successors and assigns.

(g) <u>Equitable Relief</u>. Each Party acknowledges and agrees that a breach or threatened breach by LICENSEE of any of its obligations under this Agreement would cause the LICENSOR irreparable harm for which monetary damages would not be an adequate remedy and agrees that, in the event of such breach or threatened breach,

the LICENSOR will be entitled to equitable relief, including a restraining order, an injunction, specific performance, and any other relief that may be available from any court, without any requirement to post a bond or other security, or to prove actual damages or that monetary damages are not an adequate remedy. Such remedies are not exclusive and are in addition to all other remedies that may be available at law, in equity, or otherwise.

(h) <u>Examination of Records</u>.  Licensee agrees to keep complete and accurate books of account and records covering all uses of the Data and Database.  USPS and its duly authorized representatives, which may include but not be limited to the USPS Office of Inspector General, the USPS Inspection Service, or any independent group or contractors procured by USPS to audit, shall with ten (10) days prior written notice have the right at all reasonable business hours not more frequently than twice (2) a year to examine such books and records in Licensee's possession or under its control with respect to the subject matter and terms of this Agreement, and shall have free and full access thereto for such purposes and for the purpose of making copies thereof. All such books and records shall be kept available for at least three (3) years after the termination or expiration of this Agreement. If Licensee or its representative confirms an audit field work appointment with the party conducting the audit, and such party is subsequently denied access to Licensee's books and records at such confirmed date and time for any reason, Licensee shall pay all reasonable costs and expenses incurred by such party in traveling to conduct such field work and any penalty imposed by the party.

(i) <u>Sovereign Immunity</u>.  LICENSEE acknowledges and agrees that this Agreement is subject to any legislation that might be enacted by the Congress of the United States or any orders or regulations that might be promulgated any agency, branch, or independent establishment of the United States Government.  Notwithstanding anything to the contrary set forth herein, LICENSEE further acknowledges and agrees that this Agreement in no way waives the LICENSOR's authority to act in its sovereign capacity and that, pursuant to the sovereign acts doctrine, the LICENSOR shall not be held liable for any acts performed in its sovereign capacity, or for any acts performed by any branch, agency or independent establishment of the United States in their sovereign capacities, including the Postal Regulatory Commission, that may directly or indirectly affect the terms of this Agreement.  In the event that LICENSOR or LICENSEE is required by legislation enacted by the Congress of the United States or any orders or regulations that might be promulgated by any branch, agency, or independent establishment of the United States Government to terminate this Agreement, or otherwise as a result of such action is unable to perform its obligations under this Agreement, either Party may give notice of termination, which termination (notwithstanding other provisions of this Agreement), will be effective immediately or the effective date of such requirement, whichever is later.  In the event that this Agreement is terminated as

set forth in this subsection or LICENSOR is enjoined from proceeding with this Agreement by any court of competent jurisdiction, LICENSOR will not be subject to any liability by reason of such termination or injunction.

(j)     Entire Agreement. This Agreement, together with all Exhibits, appendices, schedules, and any other attachments identified herein, the Order Form, and EPF Web Access Request Form, constitutes the sole and entire agreement of the Parties with respect to the subject matter of this Agreement and supersedes all prior and contemporaneous understandings, agreements, and representations and warranties, both written and oral, with respect to such subject matter.

(k)     Notices. Any notice required or permitted to be given under this Agreement shall be in writing and addressed as below (or to such other name and email address as shall be provided to the other Party in writing in advance of any such notice, from time to time):

For USPS:

LICENSING DEPARTMENT
ADDRESSING TECHNOLOGY
UNITED STATES POSTAL SERVICE
225 N HUMPHREYS BLVD STE 501
MEMPHIS TN 38188-1001

For Licensee [name of company]:

Name: _____
Title: _____
Address: _____
Email address: _____

(l)     Counterparts. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement.

*[signature page follows]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date and year written below. Each signatory to this agreement represents that they have authority to sign this agreement and bind their respective party to its terms.

BY SIGNING IN THE SPACE PROVIDED IMMEDIATELY BELOW, LICENSEE ACKNOWLEDGES AND AGREES TO THE TERMS AND OBLIGATIONS OF THIS DATA LICENSE AGREEMENT.

**LICENSEE**

SIGNED: _____

NAME & TITLE: _____

COMPANY:_____

DATE: _____

PLEASE SIGN AND RETURN TO USPS AT THE NOTICES ADDRESS (ABOVE)

**UNITED STATES POSTAL SERVICE**

SIGNED: _____

NAME: Earl L. Johnson, Jr.

TITLE: Director, Addressing Technology

DATE: _____

EXHIBIT A

POPULATION MOBILITY TRENDS (PMT) DATABASE

DESCRIPTIONS AND SAMPLES

Use this link - https://postalpro.usps.com/pmt - to access the following documents, all of which are incorporated herein and made a part of this Agreement:

+ Tech Guide

+ Briefing Sheet

+ Data Sample



**USPS Population Mobility Trends**            12

**Data License v. 5/12/23**

EXHIBIT B

POPULATION MOBILITY TRENDS (PMT) ORDER FORM

The most recent copy may be found on Postal Pro at  https://postalpro.usps.com/pmt



**USPS Population Mobility Trends**          13
**Data License v. 5/12/23**

EXHIBIT C

**List of Subsidiaries and Parent Companies**
(to be provided by Licensee when applicable)



# EXHIBIT D

## Population Mobility Trends Tiers of Access and Usage

| Product | Description | License Requirements |
|---|---|---|
| **Population Mobility Trends 12-Month Historical - Internal** | "Base subscription product" Twelve one-month updates | Internal use only |
| **Population Mobility Trends 12-Month Historical - Limited** | Twelve one-month updates with permission to publish limited summaries | Publish highlights in external media with attribution and disclosure requirements, right to audit, and level of detail/exposure limitations |
| **Population Mobility Trends 48-Month Historical – Internal** | 48M historical data with twelve one-month updates | Internal use only |
| **Population Mobility Trends 48-Month Historical - Limited** | 48M historical data with twelve one-month updates with permission to publish limited summaries | Publish highlights in external media with attribution and disclosure requirements, right to audit, and level of detail/exposure limitations |
| **Population Mobility Trends 48-Month Historical - Enterprise** | 48M historical data with twelve one-month updates with limited distribution to subsidiaries and parent companies, to be listed by Licensee on Exhibit C to this Agreement, which must be shared with and approved by USPS | Sharing of product with subsidiary companies for internal use only |
| **Population Mobility Trends 48-Month Historical – Enterprise R** | Enterprise product renewal consisting of twelve one-month updates with limited distribution to subsidiaries and parent companies, to be listed by Licensee on Exhibit C to this Agreement, which must be shared with and approved by USPS | Sharing of product with subsidiary companies for internal use only |

*Note: More detailed descriptions of each PMT product appear on the pages that follow.*

**USPS Population Mobility Trends**      15

**Data License v. 5/12/23**

## Population Mobility Trends 12-Month Historical - Internal

A tabular dataset built upon aggregated USPS National Change of Address data and 2020 Census demographics (income, age, household size). The data is aggregated to highlight the 9 highest volume destination ZIP Codes (3 local, in-state, and out-of-state) people are migrating to for each source ZIP. Census demographic data is included for the top 3 volume breakdowns by demographic category (income, age, household size). Data is included if the total count of source and destinations exceed a threshold

Usage is restricted to internal purposes only; no derivative works or publication of findings of any kind.

Product is offered as an annual subscription with 12 monthly updates. The file format is comma delimited.

## Population Mobility Trends 12-Month Historical - Limited

A tabular dataset built upon aggregated USPS National Change of Address data and 2020 Census demographics (income, age, household size). The data is aggregated to highlight the 9 highest volume destination ZIP Codes (3 local, in-state, and out-of-state) people are migrating to for each source ZIP. Census demographic data is included for the top 3 volume breakdowns by demographic category (income, age, household size). Data is included if the total count of source and destinations exceed a threshold.

Usage includes rights to publish highlights in external media.
- Attribution and disclosure requirement with right to audit:
    - Must provide USPS the link to article/summary of findings once published
- Permissible Summary Examples:
    - Geometric aggregations that do not expose underlying data (Cities, counties, ZIP3, etc.)
    - Temporal nationwide, statewide, or regionwide trends
    - Qualitative visualizations
    - Heat maps
    - Limited area ranking lists
- Restricted Summaries:
    - Any representation of the underlying data
    - Interactive applications or visualizations that expose underlying data
    - Unaggregated ZIP Code level data
    - Resharing files, including but not limited to subsets beyond article scope, background databases, derivative products

Product is offered as an annual subscription with 12 monthly updates. The file format is comma delimited.

## Population Mobility Trends 48-Month Historical - Internal

A tabular dataset built upon aggregated USPS National Change of Address data and 2020 Census demographics (income, age, household size). The data is aggregated to highlight the 9 highest volume destination ZIP Codes (3 local, in-state, and out-of-state) people are migrating to for each source ZIP. Census demographic data is included for the top 3 volume breakdowns by demographic category (income, age, household size). Data is included if the total count of source and destinations exceed a threshold

Usage is restricted to internal purposes only; no derivative works or publication of findings of any kind.

Product is offered as a one-time 48-month historical file and 12 monthly updates. The file format is comma delimited.

**USPS Population Mobility Trends**          16

**Data License v. 5/12/23**

## Population Mobility Trends 48-Month Historical - Limited

A tabular dataset built upon aggregated USPS National Change of Address data and 2020 Census demographics (income, age, household size). The data is aggregated to highlight the 9 highest volume destination ZIP Codes (3 local, in-state, and out-of-state) people are migrating to for each source ZIP. Census demographic data is included for the top 3 volume breakdowns by demographic category (income, age, household size). Data is included if the total count of source and destinations exceed a threshold.

Usage includes rights to publish highlights in external media.
- Attribution and disclosure requirement with right to audit:
  - Must provide USPS the link to article/summary of findings once published
- Permissible Summary Examples:
  - Geometric aggregations that do not expose underlying data (Cities, counties, ZIP3, etc.)
  - Temporal nationwide, statewide, or regionwide trends
  - Qualitative visualizations
  - Heat maps
  - Limited area ranking lists
- Restricted Summaries:
  - Any representation of the underlying data
  - Interactive applications or visualizations that expose underlying data
  - Unaggregated ZIP Code level data
  - Resharing files, including but not limited to subsets beyond article scope, background databases, derivative products.

Product is offered as a one-time 48-month historical file and 12 monthly updates. The file format is comma delimited.

## Population Mobility Trends 48-Month Historical - Enterprise

A tabular dataset built upon aggregated USPS National Change of Address data and 2020 Census demographics (income, age, household size). The data is aggregated to highlight the 9 highest volume destination ZIP Codes (3 local, in-state, and out-of-state) people are migrating to for each source ZIP. Census demographic data is included for the top 3 volume breakdowns by demographic category (income, age, household size). Data is included if the total count of source and destinations exceed a threshold.

Usage includes rights to sharing of product (derivative works) with subsidiaries and parent companies for internal use only.
- Specific use case must be approved by USPS
- List of subsidiary companies must be shared with and approved by USPS

Product is offered as a one-time 48-month historical file and 12 monthly updates. The file format is comma delimited.

## Population Mobility Trends 48-Month Historical – Enterprise R

A tabular dataset built upon aggregated USPS National Change of Address data and 2020 Census demographics (income, age, household size). The data is aggregated to highlight the 9 highest volume destination ZIP Codes (3 local, in-state, and out-of-state) people are migrating to for each source ZIP. Census demographic data is included for the top 3 volume breakdowns by demographic category (income, age, household size). Data is included if the total count of source and destinations exceed a threshold.

**USPS Population Mobility Trends**          17

**Data License v. 5/12/23**

Usage includes rights to sharing of product (derivative works) with subsidiaries and parent companies for internal use only.
- Specific use case must be approved by USPS
- List of subsidiary companies must be shared with and approved by USPS

Product is offered as an enterprise product renewal with 12 monthly updates. The file format is comma delimited.



**USPS Population Mobility Trends**          18

**Data License v. 5/12/23**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                     :      22cv6112 (DLC)

BLOOMBERG L.P. and DOW JONES &
COMPANY, INC.,                   :

                                     :      OPINION AND ORDER

                     Plaintiffs,    :

                                       :

                -v-                :

                                       :

UNITED STATES POSTAL SERVICE,    :

                                     :

                    Defendant.     :

                                     :
-------------------------------------- X

APPEARANCES:

For the plaintiffs:
Reporters Committee For Freedom of The Press
Katie Townsend
1156 15th Street NW, Suite 1020
Washington, DC 20005

For the defendant:
Tomoko Onozawa
U.S. Attorney's Office, SDNY (Chambers Street)
86 Chambers Street
New York, NY 10007

DENISE COTE, District Judge:

    Bloomberg L.P. ("Bloomberg") and Dow Jones & Company, Inc.

("Dow Jones"; together, "Plaintiffs") have filed suit against

the United States Postal Service ("USPS" or "Defendant") under

the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to

compel production of certain anonymized change-of-address data

("Requested COA Data"). The USPS asserts that the Postal

Reorganization Act exempts production of this data because it is

related to a commercial product of the USPS.  The parties have
cross-moved for summary judgment.  For the reasons that follow,
the motion for summary judgment brought by the USPS is granted.

### Background

The following facts are undisputed.  When individuals,
families, and businesses move and change address, they can
notify the USPS of a temporary or permanent change of address
("COA").  The USPS maintains data for these COA filings.
Summary COA data is publicly available on the USPS website and
is updated monthly.[1]  The publicly available summary data
contains a list of every zip code in the United States; the
total number of COA filings into and out of each zip code; the
total number of individuals, families, and businesses submitting
those COA filings; and the total number of temporary and
permanent COA requests for each month from 2018 to the present.
This data does not include where the COA filers that are moving
from a specific zip code are moving to.

On March 30, 2021, a journalist for Bloomberg CityLab made
a FOIA request for COA data, per zip code, for the month of
December 2020, including origin and destination information for
the COA filings ("Bloomberg FOIA Request").  For example, the
requested data would show how many COA filings indicated moves

---

[1] See FOIA Library, USPS,
https://about.usps.com/who/legal/foia/library.htm.

from one specific zip code to another.  The journalist had received such COA records from the USPS pursuant to FOIA requests filed in December 2020 and February 2021.

On April 19, the USPS denied the Bloomberg FOIA Request pursuant to FOIA Exemption 3, 5 U.S.C. § 552(b)(3), and 39 U.S.C. § 410(c)(2).[2]  The USPS explained that the requested records "qualifie[d] as 'information of a commercial nature' under Section 410(c)(2)" because the information is related to information that is "under development for a commercial product."  The USPS affirmed its decision on July 29.

Dow Jones owns <u>The Wall Street Journal</u> ("WSJ").  On September 15, a WSJ reporter made a FOIA request to the USPS for monthly COA data by county for residential postal customers for January 2021 to June 2021.  Specifically, the reporter asked for an Excel document with the following columns: YYYYMM, Old County, Old State, New County, New State, Total Perm, Total Temp ("Dow Jones FOIA Request").  The USPS had fulfilled similar FOIA requests filed in February and March 2021.

On September 17, the USPS denied the Dow Jones FOIA Request pursuant to Exemption 3, 5 U.S.C. § 552(b)(3), and 39 U.S.C. § 410(c)(2).  The USPS explained that the COA data requested

---

[2] As further described below, 39 U.S.C. § 410(c)(2) exempts from FOIA USPS "information of a commercial nature . . . which under good business practice would not be publicly disclosed."  39 U.S.C. § 410(c)(2).

3

**JA183**

"qualifie[d] as 'information of a commercial nature' under Section 410(c)(2)" because it is related to COA counts by origin and destination which is information that is "currently under development for a commercial product." The USPS continued, "Requests for COA data that seek the originating and destination location, at any level, is no longer releasable under the FOIA." On December 9, the USPS affirmed its decision.

The "commercial product" to which the USPS referred is a licensed data offering called Population Mobility Trends ("PMT"). The USPS launched PMT on May 12, 2023. PMT provides tabular COA data to subscribers. For each ZIP code, PMT shows the top three ZIP codes to which COA filers are moving for (1) moves within the county, (2) moves within the state, and (3) moves outside the state. PMT also includes "the three most prevalent demographic attribute ranges" for temporary, permanent, individual, family, and business filings. The PMT data is refreshed with data from the past 30 days, and subscribers are able to see 12-month and 48-month data sets when setting up the first annual subscription, which include data from the 2019-2020 calendar year.

The Plaintiffs filed this lawsuit on July 18, 2022. USPS moved for summary judgment on December 9. The Plaintiffs cross-moved for summary judgment on January 20, 2023. The motions became fully submitted on March 10.

The evidence submitted with the motions includes the FOIA requests, decisions, and appeals; declarations from the two journalists who made the requests; and a declaration from Jeffrey Tackes ("Tackes Declaration"), the Director, Digital Business Services of the USPS. The Tackes Declaration describes PMT and its development and commercial value to the USPS.

## Discussion

FOIA was enacted in 1966 "to facilitate public access to Government documents." Jabar v. U.S. Dep't of Just., 62 F.4th 44, 49 (2d Cir. 2023) (citation omitted). "FOIA is premised on a policy strongly favoring public disclosure of information in the possession of federal agencies." Id. (citation omitted). "Agencies are required to disclose requested documents unless they fall within an enumerated exemption." Knight First Amendment Inst. at Colum. Univ. v. U.S. Citizenship & Immigr. Servs., 30 F.4th 318, 327 (2d Cir. 2022). The statutory exemptions "do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." Dep't of the Int. & Bur. of Indian Affs. v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8 (2001) (citation omitted). The exemptions are thus to be "given a narrow compass." ACLU v. CIA, 24 F.4th 863, 867 (2d Cir. 2022) (citation omitted).

"FOIA cases are often resolved by summary judgment." Seife v. U.S. FDA, 43 F.4th 231, 238 (2d Cir. 2022). "[A]n agency

5

**JA185**

withholding documents responsive to a FOIA request bears the burden of showing that a FOIA exemption shields the materials at issue." Am. Oversight v. U.S. Dep't of Just., 45 F.4th 579, 587 (2d Cir. 2022).

> A district court may award summary judgment on the basis of agency declarations if the declarations describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record or by evidence of agency bad faith.

ACLU Immigrants' Rts. Project v. U.S. Immigr. & Citizenship Servs., 58 F.4th 643, 651 (2d Cir. 2023) (citation omitted). In other words, the claimed exemption must "appear logical and plausible." Am. Oversight, 45 F.4th at 587 (citation omitted). "Upon such a showing, a plaintiff who nonetheless seeks to compel disclosure must make a showing of bad faith on the part of the agency or provide some tangible evidence that an exemption claimed by the agency should not apply or summary judgment is otherwise inappropriate." Id. (citation omitted). "[A]ll doubts as to the applicability of the exemption must be resolved in favor of disclosure." ACLU, 24 F.4th at 867 (citation omitted). A court "review[s] the adequacy of the agency's justifications de novo." ACLU v. Dep't of Just., 681 F.3d 61, 69 (2d Cir. 2012).

The USPS seeks to withhold material under FOIA Exemption 3.

See 5 U.S.C. § 552(b)(3).

> Exemption 3 allows an agency to withhold information
> from public disclosure if (1) the information is
> specifically exempted from disclosure by statute; and
> (2) the exemption statute requires that the matters be
> withheld from the public in such a manner as to leave
> no discretion on the issue or establishes a particular
> criteria for withholding or refers to particular types
> of matters to be withheld.

ACLU, 24 F.4th at 867 (emphasis added).  "To claim this
Exemption, the government must demonstrate that: (1) the statute
invoked qualifies as an Exemption 3 withholding statute, and (2)
the materials withheld fall within that statute's scope."
Spadaro v. U.S. Customs & Border Protection, 978 F.3d 34, 42 (2d
Cir. 2020) (citation omitted).

The USPS cites 39 U.S.C. § 410(c)(2) ("§ 410(c)(2)") as the
applicable withholding statute, and the Plaintiffs do not
dispute that this provision is a withholding statute under
Exemption 3.  The sole issue in dispute is whether the data
being withheld falls within the scope of § 420(c)(2).

Section 410(c)(2) is a provision of the Postal
Reorganization Act ("PRA"), 39 U.S.C. §§ 101 et seq.  The PRA
was enacted in 1970 "[t]o improve and modernize the postal
service."  Postal Reorganization Act, Pub. L. 91-375, 84 Stat.
719, 719 (1970).  With the PRA, "Congress intended the Postal
Service to be run more like a business than had its predecessor,

7

**JA187**

the Post Office Department." <u>Kuzma v. U.S. Postal Serv.</u>, 798 F.2d 29, 31 (2d Cir. 1986) (citation omitted).

The Committee of Post Office and Civil Service for the House of Representatives, in its Report recommending passage of the Postal Reorganization and Salary Adjustment Act of 1970 or PRA, explained the reasons for this modernization as follows: "For several years there has been a growing awareness -- increasingly widespread and increasingly acute -- that our vast sprawling postal complex is heavily overburdened and deeply in trouble." H.R. Rep. No. 91-1104, at 4 (1970). Among the many problems cited by Congress was the fact that the Post Office was operating "at a huge deficit." <u>Id.</u> at 5. Congress observed that "[a]n effective postal service needs an updated financial policy that is fully responsive to operating needs." <u>Id.</u> The PRA aimed to

> [e]liminate serious handicaps that are now imposed on the postal service by certain legislative, budgetary, financial, and personnel policies that are outmoded, unnecessary, and inconsistent with the modern management and business practices that must be available if the American public is to enjoy efficient and economical postal service.

<u>Id.</u> at 2. In short, Congress wanted the USPS to "become self-sustaining." <u>Id.</u> at 10.

The PRA addresses the extent to which FOIA applies to the USPS. Section 410 of the PRA provides that, except as provided for by subsection (b), "no Federal law dealing with the public .

8

**JA188**

. . including the provisions of chapters 5 and 7 of title 5,
shall apply to the exercise of the powers of the Postal
Service." 39 U.S.C. § 410(a). FOIA is in chapter 5 of title 5
of the U.S. Code. Subsection (b), in turn, states that FOIA
applies to the USPS, id. § 410(b)(1), but subsection (c) creates
several exceptions to FOIA's applicability, id. § 410(c).

The exception to FOIA upon which USPS relies provides that
§ 410(b)(1) "shall not require the disclosure of information of
a commercial nature, including trade secrets, whether or not
obtained from a person outside the Postal Service, which under
good business practice would not be publicly disclosed." Id. §
410(c)(2) (emphasis supplied). The PRA does not define
"commercial nature" or "good business practice."

"When interpreting a statute, [courts] begin with the plain
language of the statute, giving the statutory terms their
ordinary or natural meaning." Spadaro, 978 F.3d at 46 (citation
omitted). "When that meaning is not clear, [courts] make use of
a variety of interpretive tools, including canons, statutory
structure, and legislative history." Id. (citation omitted).
When a term is not defined by statute, courts "look to its
ordinary meaning found in contemporary dictionary definitions"
from when the statute was enacted. Mader v. Experian Info.
Sols., Inc., 56 F.4th 264, 269 (2d Cir. 2023) (citation
omitted).

9

**JA189**

The parties dispute whether the Requested COA Data (1) constitutes "information of a commercial nature," and (2) "would not be publicly disclosed" "under good business practice."  Each prong of § 410(c)(2) will be addressed in turn.

I.    "Information of a Commercial Nature"

The Requested COA Data are "information of a commercial nature" under § 410(c)(2).  In 1970, Black's Law Dictionary defined "commercial" as "[r]elating to or connected with trade and traffic or commerce in general."  Commercial, Black's Law Dictionary (Rev. 4th ed. 1968); see also Commercial, Black's Law Dictionary (5th ed. 1979).  "Commerce," in turn, was defined as "[t]he exchange of goods, productions, or property of any kind."  Commerce, Black's Law Dictionary (Rev. 4th ed. 1968).  "Trade" was defined as "[t]he act or business of exchanging commodities by barter; or the business of being and selling for money."  Trade, Black's Law Dictionary (Rev. 4th ed. 1968).

In 1978, the Court of Appeals for the Second Circuit opined, for purposes of applying Exemption 4 within the FOIA statute itself, that "'Commercial' surely means pertaining or relating to or dealing with commerce."[3]  Am. Airlines, Inc. v. Nat'l Mediation Bd., 588 F.2d 863, 870 (2d Cir. 1978).  In 2007,

---

[3] Under Exemption 4, "trade secrets and commercial or financial information obtained from a person and privileged or confidential" are exempt from FOIA.  5 U.S.C. § 552(b)(4).

the Court of Appeals for the Ninth Circuit surveyed dictionary definitions of the word commercial and concluded that, for purposes of § 410(c)(2) of the PRA, "information is commercial if it relates to commerce, trade, or profit." Carlson v. U.S. Postal Serv., 504 F.3d 1123, 1129 (9th Cir. 2007) (citation omitted).

This broad, commonsense definition of the word commercial compels the conclusion that the Requested COA Data are "information of a commercial nature." To obtain more revenue for itself, USPS has decided to license COA data to subscribers for a fee. Exchanging data for money falls within the plain meaning of the word "commerce" and the term "information of a commercial nature." Because the information sought by the Plaintiffs is being used for commercial purposes by the USPS and is directly related to the USPS's participation in commerce, the information is "of a commercial nature" under § 410(c)(2).

The Plaintiffs put forward two arguments in support of their position that the Requested COA Data are not "information of a commercial nature." First, relying on the Ninth Circuit's decision in Carlson, 504 F.3d 1123, the Plaintiffs assert that, in order for the requested information to be exempt from FOIA under § 410(c)(2), the information must be "of a commercial nature in the first instance." Id. at 1129. Because the Requested COA Data were not commercial "in the first instance,"

11

**JA191**

the Plaintiffs argue, they are not "information of a commercial nature."

This argument fails.  It seeks to add a limitation to the statutory language that does not appear in the statute.  Moreover, Carlson does not support this restrictive reading of the term.  In Carlson, the Ninth Circuit held that § 410(c)(2) did not exempt from FOIA disclosure information about the location of post offices, their telephone numbers, and hours of operation.  Id. at 1128.  The Court of Appeals described the requested information as "[b]asic," id., and observed that the information was "already publicly available" from the USPS.  Id. at 1130.  Neither of these attributes apply to the COA data requested here, and the holding in Carlson is not in tension with a finding that the Requested COA Data is information of a commercial nature.

Next, the Plaintiffs point to caselaw interpreting "commercial" under FOIA Exemption 4.  The Plaintiffs argue that, in the Exemption 4 context, courts in the Second Circuit have rejected a broad reading of the word "commercial" and have instead interpreted FOIA exemptions narrowly.  The district court decisions to which the Plaintiffs point do not suggest that the Requested COA Data is not commercial data.  Indeed, as already noted, in applying FOIA Exemption 4, the Second Circuit

12

has given the word "commercial" a broad reading.  See Am.
Airlines, Inc., 588 F.2d at 870.

II.  "Good Business Practice"

　　　The Requested COA Data are also information that would not
be publicly disclosed under "good business practice."  The
Fourth Circuit has encouraged courts to look "to the commercial
world, management techniques, and business law, as well as to
the standards of practice adhered to by large corporations" in
deciding what constitutes good business practice.  Wickwire
Gavin, P.C. v. U.S. Postal Serv., 356 F.3d 588, 592 (4th Cir.
2004) (citation omitted).  Stated concisely, courts applying
this prong of § 410(c)(2) should do so by "reference to what
businesses normally do."  Id. at 594.

　　　The Requested COA Data is commercial data that would not be
publicly disclosed under good business practice.  As explained
by Tackes in his declaration, location data demonstrating the
movement of people is a valuable commodity, and companies that
sell this information would not ordinarily release that
information for free to the public.  Disclosure through FOIA of
the data underlying the statistics that the USPS seeks to
license through PMT would defeat PMT's revenue-generating
purpose.

　　　The Plaintiffs make two arguments to support their
contention that it is "good business practice" to disclose the

Requested COA Data.  First, the Plaintiffs point to real estate companies that publish "migration" information and a social media company that adopted a "Data for Good" initiative during the COVID-19 pandemic and shared location data it had gathered from its users.  These examples miss the mark.  These businesses were not freely disclosing the information which they were also attempting to sell.  Their business models were not built upon the generation of revenue from the sale of this information.  Their free disclosure of the location data sought to promote their revenue generating lines of business and to burnish their public images.

Second, the Plaintiffs emphasize that their FOIA requests do not seek all of the COA information that will be available to licensees through PMT.  They argue that public disclosure of some of the information available through PMT may even promote PMT and benefit the USPS.  This argument fails.  The USPS has carried its burden to show that it is good business practice not to provide for free the data which it is licensing to generate income.  Having carried that burden, it is entitled to protect its PMT database from public disclosure.  The USPS can decide for itself how much COA data it wishes to share publicly and free of cost.

**JA194**

## Conclusion

The Defendant's December 9, 2022 motion for summary judgment is granted. The Plaintiffs' January 20, 2023 motion for summary judgment is denied. The Clerk of Court shall enter judgement for the Defendant and close the case.

Dated:    New York, New York
          June 13, 2023

_____
DENISE COTE
United States District Judge

**JA195**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
BLOOMBERG L.P. and DOW JONES &
COMPANY, INC.,

|  |  |  |
|---|---|---|
| | Plaintiffs, | 22 **CIVIL** 6112 (DLC) |
| -against- | | **JUDGMENT** |

UNITED STATES POSTAL SERVICE,

Defendant.
-----------------------------------------------------------X

It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion and Order dated June 13, 2023, Defendant's December 9, 2022

motion for summary judgment is granted. The Plaintiffs' January 20, 2023 motion for summary

judgment is denied; accordingly, the case is closed.


**Dated:** New York, New York
June 14, 2023


**RUBY J. KRAJICK**

_____
**Clerk of Court**


BY: _____
**Deputy Clerk**


JA196

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

**BLOOMBERG L.P.**

and

**DOW JONES & COMPANY, INC.,**

        Plaintiffs,

   v.

**UNITED STATES
POSTAL SERVICE,**

        Defendant.

Civil Action No. 22-cv-6112 (DLC)

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Plaintiffs Bloomberg L.P. and Dow Jones & Company, Inc. ("Plaintiffs"), hereby appeal to the United States Court of Appeals for the Second Circuit from the opinion and order entered on June 13, 2023 and the judgment entered on June 14, 2023.

Dated: July 7, 2023

Respectfully submitted,

*/s/ Katie Townsend*
Katie Townsend
N.Y. Bar No. 5480199
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, DC 20005
Phone: 202.795.9300
Facsimile: 202.795.9310
Email: ktownsend@rcfp.org

*Counsel for Plaintiffs*